```
O5A6SKIC                    CIVIL CONFERENCE
```

 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x
     SKILLZ PLATFORM INC.,
 3
                   Plaintiff,
 4
             v.                              24 CV 1646(DLC)
 5
     PAPAYA GAMING, LTD., et al.,
 6
                   Defendants.
 7   ------------------------------x
     BRENNA KELLY-STARKEBAUM,
 8
                   Plaintiff,
 9
             v.                              24 CV 2310(DLC)
10
     PAPAYA GAMING, LTD., et al.,
11
                   Defendants.
12   ------------------------------x
                                             New York, N.Y.
13                                           May 10, 2024
                                             11:30 a.m.
14
     Before:
15
                          HON. DENISE COTE,
16
                                             District Judge
17
                            APPEARANCES
18   KING & SPALDING LLP
          Attorneys for Plaintiff Skillz Platform, Inc.
19   BY:  CRAIG CARPENITO
          JESSICA C. BENVENISTY
20
     BURNS CHAREST LLP
21        Attorneys for Plaintiff BRENNA KELLY-STARKEBAUM
     BY:  MATTHEW S. TRIPOLITSIOTIS
22        CRISTINA R. DELISE

23   SKADDEN ARPS SLATE MEAGHER & FLOM LLP
          Attorneys for Defendant
24   BY:  ANTHONY J. DREYER
          MICHAEL W. McTIGUE, Jr
25        JORDAN FEIRMAN

O5A6SKIC                          CIVIL CONFERENCE

1          (Case called; appearances noted)

2          THE COURT:  Thank you very much.  I appreciate

3   everyone being here.

4          So I have two cases, and one of the issues, as I get

5   more familiar with these cases today, is whether there should

6   be a consolidation or amended pleadings.  But let's just start

7   with giving everybody a brief opportunity to describe to me

8   what this case is about.

9          Mr. Carpenito, we'll begin with you.

10         MR. CAPENITO:  Thank you, your Honor.  I appreciate

11  it.

12         So, your Honor, this action concerns Papaya's

13  fraudulent and anticompetitive conduct stemming from false

14  advertising of mobile games as being "totally fair and

15  skill-based," when in fact they are anything but.

16         My client, Skillz Platform, runs an actually fair

17  human-to-human mobile gaming platform.  Skillz largely created

18  and drove the growth of the mobile gaming market by matching

19  actual people of similar skill levels to play against each

20  other on Skillz Platform.  Skillz takes a nominal fee from each

21  player in exchange for the services of hosting the games.

22         THE COURT:  What is mobile gaming?

23         MR. CAPENITO:  Your Honor, essentially these are games

24  that are on your mobile telephone, things like Solitaire,

25  things like jewel games, yeah.  I have to admit, your Honor, I

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O5A6SKIC                        CIVIL CONFERENCE

1    can't tell you from personal experience, but they seem to

2    occupy my kids.

3              So these mobile games, Skillz sort of pioneered the

4    industry, created this platform, they host these games, they

5    match players, they take a nominal fee for that.  The rest of

6    the players' fees go to the winners of the games.  So, in other

7    words, if you think about it in terms of the gambling, Judge,

8    the house doesn't keep any of the money, and that's a key

9    factor here as to one of the issues that we think is going on

10   with the Papaya platform.

11             Papaya competes with Skillz for market share by

12   falsely and misleadingly representing to the public that it

13   performs a similar service for its players.  But Papaya isn't

14   actually matching human players against each other.  Papaya's

15   games are actually rigged with computer algorithms.  They are

16   called bots in the industry, disguised on Papaya's platform as

17   human players that are predetermined by Papaya to win or lose

18   by cash-paying customers.  This is unregulated gambling, as I

19   was stating, your Honor.  When a bot wins, right, the house

20   actually keeps the money.  So it completely transforms this

21   into a player-to-player situation, to a

22   player-versus-the-company situation.

23             But worst, it's like going to a casino, your Honor,

24   and playing blackjack where only -- not only the dealer, but

25   the other players at the table are actually playing for the

O5A6SKIC                         CIVIL CONFERENCE

1    casino, right, because you think you're playing against other

2    humans, but in reality, you're playing against algorithms that

3    are controlled by the company.  So that's what the case is from

4    our perspective.

5            Papaya hosts approximately 20 million tournaments

6    daily — 20 million — across what it systematically deploys bots

7    to compete against and we believe defraud human players.

8    Notwithstanding its ongoing use of these bots, Papaya continues

9    to advertise its mobile games as, quote/unquote, totally fair.

10   We believe these are misrepresentations to customers.  When

11   confronted by players about Papaya's use of bots, they continue

12   to make these misrepresentations.  We have attached to our

13   complaint numerous instances where players have complained and

14   called them out for bot usage, and they deny that they are

15   using bots.

16           THE COURT:  So the defendant doesn't disclose that it

17   uses bots, but it doesn't say that it uses humans.  You're

18   focused on the phrase "totally fair"?

19           MR. CAPENITO:  Yeah.  We believe, your Honor, that

20   although we know it's their position that they don't advertise,

21   that it's human-to-human play, we think when you take the

22   totality of the communications between players that are

23   complaining, it's done in a fashion that is meant to dissuade

24   these people from believing that there's bot usage in these

25   games.

O5A6SKIC                          CIVIL CONFERENCE

1        THE COURT:  I'm sorry.  So it's the defendant's

2    responses to complaints that is misleading?

3        MR. CAPENITO:  As well as the way they are advertising

4    the game, your Honor.

5        THE COURT:  And the advertising that's misleading is

6    the use of the phrase "totally fair"?

7        MR. CAPENITO:  And skill-based, your Honor.

8        THE COURT:  And skill-based.

9        MR. CAPENITO:  Correct.

10        THE COURT:  Good.  Thank you so much.

11        MR. CAPENITO:  Thank you, your Honor.

12        THE COURT:  Mr. Tripolitsiotis.

13        MR. TRIPOLITSIOTIS:  Thank you, your Honor.

14    Matt Tripolitsiotis on behalf of Brenna Kelly-Starkebaum.

15        We largely agree with what Mr. Carpenito said, and it

16    is the same sort of conduct here.  They have a competitor

17    complaint, and we have a class complaint that seeks to

18    represent all users of the service.

19        The one note I add to what was said is how it's

20    marketed.  These are top apps on the App Store or on

21    Google Play.  And they are marketed to consumers as a

22    skills-based gaming.  And so, for example, you'll have ten

23    people who have the same solitary deck, where the deck is set

24    up the same way, and the question is, who can clear the deck

25    the fastest.  But it's not skill-based, it's based on chance,

O5A6SKIC                        CIVIL CONFERENCE

1    it's based on odds, it's based on how much they want to win --

2    how much the defendants want to win.

3          So what we're seeking to do is kind of the other side

4    of the coin of what the competitor is trying to do and protect

5    the consumers here.

6          I don't want to go too much more.  It would prejudice

7    things.  As your Honor knows, we agreed to enter into mediation

8    discussions with the defendants, so I think I'll stay there

9    unless your Honor has questions.

10         THE COURT:  The phrase, again, that you're focused on

11   that you think is the false advertising is skill-based?

12         MR. CAPENITO:  That's one of them.  There's a

13   plethora.  When a player plays the game, for example, it claims

14   that it's going through a matching process, where it's matching

15   you with other players, and it has a picture of a map, and it's

16   scanning for other players and shows you pictures of the

17   players.  So the whole experience tells the user, this is

18   skill-based, we just have a small rake, as you would see in a

19   poker game, and that's where our interest is in this case.

20         THE COURT:  So when they are showing who they are

21   matching you with, the universe of matches, they are showing

22   faces of individuals?

23         MR. TRIPOLITSIOTIS:  Faces.

24         THE COURT:  -- as a false impression that it's

25   individuals?

O5A6SKIC                        CIVIL CONFERENCE

1          MR. TRIPOLITSIOTIS:  Yes.  Sometimes it's an icon.

2    Sometimes someone can use like a bitmoji-type thing, if your

3    Honor is familiar with that in messages.  It's like a cartoon

4    figure of someone's face.  And sometimes it's an actual

5    picture.

6          THE COURT:  The impression, though, is it's with other

7    human beings.

8          MR. TRIPOLITSIOTIS:  Absolutely.  And Papaya tells us

9    when people complain, they respond and say we have a matching

10   system where you will be matched against other people of

11   similar skill.  It pervades the entire platform.

12         THE COURT:  Okay.  Good.  Thank you.

13         Mr. Dreyer.

14         MR. DREYER:  Thank you, your Honor.  Understandably,

15   we take exception to a lot of what you've heard today, and

16   we've addressed a lot of that in our motion to dismiss.

17         THE COURT:  I have not read that.

18         MR. DREYER:  No, I understand that.  I understand.

19         In terms of the company itself, Papaya is an

20   Israeli-based gaming company.  Unlike Skillz, which simply

21   hosts other people's games, Papaya develops its own games, and

22   they have five games as described here.  The central allegation

23   that's actually in both complaints that you touched on is the

24   claim to consumers that the games are fair and skill-based, and

25   we stand behind that.  We believe the games are fair and

O5A6SKIC                        CIVIL CONFERENCE

1   skill-based.  The complaints don't point to any statements by

2   Papaya that the human -- the opponents are all human.  That's

3   not in the complaint, and they haven't identified any such

4   statements.  The focus is on fair and skill-based.

5        In fact, the complaint by Skillz concedes that when

6   consumers have asked whether Papaya is using computer opponents

7   or not, they have not denied the presence of computer

8   opponents.

9            THE COURT:  They have not denied the presence of?

10           MR. DREYER:  Computer opponents, bots.

11           THE COURT:  Computer opponents.

12           MR. DREYER:  Yes.

13       Moreover, this notion of fake faces, that is not an

14   allegation in the complaint.  Any player can have an avatar,

15   they can get their cartoon character, they can use a photo.  I

16   don't believe there are any allegations in the complaint that

17   there are actual fake human photos posing as bots.  And

18   obviously, we can deal with that if that's the case.

19       In terms of this notion of bots, at the pleading

20   stage, we have not denied the use of bots.  We think

21   nonetheless the complaint fails to state a claim.

22       And while we are not going to argue the motion to

23   dismiss today — I know better than that — our view is that the

24   sole basis they rely on to say the games are not fair or

25   skill-based are these anonymous customer complaints, reported

O5A6SKIC                          CIVIL CONFERENCE

1    customer complaints, that claim the game is not fair because

2    they lost more than they should have.  But these games are

3    tournament-based.  You have 5, 10, 20 players in the

4    tournament.  You take a 10-player tournament, and each player

5    is evenly matched, you would expect them to win only one out of

6    every ten times.  And every tournament, more players lose than

7    win.  That's an example of skill-based.

8            There's no other evidence to support these allegations

9    that computerized opponents, if we accept them as true, are not

10   skill-based.  And we all know computer opponents can and often

11   are, in games, programmed at a skill level.  So we don't think

12   there's enough basis in the case, period, to support this

13   allegation that the games are not fair and skill-based.

14           THE COURT:  So if one of those ten players is the

15   company's bot, are they winning more than ten percent of the

16   time?

17           MR. DREYER:  I mean, there's no allegation of that in

18   the complaint, to my knowledge.

19           THE COURT:  I know, but there will be discovery.

20           MR. DREYER:  No, I understand.  Look, I can represent

21   to the Court as --

22           THE COURT:  Perhaps, perhaps.

23           MR. DREYER:  Sure, perhaps.

24           As I represented to Skillz counsel yesterday as part

25   of our meet and confer in advance of this conference, I

O5A6SKIC                           CIVIL CONFERENCE

1    represented to them, I represent to the Court, the games as

2    currently constituted do not use bots.  Every single opponent

3    is a human opponent.

4           We have retained an outside expert, FTI, to look at

5    the games as currently constituted.  All of the opponents,

6    historic, that are playing the game, or all of the games, are

7    human opponents.  As a historical use, that requires a longer

8    look-back.  As I represented to counsel, we are having experts

9    look at that.  We're not in a position yet to speak to the

10   historical use.  For purposes of the motion to dismiss, we have

11   not denied that allegation.

12          THE COURT:  Okay.  This is sort of important to hear

13   for me.  So currently, you're not using bots?

14          MR. DREYER:  Correct, your Honor.  And as I

15   represented to counsel, we're getting a certification from FTI.

16   It's an internationally renowned consultant.  We are more than

17   happy to provide that certification to counsel for both

18   plaintiffs in both cases.  And if the Court would like to see

19   that, we're happy to provide that to the Court as well.

20          THE COURT:  No, I don't need to see it.  Thanks.

21          MR. DREYER:  I'm sure you have enough to read, your

22   Honor.

23          THE COURT:  I rely on the parties to give me what I

24   need to read.  Thank you.

25          MR. DREYER:  So in terms of the matters, obviously

O5A6SKIC                         CIVIL CONFERENCE

1    there are other arguments in the motion to dismiss, which will

2    be for another day, but that's our view of the facts which are

3    obviously much different.

4              THE COURT:  Okay.  So thank you for yesterday's

5    proposed schedule.

6              So the defendants filed a motion to dismiss the Skillz

7    complaint on May 6.  Is Skillz planning to amend?

8              MR. CAPENITO:  No, we're not, your Honor.  We believe

9    that our complaint is sufficient and vital on its face.  We

10   don't believe any of the issues that have been raised by the

11   defense have merit amending the complaint.  There are numerous

12   factual issues in the case if your Honor wants -- I know your

13   Honor probably does not want to go through a motion to dismiss

14   today, but we think that the motion to dismiss filed fails to

15   meet the standard under 12(b)(6).

16             THE COURT:  Thank you.  So as you understand from my

17   May 8 order, it's unlikely the plaintiff will have a further

18   opportunity to amend.  Great.

19             So with respect to the class action, the defendants

20   are answering by August 16 with a motion to dismiss or

21   otherwise.  And so the parties have agreed among themselves,

22   essentially, that the competitor's case will be the lead case,

23   and the class action case will follow.

24             Let me look at your proposed schedule.  You're making

25   initial disclosures May 24.  That's fine.

O5A6SKIC                    CIVIL CONFERENCE

1            MR. DREYER:  Your Honor, forgive the interruption.  I

2      think we submitted competing proposals.  We couldn't meet an

3      agreement on when discovery would start or...

4            THE COURT:  Oh.

5            MR. DREYER:  The length of the discovery.

6            THE COURT:  Oh, let me look at this now.  Great.  You

7      put it in one document.  Thank you.

8            So, as I understand it, if Papaya is only matching

9      human-to-human players and isn't matching human players with

10      bots, the theory of the Skillz case evaporates.  I just wanted

11      to make sure I understand that right, Mr. Carpenito.

12            MR. CAPENITO:  Yeah, I think largely, your Honor, it

13      would.

14            THE COURT:  What would be left?

15            MR. CAPENITO:  There are other, I believe,

16      misrepresentations we believe are occurring with regards to the

17      way the games operate.  But the corpus of the case is really

18      about the use of bots.

19            THE COURT:  I haven't heard anything else.

20            MR. CAPENITO:  Thank you.  We agree, your Honor.

21            THE COURT:  Okay.  Good.

22            So what is the current plan with respect to informal

23      disclosures and mediation of these cases before a

24      full-fledged -- what's the schedule there?  Does someone have

25      one?

O5A6SKIC                          CIVIL CONFERENCE

1          MR. TRIPOLITSIOTIS:  Your Honor, we're separate on

2     this.  So for the class case, we have agreed with counsel for

3     the defendants to do informal disclosures of information that

4     would help facilitate and evaluate any potential early

5     settlement.  We have agreed to produce those materials under

6     FRE 408 in advance of the mediation scheduled for July 17.

7          THE COURT:  And who are you using for mediation?  And

8     outside --

9          MR. TRIPOLITSIOTIS:  It's Robert Meyer.

10          THE COURT:  That's fine.  But someone else outside of

11     the court system?

12          MR. TRIPOLITSIOTIS:  Yes, your Honor.

13          THE COURT:  And that's scheduled for July 17?

14          MR. TRIPOLITSIOTIS:  Yes, your Honor.

15          THE COURT:  Okay.  Good.  And on Skillz?

16          MR. DREYER:  On the Skillz case, your Honor,

17     particularly in light of what we represented to counsel

18     yesterday, our view is this case is also appropriate for early

19     mediation and resolution.  We've not received a response yet

20     from the plaintiffs, but we think it would be perfectly

21     appropriate to prepare to mediate.

22          THE COURT:  Mr. Dreyer, is there any reason from the

23     defendant's point of view not to fold in Skillz on the same

24     schedule that governs the class action mediation?  Maybe not

25     the same sessions, but the same schedule.

O5A6SKIC                    CIVIL CONFERENCE

1          MR. DREYER:  I mean, I'd have to check with the

2     client, but I think we'd certainly be amenable to mediating in

3     the next two months assuming -- the one mediation may take away

4     the timing and availability of the other.  But on a similar

5     track, without question, we'd be prepared to do that, your

6     Honor.

7          THE COURT:  And Mr. Carpenito.

8          MR. CAPENITO:  Yes, your Honor.  We have not reached

9     agreement, and we actually believe that we need expedited

10    discovery in our matter.  We agree, your Honor, that the core

11    issue here is whether or not they are using bots.  There are a

12    couple issues I'd like to raise that we believe justify

13    expedited discovery.

14          I'll start with the first one, which we raised on

15    Wednesday with Mr. Dreyer.  We believe that there has been

16    witness tampering here by Papaya.  And we'll explain to you --

17          THE COURT:  How can you tamper with a witness?  It's

18    the underlying functionality of the game.

19          MR. CAPENITO:  So we were contacted by a Papaya

20    platform user who is an attorney.  He contacted and spoke to

21    Ms. Benvenisty.  The player laid out for us the complaints he

22    had about the platform and offered to provide us with materials

23    that would help us prove allegations in the complaint.  We had

24    a conversation about this individual.  He was going to send us

25    this information.  He told us he was contacted and in

O5A6SKIC                        CIVIL CONFERENCE

1    discussions with a lawyer for Papaya — not someone from

2    Skadden, but another attorney outside.

3         That lawyer sought to reach a financial settlement

4    with him on his complaints, and as a condition of that, wanted

5    him to agree he would not cooperate further or talk to Skillz.

6    The attorney told us that the lawyer for Papaya brought up

7    Skillz, not him, and that he was told as a condition of a

8    financial settlement, he would have to provide all evidence he

9    had against Papaya to the company.

10        THE COURT:  But he's not an insider of the defendant,

11   he's a player in the game?

12        MR. CAPENITO:  Correct, your Honor.  But a witness

13   that contacted us that believed that they could cooperate in

14   our case against Papaya.  And a financial settlement was

15   reached, we understand, and we had no further contact from him.

16   The player will no longer return any of the outreach from

17   Ms. Benvenisty.

18        THE COURT:  So the defendants settled with a

19   complainant, with a nondisclosure agreement.

20        MR. CAPENITO:  And specifically sought return of

21   evidence that the player says is relevant in this litigation.

22        THE COURT:  Right.  But it's not like that person, an

23   outsider, can destroy evidence that you could obtain in

24   discovery from the defendant.

25        MR. CAPENITO:  I think there's no way for us to know

O5A6SKIC                    CIVIL CONFERENCE

1    that, your Honor.  I understand why you're saying it, but

2    there's no way for us to know what he has or what exists.  And

3    we don't know how many other players have had similar

4    complaints and have been approached by the company about

5    resolving a case with an agreement not to cooperate with our

6    complaint.  We just don't know it's out there.

7          So from our perspective, what we're going to ask the

8    Court for is expedited discovery on the issue of player

9    complaints and settlements that were reached, a preservation

10   order for any of the evidence that existed with regards to

11   these individuals.

12         THE COURT:  Well, certainly a preservation order is

13   appropriate for both Skillz and Papaya's own internal

14   documentation.  And who is taking the laboring oar on that?

15         MR. CAPENITO:  We'll take the laboring oar on

16   drafting --

17         THE COURT:  Good.  Can you get a draft to the

18   defendant next week?

19         MR. CAPENITO:  Absolutely, your Honor.

20         MR. DREYER:  Your Honor, I represent that the duty

21   launched -- I mean we have the hold in place and have since the

22   start of -- the litigation in hold in place, and we have since

23   the start of the litigation.  So whatever customer complaints

24   exist on the system are locked down.  We have them.

25         THE COURT:  Right.  There's a litigation hold.

O5A6SKIC                    CIVIL CONFERENCE

1          MR. CAPENITO:  And we would ask the Court for

2     expedited discovery on this particular issue of the attempts to

3     stop players on the platform from cooperating with Skillz.

4          THE COURT:  I'm not going to do that now.  You may

5     reapply.  But what I am going to do is make sure that there is

6     a schedule in place for informal discovery so the defendant can

7     show to Skillz' satisfaction, if it is true, that it is not

8     currently using bots as players in the game.  And if that is

9     true, then this becomes an historical case.  I'm not saying

10    that's not important, but it's a different kind of case, and

11    therefore, I would like -- and I take it, Mr. Dreyer, you're

12    happy to share that informal discovery with Skillz also to show

13    that there's no current use of bots as players?

14         MR. DREYER:  Yes, your Honor.  We're happy to work

15    through it.

16         Two caveats, which I'm sure the Court appreciates:

17    One, these are direct competitors, so we'll obviously need a

18    very tight outside counsels' eyes only/expert eyes only

19    protective order in place.  They've indicated they want our

20    source code, which is like Pepsi asking for the formula to

21    Coke.

22         THE COURT:  Right.  It's not going to be the source

23    code.

24         MR. DREYER:  Right.  So we have to work through those

25    issues.

O5A6SKIC                     CIVIL CONFERENCE

1           And then the other overlay, which is navigable but I

2      just want to flag for the Court, as I flagged for plaintiffs'

3      counsel, is because our data, our servers are located in

4      Israel, we're subject to Israeli data protection law.  So we

5      may have to go through the Hague for some of this.  We'll fully

6      cooperate, but I just want to make sure my client is protected,

7      and isn't accused of a civil or criminal violation of the data

8      privacy/data protection laws.

9           So it's navigable, and we'll work very cooperatively

10     with plaintiffs' counsel to do that, but that's our view.

11     Through that process, we'll get to where we need to get.

12           THE COURT:  So whether or not the informal disclosures

13     that are completed by the end of June, such that you can

14     prepare for a mid-July mediation, I would like, Mr. Carpenito,

15     for you to participate in a mid-July mediation on the

16     assumption that there's no current use of bots as players.

17           MR. CAPENITO:  Okay.

18           THE COURT:  Assuming, again, that the disclosures

19     you've received through the end of June are all indicating

20     that.  Of course, all bets are off — ha-ha — if the defendant

21     can't satisfy you of that ultimately.  But it's a very

22     different case, as we've all agreed, if what we're talking

23     about is historical use only.  And there can also be, of

24     course, an agreement going forward of what's fair or fair

25     notice to each other and what's appropriate, and I leave that

O5A6SKIC                          CIVIL CONFERENCE

1    to counsel to negotiate with.

2              But I'll have a motion to dismiss to decide.  You will

3    have one good early chance at mediation in July.  And,

4    Mr. Carpenito, do you want to use the same mediator?  I think

5    that makes sense, maybe not on the same -- because of

6    efficiencies of one person getting up to speed as opposed to

7    multiple.  But why don't you discuss that with Mr. Dreyer,

8    whether you want a different mediator.  And of course I can

9    give you a court mediator.

10             MR. CAPENITO:  Your Honor, we have to consult with our

11   client.

12             THE COURT:  Sure.  Sure.

13             MR. CAPENITO:  Obviously --

14             THE COURT:  But what I am -- I'm ordering that this

15   informal disclosure take place and that there be a mid-July

16   mediation in good faith between the parties.  So,

17   Mr. Carpenito, you can obviously tell your client that the

18   Court has ordered this.

19             MR. CAPENITO:  Of course.

20             THE COURT:  And consult with them about whether they

21   want a different mediator than the one we'll be having in the

22   class action.

23             MR. CAPENITO:  That's what I was referring to, your

24   Honor.  Of course.

25             THE COURT:  Of course.  No.  I'm hoping the order will

O5A6SKIC                        CIVIL CONFERENCE

1    be helpful to you and your client.  And so I'm going to want a

2    status letter, because I'll probably have another conference.

3    This case, as I see it, will have a certain configuration if

4    it's just an historical case, and a different configuration if

5    it's not so confined.  And so it may be that we need to see

6    each other two weeks, late July or mid-August or something.

7            So I'm going to ask for a status letter from the

8    parties.  And then we'll set a conference schedule and a

9    further schedule for litigation, assuming the motion to dismiss

10   is denied.

11           MR. TRIPOLITSIOTIS:  Your Honor.

12           THE COURT:  Yes.

13           MR. TRIPOLITSIOTIS:  If I may.  You did set a second

14   scheduling conference, status conference in the class case for

15   July 23 following the mediation.  I don't know if you want to

16   use that same day for both or set a new date.

17           THE COURT:  Thank you.  I'm going to switch that to a

18   July 23 status letter.

19           MR. TRIPOLITSIOTIS:  Okay.

20           THE COURT:  In both cases.  Because I think the

21   likelihood that a July 17 mediation, as optimistic as I might

22   be, will bring you to the point where you really can consult

23   with each other meaningfully about the next stage is unlikely,

24   so we'll have status letters due July 23 for all cases with

25   proposals for next steps.

O5A6SKIC                        CIVIL CONFERENCE

1        MR. CAPENITO:  And, your Honor, if I may go back to

2   the question of this informal discovery.  I just want to be

3   clear with the Court that we've shared with opposing counsel

4   that we may be moving for a preliminary injunction.  That's

5   what led to a discussion about the certification.  My concern

6   about the certification, your Honor, is that it's a document,

7   or an --

8        THE COURT:  What certification?

9        MR. CAPENITO:  The certification that's been offered

10  by Papaya relating to the current status of its platform and

11  unused bots is that, although FTI may be known to us, they've

12  been retained by Papaya, and any certification is going to be

13  one prepared by the defendants.  So without a mechanism to test

14  the veracity of the certification, I don't know that there's

15  going to be any ability to get comfortable that these bots are

16  really not being used going forward.

17       THE COURT:  You're entitled to getting a level of

18  comfort, and the defendant sounds like it's going to be well

19  motivated to give you that comfort.  So consult away.

20  Obviously if I can be of assistance at any point, I'm happy to.

21  But if this case is going to be resolved with respect to

22  current usage, you have to be made comfortable.

23       MR. CAPENITO:  Understood, your Honor.

24       THE COURT:  Good.  And any party has a right to bring

25  a motion permitted by the federal rules at any time.  They

O5A6SKIC                        CIVIL CONFERENCE

1    don't need my permission in advance.  So if there comes a point

2    in which the plaintiff feels it needs to bring a motion for

3    preliminary injunction, if it can be brought in good faith, you

4    may bring it.

5            I suggest you consult with your adversary or other

6    counsel with respect to the schedule.  But, obviously, the hope

7    here is that you can rely on the good faith of defense counsel,

8    as they are making these representations on the record and in

9    open court that they've done their due diligence to confirm to

10   their satisfaction that bots are not being used now in the game

11   by the defendant.  But you're entitled to get that satisfaction

12   and comfort level yourself.

13           MR. CAPENITO:  Thank you, your Honor.

14           THE COURT:  Good.  Good luck, everyone.

15           (Adjourned)

16

17

18

19

20

21

22

23

24

25