## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SKILLZ PLATFORM INC.,<br>a Delaware corporation,<br><br>　　　Plaintiff,<br><br>　　　　　　-against-<br><br>PAPAYA GAMING, LTD., a foreign<br>corporation; and PAPAYA GAMING, INC.,<br>a Delaware corporation,<br><br>　　　Defendants. | Civil Action No.: 1:24-cv-01646<br><br><br><br>Hon. Denise L. Cote |
| PAPAYA GAMING, LTD.,<br><br>　　　Counterclaim-Plaintiff,<br><br>　　　　　　-against-<br><br>SKILLZ PLATFORM INC.,<br><br>　　　Counterclaim Defendant, | |

## PLAINTIFF SKILLZ PLATFORM INC.'S MEMORANDUM OF LAW IN SUPPORT OF ITS OMNIBUS *DAUBERT* MOTION TO EXCLUDE CERTAIN OPINIONS AND TESTIMONY OF PAPAYA'S EXPERTS

## TABLE OF CONTENTS

Page

I.    PRELIMINARY STATEMENT ............................................................................ 1

II.   BACKGROUND ................................................................................................ 4

    A.    Litigation History and Relevant Facts ....................................................... 4

    B.    Papaya's Experts ...................................................................................... 6

III.  LEGAL STANDARD ....................................................................................... 10

IV.  ARGUMENT .................................................................................................... 12

    A.    The Court Should Exclude All Affirmative Opinions of Jonathan Orszag
        and Portions of His Rebuttal Testimony Because Mr. Orszag Is Not
        Qualified, His Testimony Serves as a Conduit for Papaya to Present
        Inadmissible Hearsay, His Methodologies Are Unreliable, His Testimony
        Is Not Based on Sufficient Facts or Data, and His Testimony Will Not
        Assist the Trier of Fact. ........................................................................... 12

        1.    Mr. Orszag's affirmative opinions and testimony should be
            excluded in their entirety. ............................................................... 17

            i.    Mr. Orszag has no basis for the central assumption upon
                which the entirety of his damages opinion relies. .......................... 17

            ii.    Mr. Orszag's inconsistent application of the economic
                concepts he relies on to the facts of this case renders his
                affirmative opinions unreliable. ................................................... 20

                a.    Mr. Orszag does not measure Skillz's increased revenue or
                    profit arising out of the alleged false advertising. ............. 20

            iii.   Mr. Orszag fails to accurately calculate the economic
                 impact of          players and Skillz in his but-for world. ......... 22

            iv.    Mr. Orszag fails to properly apply the economic concept
                of "compensating variation" to the players in a Skillz's
                tournament. ................................................................................ 24

            v.    Mr. Orszag is not qualified to testify regarding the
                propriety of Skillz's matchmaking algorithms or state of
                mind, and he cannot serve as a conduit of hearsay for
                Papaya. ...................................................................................... 26

        2.    Portions of Mr. Orszag's rebuttal opinions and testimony should
            be excluded. ................................................................................. 29

Table of Contents (continued)

Page

i.   Mr. Orszag's speculative testimony that players may prefer Papaya's ▉ over Skillz's matchmaking practices should be excluded. ...................................................................... 29

ii.  Mr. Orszag speculation regarding Mr. Bergman's analysis of Papaya's financial statements should be excluded. .................. 31

iii. Mr. Orszag's testimony regarding the RTP of Papaya's ▉ should be excluded as not helpful to the trier of fact. .......... 32

iv.  Mr. Orszag's testimony and opinions relying on a report from an anonymous short-seller should be excluded as unreliable. ......................................................................... 34

B.  The Court Should Exclude Certain Testimony and Opinions of Papaya's Survey Experts, Dr. Bruce Isaacson and Healey Whitsett, Because Their Surveys Are Unreliable and Will Not Assist the Trier of Fact. ............................ 35

   1.  Dr. Bruce Isaacson's survey, and all opinions and testimony connected therewith, are unreliable and will not assist the trier of fact. ........................................................................................ 36

       i.   Dr. Isaacson's survey fails to get to the heart of Skillz's advertising and will be unhelpful to the trier of fact. ................... 38

       ii.  Dr. Isaacson failed to survey the appropriate universe. ............... 40

       iii. Dr. Isaacson used an inappropriate stimulus. ............................... 42

       iv.  Dr. Isaacson used improper leading questions aimed to push Papaya's theory of liability. ..................................................... 43

       v.   Dr. Isaacson's improper, biased coding did not accurately report the data gathered by his survey. .......................................... 46

       vi.  The cumulative flaws in Dr. Isaacson's survey warrant exclusion. ............................................................................................ 47

   2.  Healey Whitsett's survey should be excluded because she surveyed the improper universe, used a flawed stimulus, and the cumulative flaws in her survey warrant exclusion. .................................... 48

       i.   Ms. Whitsett failed to survey the appropriate universe. ............... 49

       ii.  Ms. Whitsett's survey used an inappropriate stimulus. ................. 49

       iii. The cumulative flaws in Ms. Whisett's survey warrant exclusion. ............................................................................................ 52

Table of Contents (continued)

Page

C.   The Court Should Exclude The Testimony of Dr. Randall Heeb Because
He Is Unqualified, His Testimony Is Irrelevant And Misleading, and His
Methodology Is Inconsistent and Unreliable. ...................................... 52

    1.   Dr. Heeb's testimony should be excluded because he is
unqualified to opine on the use of ▆▆ in real-money skill-based
mobile games. ................................................................................ 53

    2.   Dr. Heeb's opinions should be excluded because they lack any
factual support ............................................................................... 57

    3.   Dr. Heeb's opinion that the underlying games offered by Papaya
when played only by humans—separate from Papaya's ▆▆
▆▆▆▆▆▆ structure—are games of skill is irrelevant
and unhelpful to the trier of fact. ............................................... 61

D.   The Court Should Exclude the Testimony of Cristoffer Holmgård
Because His General Assertions About Artificial Intelligence in Video
Games Do Not Apply to Papaya's ▆▆ He Simply Repeats Hearsay
from Papaya, and His Testimony Is Unreliable and Unhelpful. ........................ 65

    1.   Dr. Holmgård's assertions about ▆▆ in the video games industry
are not "sufficiently tied to the facts of the case" because they
plainly do not apply to Papaya's practices or Skillz's claims in
this litigation ................................................................................. 66

    2.   Dr. Holmgård's opinions will not assist the trier of fact because
he relies only on Papaya's own representations without any
independent analysis ....................................................................... 69

V.   CONCLUSION ..................................................................................... 70

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*523 IP LLC v. CureMD.Com,*
    48 F. Supp. 3d 600 (S.D.N.Y. 2014)........................................................................68

*In re Acetaminophen - ASD-ADHD Prods. Liab. Litig.,*
    707 F. Supp. 3d 309 (S.D.N.Y. 2023)......................................................................11

*Amorgianos v. Nat'l R.R. Passenger Corp.,*
    303 F.3d 256 (2d Cir. 2002)..............................................................................11, 12

*AngioDynamics, Inc. v. C.R. Bard, Inc.,*
    2022 WL 4333555 (N.D.N.Y. Sept. 19, 2022) ........................................................73

*Arche, Inc. v. Azaleia, U.S.A., Inc.,*
    882 F. Supp. 334 (S.D.N.Y. 1995) ..........................................................................49

*Arista Recs. LLC v. Usenet.com, Inc.,*
    608 F. Supp. 2d 409 (S.D.N.Y. 2009)..............................................................*passim*

*B & R Supermarket, Inc. v. Visa Inc.,*
    2024 WL 4252031 (E.D.N.Y. Sept. 20, 2024) ..................................................59, 63

*Bank of Am., N.A. v. Bear Stearns Asset Mgmt.,*
    969 F. Supp. 2d 339 (S.D.N.Y. 2013).....................................................................11

*Bayoh v. Afropunk LLC,*
    2020 WL 6269300 (S.D.N.Y. Oct. 26, 2020) (Cote, J.) .............................12, 19, 29

*Bazarian Int'l Fin. Assocs., LLC v. Desarrollos Aerohotelco, C.A.,*
    315 F. Supp. 3d 101 (D.D.C. 2018).........................................................................69

*Bd. of Trs. of AFTRA Ret. Fund v. JPMorgan Chase Bank, N.A.,*
    2011 WL 6288415 (S.D.N.Y. Dec. 15, 2011) .........................................................60

*Bracco Diagnostics, Inc. v. Amersham Health, Inc.,*
    627 F. Supp. 2d 384 (D.N.J. 2009) .........................................................................42

*Buckley v. Deloitte & Touche USA LLP,*
    888 F. Supp. 2d 404 (S.D.N.Y. 2012), *aff'd,* 541 Fed. Appx. 62 (2d Cir. 2013) ..............33, 59

*Bustamante v. KIND, LLC,*
    100 F.4th 419 (2d Cir. 2024) .............................................................................37, 40

*Conopco, Inc. v. Cosmair, Inc.*,
    49 F. Supp. 2d 242 (S.D.N.Y. 1999)................................................................43

*Coty Inc. v. Excell Brands, LLC*,
    277 F. Supp. 3d 425 (S.D.N.Y. 2017)........................................................38, 47

*Daniels-Feasel v. Forest Pharms., Inc.*,
    2021 WL 4037820 (S.D.N.Y. Sept. 3, 2021)..................................15, 25, 27, 28

*Daubert v. Merrell Dow Pharms., Inc.*,
    509 U.S. 579 (1993)......................................................................... *passim*

*Dyson, Inc. v. Bissell Homecare, Inc.*,
    951 F. Supp. 2d 1009 (N.D. Ill. 2013)..............................................................49

*Edmondson v. RCI Hosp. Holdings, Inc.*,
    2020 WL 1503452 (S.D.N.Y. Mar. 30, 2020).................................................37

*In re Elec. Books Antitrust Litig.*,
    2014 WL 1282298 (S.D.N.Y. Mar. 28, 2014) (Cote, J.)................................ *passim*

*In re Elysium Health-ChromaDex Litig.*,
    2022 WL 421135 (S.D.N.Y. Feb. 11, 2022).............................................21, 38, 43

*Fin. Guar. Ins. Co. v. Putnam Advisory Co.*,
    2020 WL 4251229 (S.D.N.Y. Feb. 19, 2020)........................................34, 35, 36, 64

*Franklin Res., Inc. v. Franklin Credit Mgmt. Corp.*,
    988 F. Supp. 322 (S.D.N.Y. 1997).................................................................40

*Friesland Brands, B.V. v. Vietnam Nat'l Milk Co.*,
    221 F. Supp. 2d 457 (S.D.N.Y. 2002).........................................................37, 49, 53

*Estate of Jaquez v. City of New York*,
    104 F. Supp. 3d 414 (S.D.N.Y. 2015), *aff'd sub nom. Estate of Jaquez by Pub.*
    *Adm'r of Bronx Cnty. v. City of New York*, 706 Fed. Appx. 709 (2d Cir. 2017)....................55

*Jones v. Varsity Brands, LLC*,
    2024 WL 457173 (W.D. Tenn. Feb. 6, 2024)..............................................19, 20

*In re KIND LLC "Healthy & All Natural" Litig.*,
    627 F. Supp. 3d 269 (S.D.N.Y. 2022), *aff'd sub nom. Bustamante v. KIND*,
    *LLC*, 100 F.4th 419 (2d Cir. 2024).........................................................45, 46, 47, 49

*Koehler v. Infosys Techs. Ltd. Inc.*,
    628 F. Supp. 3d 835 (E.D. Wis. 2022)..........................................................56

*Kwan Software Eng'g, Inc. v. Foray Techs., LLC*,
    2014 WL 572290 (N.D. Cal. Feb. 11, 2014) ........................................................41

*Lebron v. Sec'y of Fla. Dept. of Child. & Fams.*,
    772 F.3d 1352 (11th Cir. 2014) ..................................................................56, 59

*In re Lyondell Chem. Co.*,
    558 B.R. 661 (Bankr. S.D.N.Y. 2016)..................................................1, 15, 28, 31

*M.B. v. CSX Transp., Inc.*,
    130 F. Supp. 3d 654 (N.D.N.Y. 2015)..............................................................56

*Magallon v. Robert Half Int'l, Inc.*,
    743 F. Supp. 3d 1237 (D. Or. 2024) ...............................................................64

*Malletier v. Dooney & Bourke, Inc.*,
    525 F. Supp. 2d 558 (S.D.N.Y. 2007)..........................................................13, 49

*Merck Consumer Pharms. Co. v. Smithkline Beecham Corp.*,
    960 F.2d 294 (2d Cir. 1992)......................................................................38, 39

*In re Mirena IUS Levonorgestrel-Related Prods. Liab. Litig.* (No. I),
    982 F.3d 113 (2d Cir. 2020)......................................................................11, 59

*In re Mirena IUS Levonorgestrel-Related Prods. Liab. Litig.* (No. II),
    341 F. Supp. 3d 213 (S.D.N.Y. 2018)..............................................................56

*Orbital Eng'g, Inc. v. Buchko*,
    578 F. Supp. 3d 736 (W.D. Pa. 2022)..............................................................68

*Orthoflex, Inc. v. ThermoTek, Inc.*,
    986 F. Supp. 2d 776 (N.D. Tex. 2013) .............................................................72

*In re Paoli R.R. Yard PCB Litig.*,
    35 F.3d 717 (3d Cir. 1994)........................................................................12, 34

*Revlon Consumer Prods. Corp. v. Jennifer Leather Broadway, Inc.*,
    858 F. Supp. 1268 (S.D.N.Y. 1994), *aff'd*, 57 F.3d 1062 (2d Cir. 1995) ...............49

*In re Rezulin Prods. Liab. Litig.*,
    309 F. Supp. 2d 531 (S.D.N.Y. 2004)................................................10, 11, 12, 21

*Schering Corp. v. Pfizer Inc.*,
    189 F.3d 218 (2d Cir. 1999), *amended on reh'g* (Sept. 29, 1999)..............37, 41, 49

*Scott v. Chipotle Mexican Grill, Inc.*,
    315 F.R.D. 33 (S.D.N.Y. 2016) ..................................................................31, 33

*Scotts Co. v. United Indus. Corp.*,
   315 F.3d 264 (4th Cir. 2002) ............................................................45

*Shreve v. Sears, Roebuck & Co.*,
   166 F. Supp. 2d 378 (D. Md. 2001) ..............................................11, 56, 59

*Starter Corp. v. Converse, Inc.*,
   170 F.3d 286 (2d Cir. 1999) ............................................................49

*State Farm Fire & Cas. Co. v. Electrolux Home Prods., Inc.*,
   980 F. Supp. 2d 1031 (N.D. Ind. 2013) ......................................18, 36, 72

*Trouble v. The Wet Seal, Inc.*,
   179 F. Supp. 2d 291 (S.D.N.Y. 2001) ..............................................43, 52

*U.S. Commodity Futures Trading Comm'n v. Wilson*,
   2016 WL 7229056 (S.D.N.Y. Sept. 30, 2016) ....................................60

*United States v. Cruz*,
   363 F.3d 187 (2d Cir. 2004) ............................................................11

*United States v. Downing*,
   753 F.2d 1224 (3d Cir. 1985) ....................................................17, 34, 63

*United States v. Patel*,
   2023 WL 2643815 (D. Conn. Mar. 27, 2023) ....................................60

*Universal City Studios, Inc. v. Nintendo Co.*,
   746 F.2d 112 (2d Cir. 1984) ..........................................................45, 47

*Volkswagen Astiengesellschaft v. Uptown Motors*,
   1995 WL 605605 (S.D.N.Y. May 11, 1995) ........................................45

*Weight Watchers Int'l, Inc. v. Stouffer Corp.*,
   744 F. Supp. 1259 (S.D.N.Y. 1990) ..................................................41

*Weisgram v. Marley Co.*,
   528 U.S. 440 (2000) ......................................................................11

*Wood v. Credit One Bank*,
   277 F. Supp. 3d 821 (E.D. Va. 2017) ..............................................56, 59

## Statutes

Lanham Act ...............................................................................*passim*

New York General Business Law ...................................................*passim*

## Other Authorities

Federal Rule of Evidence 702 ...................................................................................... *passim*

Federal Rule of Evidence 403 ...................................................................................... *passim*

Pursuant to Federal Rules of Evidence 702 and 403, Plaintiff Skillz Platform Inc. ("Skillz") submits this Memorandum of Law in Support of its Omnibus *Daubert* Motion to exclude certain opinions and testimony of the expert witnesses designated by Papaya Gaming, Ltd. ("Papaya").

## I.     PRELIMINARY STATEMENT

Left unable to elicit testimony from its own witnesses, Papaya improperly attempts to rely on expert witnesses to defend its secret ███████ and prove up its baseless counterclaims. Papaya could not find experts with experience in the real-money skill-based ("RMSB") gaming industry and instead hired people who claim to have expertise in—among other things—patent damages, antitrust liability, merger guidelines, and tax reform. In exchange for top-dollar fees, these experts are willing to act as mouthpieces, spinning Papaya's factual narratives without a shred of reliable testimony from any witness with personal knowledge of Papaya's business practices. Indeed, the only Papaya employee that Papaya's experts have ever spoken to is Papaya's general counsel. "Such cherry-picking and editorializing" by testifying experts "is exactly the type of 'factual narrative' that courts routinely exclude because it invades the province of the factfinder by merely 'regurgitat[ing] the evidence.'" *In re Lyondell Chem. Co.*, 558 B.R. 661, 668 (Bankr. S.D.N.Y. 2016) (*quoting In re Fosamax Products Liab. Litig.*, 645 F. Supp. 2d 164, 196 (S.D.N.Y. 2009)).

All five of Papaya's testifying experts are attempting to offer inadmissible testimony that must be excluded under *Daubert*:

*First,* Jonathan Orszag—an economist by training with no experience in skill-based mobile gaming—seeks to offer extensive non-economic testimony regarding matchmaking algorithms in the RMSB gaming industry, an area admittedly outside of his area of expertise. His testimony about Skillz's matchmaking systems is contradicted by the evidence and culminates in an

unreliable calculation of Skillz's purported profits from using the ███████████████

███████, according to Mr. Orszag's say-so, matches players unevenly."

In rebuttal to Skillz's claims, Mr. Orszag speculates that players may prefer to play against

Papaya's ███ instead of participating on a platform like Skillz's, that employs matchmaking

techniques to balance fairness with entertainment *without* ███████████████. Mr. Orszag

also criticizes the damages estimates of Skillz's expert, James Bergman, using unreliable

techniques. For example, Mr. Orszag selectively applies the economic principle he purports to rely

on to "jerry-rig" his damages calculations and relies upon factual assumptions central to his

analysis that have no evidentiary basis and are not within his scope of his expertise. Mr. Orszag

further seeks to opine that Mr. Bergman erred in interpreting the parties' financial statements

(despite admitting he has no basis for this opinion), and relies upon an inherently unreliable

"report" from an anonymous short-seller (which he misleadingly tries to pass off ███████

diligence report) in an effort to downplay the harm Papaya's ███ caused to Skillz. Mr. Orszag's

opinions—which far exceed the scope of his qualifications, constitute factual testimony lacking

foundation, and are the result of dubious methodologies—have been excluded as unreliable in the

past, including by this Court. These opinions are therefore inadmissible.

*Second*, Papaya's two survey experts—Dr. Bruce Isaacson and Healey Whitsett—intend to

present to the jury the results of two surveys in support of Papaya's false advertising counterclaims

that, in essence, asked respondents to read the literal words on two Skillz webpages without asking

respondents what they understood those words to mean. Dr. Isaacson and Ms. Whitsett conducted

no analysis supporting their decision to show survey respondents lengthy webpages to approximate

the impressions of consumers in the RMSB gaming industry, who interact with Skillz's and

Papaya's products in app stores and other mobile applications. Both Dr. Isaacson and Ms. Whitsett

further tested statements summarizing Papaya's interpretation of Skillz's webpages, not the webpages themselves. Dr. Isaacson further applied a subjective "coding" methodology that was inherently biased against measuring the reaction of consumers most relevant to this litigation: whether people are willing to play RMSB games against undisclosed bots that give the "house" (like Papaya) an unfair advantage. Accordingly, Dr. Isaacson and Ms. Whitsett's affirmative opinions should be excluded.

*Third*, Papaya's rebuttal expert, Dr. Randall Heeb, is an economist with no experience in the RMSB gaming industry who intends to present a statistical analysis of Papaya's game log data that, in his inexpert opinion, suggests Papaya's intent behind its creation and employment of its undisclosed ████. Dr. Heeb has no foundation to reliably testify *on behalf of Papaya* as to Papaya's intent when *zero* of Papaya's percipient witnesses testified about the subject, particularly when he ignores the only competent evidence in the record that *could* indicate Papaya's intention: the thousands of contemporaneous communications by Papaya's executives that have been produced in this litigation. Dr. Heeb also uses Papaya's own metrics—again, without any specialized analysis that he is qualified to conduct—to argue that ████████ enhanced the gaming experience" for Papaya's users and that such users actually "benefited" from Papaya's ████████ Dr. Heeb sets forth no economic or other technical standard for assessing the intent behind Papaya's ████████ which cause his opinions to invade the province of the trier of fact. Most glaringly, Dr. Heeb opines that Papaya's game titles when played by *humans* who are *not* ████████ are "skill-based." This testimony is irrelevant and will be highly confusing to the jury because it completely misses the point of Skillz's claims in this litigation: that Papaya's advertisements are false because its tournament structure, which has been fueled by its ████████ its product unfair, gives Papaya a vested interest in who wins or loses, and causes

Papaya to profit more depending on the outcomes of its tournaments that ███████████████ ████████████ Thus, Dr. Heeb's opinions should be excluded.

*Fourth and finally*, Papaya's industry rebuttal expert, Dr. Cristoffer Holmgård, seeks to offer purely irrelevant testimony about the use of artificially intelligent characters in video games. ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████ And Papaya does not offer traditional video games to the public; instead, it is selling the opportunity to play games of skill *for cash prizes* while deceptively ████████████████████████████████████ Yet, Dr. Holmgård confusingly opines that Papaya's product being part of the RMSB gaming industry is "of no material consequence" to his analysis. Worse, Dr. Holmgård conducted no analysis that actually applies his general knowledge of artificial intelligence to Papaya's actual conduct in this case, relied entirely on the hearsay testimony of Papaya's corporate witness in support of his description of Papaya's system, and despite opining at length about ███████████████████ actually testified that the question of whether Papaya should or should not have ███████████ is outside the scope of his expertise. For these reasons and others, the entirety of Dr. Holmgård's testimony is inadmissible under *Daubert*.

Papaya's proffered expert testimony should be therefore excluded or significantly limited as explained in greater detail below.

## II.    BACKGROUND

### A.    Litigation History and Relevant Facts

Skillz filed this litigation on March 4, 2024, asserting claims of false advertising under the Lanham Act and violations of New York General Business Law (N.Y. G.B.L.) § 349. ECF No. 1 at 1. The central allegation underlying Skillz's claims is that Papaya deceptively deploys bots

against unsuspecting U.S. customers who wager cash on Papaya's platform, all while falsely advertising that its games are "totally fair" and "skill-based." Unable to deny Skillz's allegations, Papaya launched ten baseless counterclaims as a distraction. ECF No. 89. Only two such claims have survived to this point: Papaya's Lanham Act and N.Y. G.B.L. § 349 claims alleging that Skillz falsely advertised the nature of its own games. *See* ECF Nos. 234, 277.

Document discovery in this case has unequivocally shown that ██████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ Skillz was prevented from discovering the story behind Papaya's ████████████████████████ ████████████████████████████ because *every single one* of Papaya's percipient witnesses invoked their Fifth Amendment rights to avoid testifying about either ████████████████ the purported harm giving rise to Papaya's counterclaims against Skillz. This substantial evidentiary gap left Skillz's experts with a bare documentary record and the deposition testimony of Papaya's corporate representative, who has no firsthand knowledge about ████████████████████████ ████████████████████████ and began working at Papaya only two months before this lawsuit was filed. Ex. G (Revah Dep.) 10:13-17; 22:7-8; 106:13-18. In contrast, Papaya has full deposition

testimony from five Skillz employees with knowledge of Skillz's advertising, matchmaking processes, and the harm caused by Papaya's fraudulent competitive strategies.

### B. Papaya's Experts

Papaya disclosed five testifying experts in this action. Notably, *none* of Papaya's experts has any experience in the RMSB industry, and none of them offer evidence supporting Papaya's claimed harm, a necessary element of its counterclaims and certain affirmative defenses and on which Papaya bears the burden of proof.

In support of its counterclaims that Skillz falsely advertises the nature of its product, Papaya designated three experts: Bruce Isaacson and Healey Whitsett (both survey experts), and a damages expert, Jonathan Orszag. In response to Skillz's claims that Papaya lied to consumers about its illicit bot scheme, Papaya submitted four expert rebuttal reports. Three of these experts (Mr. Orszag, Dr. Heeb, and Dr. Holmgård) offer factual assertions in defense of ████████ that find zero support in the record.

Relevant here, Papaya's five experts offer the following opinions, which Skillz seeks to exclude under *Daubert* and Federal Rules of Evidence 702 and 403:

1. **Jonathan Orszag**, an economist and Founding Partner at Econic Partners, LLC, was disclosed to affirmatively testify in support of Papaya's false advertising counterclaims to the following opinions:





2.      Mr. Orszag was also disclosed to rebut the testimony of Skillz's damages expert,

James Bergman, by offering the following opinions:

████████████████████████████████████

████████████████████████████████████

3.    **Dr. Bruce Isaacson**, the Senior Managing Director of the Litigation Surveys & Consumer Science group at MMR Strategy Group, was disclosed to testify in support of Papaya's false advertising counterclaims by offering a survey he conducted. Dr. Isaacson contends that this survey shows:

- "Skillz webpages… communicate to a substantial percentage of respondents that players will always be matched with other players who are equally skilled" (Ex. J (Isaacson Rpt.) ¶ 34);

- "Skillz webpages do not communicate to a substantial percentage of respondents that the longer they wait to be matched with another player, the less likely it will be that the other player will be at their skill level." (*Id.*); and

- "Skillz webpages do not communicate to a substantial percentage of respondents that if they are on a winning streak, they will be matched with other players in a way that makes it likely that they will lose their next match." (*Id.*).

4.    **Healey Whitsett**, a Director at NERA, intends to testify in support of Papaya's false advertising counterclaims by proffering a survey she conducted about the materiality of certain statements on Skillz's website to consumer behavior. In Ms. Whitsett's opinion:

- The four "messages" that Dr. Isaacson purportedly measured as being communicated by Skillz's website are "material to consumers" (Ex. K (Whitsett Rpt.) ¶ 12).

5.   **Dr. Randall Heeb**, a senior managing director of FTI Consulting and an economist, was proffered by Papaya in rebuttal to Skillz's industry expert, Dr. José Zagal, to opine that:



6.   **Dr. Cristoffer Holmgård**, the founder and owner of modl.ai, was disclosed in rebuttal to Skillz's industry expert, Dr. José Zagal. Dr. Holmgård seeks to testify that:



This testimony and opinions should be excluded or significantly limited under Rule 702 and 403 for the reasons articulated below.

### III.    LEGAL STANDARD

Federal Rule of Evidence 702 governs the admissibility of expert testimony. *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 539–40 (S.D.N.Y. 2004). In determining whether to admit any particular expert opinion, the trial court acts as a "gatekeeper" to ensure that the testimony is both relevant and reliable. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993). This is a three-prong inquiry, which requires that the expert (1) is qualified to testify competently on matters which he intends to opine on; (2) reaches his conclusions using reliable methodology; and (3) offers testimony that will assist the trier of fact. *Rezulin*, 309 F. Supp. 2d at 539–40 (citations omitted). The proponent of an expert's testimony bears the burden of proving each of these three elements by a preponderance of the evidence. *Bank of Am., N.A. v. Bear Stearns Asset Mgmt.*, 969 F. Supp. 2d 339, 349 (S.D.N.Y. 2013).

First, the proponent must show the expert is qualified by "demonstrat[ing] to the court that it is more likely than not that... the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." *In re*

*Acetaminophen - ASD-ADHD Prods. Liab. Litig.*, 707 F. Supp. 3d 309, 334 (S.D.N.Y. 2023) (quoting Fed. R. Evid. 702). Any opinions proffered by the expert must clearly fit within the scope of this "specialized knowledge." *United States v. Cruz*, 363 F.3d 187, 194 (2d Cir. 2004) ("[D]istrict courts, in their role as gatekeepers, must be ever vigilant against expert testimony that could stray from the scope of a witness' expertise."); *Shreve v. Sears, Roebuck & Co.*, 166 F. Supp. 2d 378, 391 (D. Md. 2001) ("The fact that a proposed witness is an expert in one area, does not *ipso facto* qualify him to testify as an expert in all related areas.").

Second, expert testimony must meet "exacting standards of reliability." *Weisgram v. Marley Co.*, 528 U.S. 440, 455 (2000). In evaluating reliability, the court must rigorously examine the data and methodology underlying proffered expert opinions. *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002); *see also In re Mirena IUS Levonorgestrel-Related Prods. Liab. Litig.* (No. I), 982 F.3d 113, 123 (2d Cir. 2020) (a court must "undertake a *rigorous examination* of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand") (cleaned up) (emphasis in original). "[I]t is critical that an expert's analysis be reliable at every step." *Amorgianos*, 303 F.3d at 267.

Third and finally, the proffered expert testimony must "assist the trier of fact to understand the evidence or to determine a fact in issue." *Rezulin*, 309 F. Supp. 2d at 540. This prong is also known as "helpfulness" or "fit," and is "akin to the relevance requirement of Rule 401," but it goes even "beyond mere relevance" because it requires the testimony to share a "valid scientific connection to the pertinent inquiry." *Id*. This means that "even if an expert's proposed testimony constitutes scientific knowledge, his or her testimony will be excluded if it is not scientific knowledge *for purposes of the case*." *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 743 (3d Cir.

1994) (emphasis in original). "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Bayoh v. Afropunk LLC*, 2020 WL 6269300, at *4 (S.D.N.Y. Oct. 26, 2020) (Cote, J.) (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)).

In addition to these three elements, Federal Rule of Evidence 403 is particularly important in governing the admissibility of expert evidence. *In re Elec. Books Antitrust Litig.*, 2014 WL 1282298, at *7 (S.D.N.Y. Mar. 28, 2014) (Cote, J.). Rule 403 permits the exclusion of evidence "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. Because of "the risk that the jurors... give undue deference" to expert testimony, *Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 649 (S.D.N.Y. 2007), and the "difficulty in evaluating" expert testimony, Rule 403 allows judges to "exercise[] more control over experts than over lay witnesses." *In re Elec. Books*, 2014 WL 1282298, at *7 (*quoting Daubert*, 509 U.S. at 595).

## IV.    ARGUMENT

### A.    The Court Should Exclude All Affirmative Opinions of Jonathan Orszag and Portions of His Rebuttal Testimony Because Mr. Orszag Is Not Qualified, His Testimony Serves as a Conduit for Papaya to Present Inadmissible Hearsay, His Methodologies Are Unreliable, His Testimony Is Not Based on Sufficient Facts or Data, and His Testimony Will Not Assist the Trier of Fact.

Papaya retained economist Jonathan Orszag to: (1) opine on Papaya's purported damages arising out of its counterclaims against Skillz; and (2) rebut the damages analysis submitted by Skillz's damages expert, James Bergman, and portions of the testimony offered by Skillz's gaming expert, Dr. José Zagal.

Mr. Orszag performed no economic analysis regarding how Skillz's use of ████████

████████████████████████████████████████████████████████████████████████████

████████, Mr. Orszag opines that, through the application of the economic concept of

"compensating variation," an economically rational player who ██████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████. Although Mr. Orszag acknowledged that because, ██████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████. Nor does Mr.

Orszag's "but-for world" where players are not told they will be ██████████████████████

████████████████████████████████████████████████████████████████████████████

[REDACTED] *See In re Elec. Books*, 2014 WL 1282298, at \*16 (excluding Mr. Orszag's testimony that "rests on layers of assumptions, many of which are untethered to the real world or at odds with the facts"); *Daniels-Feasel v. Forest Pharms., Inc.*, 2021 WL 4037820, at \*17 (S.D.N.Y. Sept. 3, 2021) (excluding expert testimony that only included half of an equation, because "the unreliability of her methodology is... revealed by her inconsistent application of the principles she claims to respect").

Mr. Orszag also seeks to offer affirmative opinions and testimony on the propriety of

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████ 'no more than counsel … will do in argument'" and is exactly the type of "cherry-picking and editorializing" from experts that courts in this jurisdiction routinely exclude'. *In re Lyondell Chem. Co.*, 558 B.R. 661, 668–69 (Bankr. S.D.N.Y. 2016) (collecting cases) (cleaned up).

Mr. Orszag's rebuttal report fares no better. ***First***, without any economic analysis or other basis within his area of expertise, Mr. Orszag extensively speculates that players may ██████ ██████████████████████████████████████████████████

██████████████ These ungrounded opinions that fail to represent "a considered and developed economic analysis that would be of assistance to a jury" and "merely invite the jury's speculation" appear to be a specialty of Mr. Orszag's that this Court has correctly excluded in the past. *In re Elec. Books*, 2014 WL 1282298, at *15–18 (barring Mr. Orszag's testimony under Rules 702 and 403 "[f]or the absence of the same level of intellectual rigor that characterizes the practice of an expert economist, for its flawed assumptions, and for its invitation to engage in guesswork.") (cleaned up).

***Second***, Mr. Orszag opines that ████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████ and merely invites the trier of fact to speculate

regarding Papaya's possible accounting practices without any basis in the record. *See In re Elec.*

*Books*, 2014 WL 1282298, at *15.

   ***Third***, ██████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████ *See United States v. Downing*, 753 F.2d 1224, 1237 (3d Cir. 1985).

   ***Fourth***, Mr. Orszag ████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████ *See State Farm Fire & Cas.*

*Co. v. Electrolux Home Prods., Inc.*, 980 F. Supp. 2d 1031, 1049 (N.D. Ind. 2013) (excluding testimony of expert who received data from interested party, and "admittedly did nothing to independently verify the reliability of this information before she used it in her calculations").

For these reasons and as further discussed below, the entirety of Mr. Orszag's affirmative opinions and portions of Mr. Orszag's rebuttal testimony and opinions should be excluded under Federal Rules of Evidence 702 and 403.

   **1.**  **Mr. Orszag's affirmative opinions and testimony should be excluded in their entirety.**

      **i.**  **Mr. Orszag has no basis for the central assumption upon which the entirety of his damages opinion relies.**

████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████ *Id.* 34:19-35:7.

Mr. Orszag's analysis relies entirely on the assumption that when Skillz says ███████

███████████████████████████████████████████████████████████████

██████████████████████████████ Ex. H (Orszag Rpt.) ¶ 10.███

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

"[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Bayoh*, 2020 WL 6269300, at *4 (Cote, J.). Putting aside the fact that ████████████████

███████████████████████████████████████ as courts across the country have held, including with respect to Mr. Orszag's own opinions, "[i]f an expert is relying on their 'practical experiences,' their report must include 'how and why the expert reached a particular result, not merely the expert's conclusory opinions.'" *Jones v. Varsity Brands, LLC*, 2024 WL 457173, at *3 (W.D. Tenn. Feb. 6, 2024) (excluding Mr. Orszag's opinions as conclusory, unsupported, and therefore unreliable) (internal citations omitted). As in this case, "[b]ecause

Orszag appears to be relying primarily on his experience, rather than any methodology, he must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." *Id.* at *4 (cleaned up). Mr. Orszag offers no such explanation in his affirmative report and could not point to any during his deposition, either. Accordingly, given that Mr. "Orszag does not connect the dots between his opinions and his prior experience; he simply offers his opinions without any rationale to support his conclusions," his unsupported damages opinion should be excluded as unreliable. *Id.*



*In re Elec. Books*, 2014 WL 1282298, at *17.

Mr. Orszag performed no such analysis. Mr. "Orszag therefore has no basis for the central

assumption in his string of assumptions," and his opinion should be excluded as unreliable. *Id.*; Fed. R. Evid. 702(b) (requiring expert testimony to be "based on sufficient facts or data").



*Rezulin*, 309 F. Supp. 2d at 540 (finding expert testimony must assist the trier of fact to understand the evidence or to determine a fact in issue); *In re Elec. Books*, 2014 WL 1282298, at *17 (excluding Mr. Orszag's opinions because, among other reasons, he had no basis for a central assumption underlying his analysis). Accordingly, Mr. Orszag's affirmative damages calculations should be excluded in their entirety pursuant to Rules 702 and 403.

> **ii.    Mr. Orszag's inconsistent application of economic principles to the facts of this case renders his affirmative opinions unreliable.**

>> **a.    Mr. Orszag does not measure Skillz's increased revenue or profit arising out of the alleged false advertising.**

Even if Mr. Orszag had a basis for the assumptions used in his calculations (he does not), he still fails to reliably calculate Skillz's profits gained from its alleged false advertising. Under the Lanham Act, a party may be entitled to recover a defendant's profits arising out of the alleged false advertising. *In re Elysium Health-ChromaDex Litig.*, 2022 WL 421135, at *18 (S.D.N.Y. Feb. 11, 2022).



b. **Mr. Orszag fails to accurately calculate the economic impact of DOM on players and Skillz in his but-for world.**



███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████

     The entire premise of Mr. Orszag's damages theory is that ███████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████ *In re Elec. Books*, 2014 WL 1282298, at \*16–18 (Cote, J.) (excluding Mr.

Orszag's "jerry-rigged" calculations that rested "on layers of assumptions, many of which are

untethered to the real world or at odds with the facts" as unreliable); Fed. R. Evid. 702(d) (expert's

opinion must "reflect[] a reliable application of the principles and methods to the facts of the case").

### c. Mr. Orszag fails to properly apply the economic concept of "compensating variation" to the players in a Skillz tournament.

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████ *Daniels-Feasel*, 2021 WL 4037820, at *17 (excluding expert testimony that only included half of an equation, because "[t]he unreliability of her methodology is thus revealed by her inconsistent application of the principles she claims to respect")██████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████ support of this hypothesis, Mr. Orszag

relies on the definition of "compensating variation" contained in *The MIT Dictionary of Modern Economics*:

> The compensating variation is the maximum amount of income that could be taken from someone who gains from a particular change while still leaving him no worse off than before the change. The compensating variation of the loser from some change is the minimum amount he would require following the change to leave him as well off as he was prior to the change.

*Id.* ¶ 29, n.43; Ex. Q (Excerpt of *The MIT Dictionary of Modern Economics*) at 78. By the plain language of the definition, the "compensating variation" applies both to individuals who "gain" from a specific change as well as those who "lose" from a specific change.[1]

In the context of ███████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

---

[1] ████████████████████████████████████████████████

████████████ Ex. P (Bergman Rebuttal Rpt.) ¶ 31.

[REDACTED]

[REDACTED] This inconsistent, biased application of economic principles is unreliable and should be excluded. *In re Elec. Books*, 2014 WL 1282298, at *16–17 (Cote, J.) (excluding Mr. Orszag's "jerry-rigged" calculations that rested "on layers of assumptions, many of which are untethered to the real world or at odds with the facts" as unreliable); *Daniels-Feasel*, 2021 WL 4037820, at *17 (excluding expert testimony that only included half of an equation, because "[t]he unreliability of her methodology is thus revealed by her inconsistent application of the principles she claims to respect").

### iii. Mr. Orszag is not qualified to testify regarding the propriety of Skillz's matchmaking algorithms or state of mind, and he cannot serve as a conduit of hearsay for Papaya.

In addition to offering unreliable damages analysis, Mr. Orszag's affirmative report includes extensive testimony regarding the propriety of Skillz's use of [REDACTED]

[REDACTED]

*First,* Mr. Orszag's affirmative report offers extensive discussion regarding ███████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

██████████████████████████████. Such non-technical testimony beyond the scope

of the witness's expertise is routinely excluded by courts. *Lyondell Chem.*, 558 B.R. at 668–69

(finding courts routinely exclude expert testimony that selects, organizes, and characterizes

excerpts of the record as factual narratives). ████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

██████████████████████████████████████ This is not appropriate expert testimony

and should be excluded. *Bayoh*, 2020 WL 6269300, *5 (excluding *ipse dixit* assertions from expert

who did not apply any rigorous analysis or methodology to arrive at his opinion) (Cote, J.); *In re*

*Elec. Books*, 2014 WL 1282298, at *16 (Cote, J.).

[REDACTED]

*In re Elec. Books*, 2014 WL 1282298, at
*17 (Cote, J.) (excluding Mr. Orszag's opinion because, among other reasons, Mr. Orszag had no basis for a central assumption underlying his analysis).

Second, [REDACTED]

[REDACTED]

. *Arista Recs. LLC v. Usenet.com*,

*Inc.*, 608 F. Supp. 2d 409, 424 (S.D.N.Y. 2009) ("An expert who simply regurgitates what a party has told him provides no assistance to the trier of fact through the application of specialized knowledge.")

> **2.    Portions of Mr. Orszag's rebuttal opinions and testimony should be excluded.**

In addition to the entirety of Mr. Orszag's affirmative report, four portions of Mr. Orszag's rebuttal report should be excluded for the reasons detailed below.

> **i.    Mr. Orszag's speculative testimony that players may prefer ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ be excluded.**

In his rebuttal report, Mr. Orszag extensively speculates (without offering any ultimate opinion) that players may prefer playing ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

The rest of his opinions on this subject are grounded in nothing other than Mr. Orszag's say-so, as demonstrated by his editorializing of cherry-picked pieces of evidence to speculate that

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

██████████████████████████ As discussed above, an expert's regurgitation of defendant's views of documents and testimony without any independent analysis within the expert's area of expertise is not helpful to the trier of fact and is routinely excluded by courts. *Arista Recs.*, 608 F. Supp. 2d at 429; *Lyondell Chem.*, 558 B.R. at 668–69.████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

███████████████████████████ *Scott v. Chipotle Mexican Grill, Inc.*, 315 F.R.D. 33, 44 (S.D.N.Y. 2016) ("At a minimum... rebuttal experts must meet *Daubert*'s threshold standards regarding the qualifications of the expert, sufficiency of the data, reliability of the methodology, and relevance of the testimony"); *In re Elec. Books*, 2014 WL 1282298, at *16 (Cote, J.) (excluding Mr. Orszag's report because it invited the jury to speculate without any modeling or analysis).

Mr. Orszag also opines (again without any analysis) that █████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

---

[2] ███████████████████████████████████████████████
████████████

8. Mr. Orszag's testimony on

such subject matter should therefore be excluded under Federal Rules of Evidence 702 and 403.

        ii.       **Mr. Orszag speculation regarding Mr. Bergman's analysis of Papaya's financial statements should be excluded.**



Ex. I (Orszag Rebuttal Rpt.) ¶¶ 66-71, 75-76; *Scott*, 315 F.R.D. at 44; *Buckley v. Deloitte & Touche USA LLP*, 888 F. Supp. 2d 404, 412 (S.D.N.Y. 2012), *aff'd*, 541 Fed. Appx. 62 (2d Cir. 2013) (noting courts regularly exclude expert opinions "without factual basis and... based on speculation or conjecture"); Fed R. Evid. 702.

    **iii.**    **Mr. Orszag's testimony regarding** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ **should be excluded as not helpful to the trier of fact.**

To be admissible under Federal Rules of Evidence 702 and 403, "even if an expert's proposed testimony constitutes scientific knowledge, his or her testimony will be excluded if it is not scientific knowledge *for purposes of the case*." *Paoli R.R. Yard*, 35 F.3d at 743 (emphasis in original). This "helpfulness" requirement focuses on "the proffered connection between the scientific research or test result to be presented, and particular disputed factual issues in the case." *Downing*, 753 F.2d at 1237. Even methodology that is otherwise reliable and generally accepted cannot be introduced at trial if its application to the facts "does not bear on the relevant inquiry" of the claims at issue. *Fin. Guar. Ins. Co. v. Putnam Advisory Co.*, 2020 WL 4251229, at *9–10 (S.D.N.Y. Feb. 19, 2020) (excluding economic analyses that did not "assist the trier of fact to understand" the specific questions at issue).

████████

██████████████

██████████████

██████████████

██████████████

██████████████

██████████████

████████ has no bearing on any issue for the trier of fact to decide in this case and therefore

fails to satisfy the "helpfulness" requirement of Rule 702. *Id.* ¶ 47.

As Mr. Orszag admits, whether ██████████████

██████████████

██████████████

██████████████

██████████████

██████████████

██████████████

██████████████

██████████████

██████████████

██████████████ "does not bear on the

relevant inquiry" of the claims at issue and therefore fails the "helpfulness" requirement. *Fin. Guar.*

*Ins.*, 2020 WL 4251229, at *9–10.

Nor does Mr. Orszag's ████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████ are not helpful to the trier and fact in resolving any issues pertaining to Skillz's Lanham Act and N.Y. G.B.L. claims, and create a serious risk of confusing the jury. *Fin. Guar. Ins.*, 2020 WL 4251229, at *9–10; Fed. R. Evid. 403 (excluding evidence "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence").

    **iv.**    **Mr. Orszag's testimony and opinions relying on a ████████████ ████████████ should be excluded as unreliable.**

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████



*see State Farm Fire,* 980 F. Supp. 2d at 1049 (excluding testimony of expert who received data from interested party, and "admittedly did nothing to independently verify the reliability of this information before she used it in her calculations"). Accordingly, ████████████████████████████████████

████████████████████████████████████████████████

████████

### B.    The Court Should Exclude Certain Testimony and Opinions of Papaya's Survey Experts, Dr. Bruce Isaacson and Healey Whitsett, Because Their Surveys Are Unreliable and Will Not Assist the Trier of Fact.

In a Lanham Act case, the Court's gate-keeping responsibility under *Daubert* "extends to expert opinions based on the results of surveys." *Edmondson v. RCI Hosp. Holdings, Inc.*, 2020 WL 1503452, at *6 (S.D.N.Y. Mar. 30, 2020). To be admissible, surveys must "be 'properly designed, executed, and described,' and must be 'conducted in accordance with generally accepted survey principles.'" *Id.* While errors in survey methodology "properly go only to the weight of the evidence," *Schering Corp. v. Pfizer Inc.*, 189 F.3d 218, 228 (2d Cir. 1999), *amended on reh'g* (Sept. 29, 1999), a survey's results are properly excluded where they do not provide "useful information"

that can assist the trier of fact. *Bustamante v. KIND, LLC*, 100 F.4th 419, 430 (2d Cir. 2024) (affirming exclusion of survey evidence in a false advertising consumer class action where "'even ignoring' the survey's methodological failures," it provided "no useful information" regarding how consumers understood a key statement). A survey must also be excluded where it is "so flawed in methodology that its probative value is substantially outweighed by its prejudicial effect." *Friesland Brands, B.V. v. Vietnam Nat'l Milk Co.*, 221 F. Supp. 2d 457, 460 (S.D.N.Y. 2002).

"To evaluate the validity and reliability of a survey, a court should consider whether: '(1) the proper universe was examined and the representative sample was drawn from that universe; (2) the survey's methodology and execution were in accordance with generally accepted standards of objective procedure and statistics in the field of such surveys; (3) the questions were leading or suggestive; (4) the data gathered were accurately reported; and (5) persons conducting the survey were recognized experts.'" *Coty Inc. v. Excell Brands, LLC*, 277 F. Supp. 3d 425, 449–50 (S.D.N.Y. 2017) (quoting *Gucci Am., Inc. v. Guess?, Inc.*, 831 F. Supp. 2d 723, 738 (S.D.N.Y. 2011)). "To be admissible, a survey generally must, among other things, (i) properly define the target population; (ii) select a representative sample; (iii) use precise, non-leading questions; (iv) report data accurately; and (v) maintain objectivity." *Elysium Health*, 2022 WL 421135, at *2 (limiting testimony of Dr. Bruce Isaacson where he improperly aggregated his conclusions based on cumulative responses to the challenged statements). "The probative value of any given survey is a fact specific question that is uniquely contextual." *Johnson & Johnson * Merck Consumer Pharms. Co. v. Smithkline Beecham Corp.*, 960 F.2d 294, 300 (2d Cir. 1992).

### 1. Dr. Bruce Isaacson's survey, and all opinions and testimony connected therewith, are unreliable and will not assist the trier of fact.

Dr. Bruce Isaacson's survey purports to "measure certain advertising messages communicated by Skillz. Ex. J (Isaacson Rpt.) ¶ 1. Specifically, Dr. Isaacson's report is offered to

substantiate Papaya's allegation that Skillz falsely advertises to consumers that "the games available for play on its platform are intended to, and always do, evenly match players, provide every player with a fair and real chance to win." ECF No. 89 (Papaya's First Amended Counterclaims) ¶¶ 370, 385. In attempting to obtain evidence of customer confusion about these messages, Dr. Isaacson's survey showed survey respondents the Skillz website homepage and the Skillz "Players" subpage—together, over 10 pages when printed—as a stimulus. Ex. J (Isaacson Rpt.) ¶ 9. Dr. Isaacson's survey first asked an open-ended question asking respondents to identify the "main messages" communicated or implied by the stimulus. *Id.* at 29 (Table A), Ex. 3 at 8 (survey). Dr. Isaacson's survey next asked whether the stimulus "communicate[s] or impl[ies] anything about how you will be matched with other players to compete against," followed by another open-ended question about what messages were communicated or implied. *Id.*, Ex. 3 at 8–9. Following these open-ended questions, Dr. Isaacson's survey asked a closed-ended question regarding whether the stimulus "communicate[d] or impl[ied]" a series of statements that unequivocally do not appear anywhere in the stimulus: (1) "Every match is between players who have the same likelihood of winning;" (2) "Players are always matched with other players who are equally skilled at a game;" (3) "The longer I wait to be matched with another player, the less likely it will be that the other player will be at my skill level;" and (4) "If I am on a winning streak, I will be matched with another player in a way that makes it likely that I will lose my next match." *Id.*, Ex. 3 at 9.

Dr. Isaacson's survey should be excluded because its methodological errors and failure to offer relevant information render it unreliable, irrelevant, and unhelpful to the trier of fact.

i.    **Dr. Isaacson's survey fails to get to the heart of Skillz's advertising and will be unhelpful to the trier of fact.**

Because Dr. Isaacson's survey does not provide any helpful assessment of customer confusion and fails to measure how consumers understand Skillz's advertising, it is neither probative nor helpful to the trier of fact. "Generally, before a court can determine the truth or falsity of an advertisement's message, it must first determine what message was actually conveyed to the viewing audience. Consumer surveys supply such information." *Johnson & Johnson*, 960 F.2d at 298. Here, Dr. Isaacson's survey made no effort to understand "what message" was being conveyed because he never asked how respondents were interpreting key terms bound up in his survey questions, including "same likelihood of winning," "equally skilled," and "skill level." Ex. T (Isaacson Dep.) 206:8-207:15. Compounding this error, he also made no effort to gauge consumers' understanding of key terms within the stimulus, including "evenly matched," "fair," "unfair bots," "similar skill levels," and "fair chance to win." Ex. J (Isaacson Rpt.), Ex. 3 at 28–37; Ex. T (Isaacson Dep.) 168:22-25, 172:19-173:20, 179:5-181:13. Dr. Isaacson testified that he himself is not even sure what "even matching" means. Ex. T (Isaacson Dep.) 169:1-12.

A survey that fails to define key terms and "is plainly designed to validate plaintiffs' theory of liability" is properly excluded, because it "provide[s] no useful information" to the trier of fact. *Bustamante*, 100 F.4th at 428–30 (affirming exclusion of survey of consumers of protein bars where the terms "artificial" and "synthetic" were undefined and the survey asked leading, closed-ended questions regarding consumers' understanding of the term "All Natural"). Without a clear understanding of key terms and meaningful information on whether customers were actually confused by Skillz's advertising, Dr. Isaacson's survey provides no meaningful information, cannot assist the trier of fact, and is properly excluded.

Far from measuring consumers' understanding of the key concepts at issue in the challenged statements, Dr. Isaacson's survey tested nothing more than consumers' ability to read the words on the Skillz website. "Surveys which do nothing more than demonstrate the respondents' ability to read are not probative on the issue of likelihood of consumer confusion." *Franklin Res., Inc. v. Franklin Credit Mgmt. Corp.*, 988 F. Supp. 322, 335 (S.D.N.Y. 1997). Here, Dr. Isaacson agreed that respondents to his survey parroted back, in whole or in part, language which appeared on the Skillz website. Ex. T (Isaacson Dep. 185:15-20). His survey first asked respondents whether the stimulus—which indisputably contained the terms "evenly-matched," "head to head," "similar skill levels," "proprietary technology," and "fair play"—"communicate[d] or impl[ied] anything about how you will be matched with other players to compete against." Aware that the stimulus contained language implicating matchmaking, Dr. Isaacson asked respondents to indicate what the stimulus webpages "communicate or imply about how you will be matched with other players to compete against"—thus inviting respondents to repeat the terms used in the stimulus. Ex. J (Isaacson Rpt.), Ex. 3 at 9. *Only after* eliciting these parrot reactions did Dr. Isaacson then ask whether respondents understood the advertising to "communicate or imply" the four specific statements (none of which appear in Skillz's advertising) tested by Dr. Isaacson. *Id.* at 8. In short, Dr. Isaacson's survey only proves the obvious (whether particular words or concepts appear in the stimulus) while failing to shed any light on issues that the jury will need to resolve (i.e., whether consumers understood Skillz's statements to convey or promise something inconsistent with the reality of how its business functions). *Schering*, 189 F.3d at 229 (implied falsity requires demonstrating that an advertisement "has left an impression on the listener that conflicts with reality").

Because it will not help the trier of fact understand the truth or determine a fact at issue, Dr. Isaacson's survey should be excluded.

### ii.    Dr. Isaacson failed to survey the appropriate universe.

Dr. Isaacson's survey has no probative value because he did not survey the proper universe for Skillz's advertisements. "Flaws in a study's universe quite seriously undermine the probative value of the study, because to be probative and meaningful surveys must rely upon responses by potential consumers of the products in question." *Weight Watchers Int'l, Inc. v. Stouffer Corp.*, 744 F. Supp. 1259, 1273 (S.D.N.Y. 1990) (cleaned up). Failure to survey the appropriate universe can render a survey's results irrelevant and unhelpful to the trier of fact. "[E]ven if the proper questions are asked in a proper manner, if the wrong persons are asked, the results are likely to be irrelevant." 6 J. Thomas McCarthy, McCarthy On Trademarks And Unfair Competition § 32:159 (4th ed. 2015); *see also Kwan Software Eng'g, Inc. v. Foray Techs., LLC*, 2014 WL 572290, at *5 (N.D. Cal. Feb. 11, 2014) (excluding consumer survey for failure to survey the proper universe where the proponent "made no attempt to show" that the respondents "are people who would see the alleged misrepresentations"); *Bracco Diagnostics, Inc. v. Amersham Health, Inc.*, 627 F. Supp. 2d 384, 447 (D.N.J. 2009) (excluding survey and finding failure to "identify the correct sample population" to be "a critical flaw in the design of the survey, which makes it significantly less useful for determining whether consumers who were making the actual purchasing decision were deceived").

At best, Dr. Isaacson's survey provides the opinions of an artificially constrained subset of potential Skillz users. Dr. Isaacson failed to establish that respondents in his survey were individuals who would have ever seen the stimulus he selected: Skillz's website and the linked "Players" page. Ex. J (Isaacson Rpt.) ¶¶ 51-52. He performed no screening to determine whether respondents had ever visited Skillz's website or the website of any mobile gaming company,

instead presuming (without any support) that consumers of a *mobile app* would visit the app owner's *website* when deciding whether to use the *app*. Ex. T (Isaacson Dep.) 87:2-88:3. In fact, Dr. Isaacson purposefully did not ask respondents whether they had visited the Skillz website because doing so "could potentially influence subsequent answers." *Id.* 207:23-209:12. His failure to ask respondents whether they had visited the website of *any* mobile gaming company which offered cash games—potentially asking website-based questions of a universe of respondents who have never visited the website of a mobile gaming application at all, let alone a cash gaming app— also likely affected the results of his survey because of the inherently unrealistic stimulus setup that he created. Ex. T (Isaacson Dep.) 209:13-210:24. In previous surveys, Dr. Isaacson has recognized the importance of screening respondents for a potential survey a population so it is limited to those who may actually encounter the stimulus. Ex. T (Isaacson Dep.) 210:25-211:16; *Elysium Health*, 2022 WL 421135, at *4 (admitting survey where Dr. Isaacson screened potential respondents based on "whether they had visited Facebook in the prior three months, so that only those who answered affirmatively to this question were queried on the [contested] materials").

Moreover, Dr. Isaacson's survey targeted the wrong universe by surveying only respondents who own a desktop computer, laptop computer, or tablet. Skillz offers real-money mobile games which can only be played on a mobile phone or tablet, not a computer. Ex. T (Isaacson Dep.) 202:18-25. Despite the fact that Skillz only offers its products on mobile devices, Dr. Isaacson required respondents to take his survey on a desktop computer, laptop or tablet. By doing so, Dr. Isaacson's survey entirely disqualified users who do not own such devices— potentially excluding a substantial portion of potential Skillz customers who use only their mobile phones to participate in Skillz's games and receive Skillz's advertisements. *Id.* 213:8-12.

Because the opinions of an artificially constrained subset of potential Skillz users who may not have ever seen the stimulus in question offer no probative value to the trier of fact, Dr. Isaacson's survey should be excluded.

### iii.    Dr. Isaacson used an inappropriate stimulus.

The improper stimulus selected by Dr. Isaacson, which failed to replicate the market conditions under which a potential consumer of a real-money mobile gaming app would decide whether to play one of the games on the Skillz platform, further supports exclusion of Dr. Isaacson's survey. "Although no survey can construct a perfect replica of 'real world' buying patterns, a survey must use a stimulus that, at a minimum, tests for confusion by roughly simulating marketplace conditions." *Trouble v. The Wet Seal, Inc.*, 179 F. Supp. 2d 291, 308 (S.D.N.Y. 2001); *see also Conopco, Inc. v. Cosmair, Inc.*, 49 F. Supp. 2d 242, 253 (S.D.N.Y. 1999). Dr. Isaacson testified that, as a general principle, false advertising surveys in Lanham Act cases must "match marketplace conditions, that the ways in which consumers encounter whatever's being shown in the survey will match how consumers would encounter that same item in the real world marketplace, at least to a reasonable degree." Ex. T (Isaacson Dep.) 47:23-48:13. He nonetheless selected a stimulus—two lengthy webpages that could only be viewed on a computer screen—that mobile gamers would be unlikely to encounter in real-world marketplace conditions, undermining the reliability of his survey.

Dr. Isaacson had a variety of potential stimuli to use for his survey, including actual video or in-app advertisements published by Skillz. Ex. T (Isaacson Dep.) 207:18-22. He admitted that he could have used the App Store page for a Skillz game as the stimulus for his survey. *Id.* 212:13-17. However, instead of considering any other stimuli, Dr. Isaacson chose to use the 10-page website of a mobile gaming company as the stimulus for a survey of mobile gaming app consumers. *Id.* 46:10-12. Dr. Isaacson testified that he considered Skillz's website "the front door,

the place where someone might go who's considering playing – who's considering using the Skillz platform to play games." *Id.* 87:17-20. He cited no source for his apparent belief that consumers of mobile games would consult the website published by the owner of an app platform (not even the description of app itself in the app store) before deciding whether to download a gaming app. His knowledge of the mobile gaming industry rests entirely on assumptions and information from Papaya's counsel, as he has never played mobile games or spoken to anyone in the mobile gaming industry and apparently believes that Skillz and Papaya are "websites" first, and operators of "gaming platforms that take place in apps" second. *Id.* 26:15-28:19, 128:2-19. He has no knowledge regarding how often players or potential players visit the Skillz website, and he conceded that his chosen stimulus could be accessed "infrequently." *Id.* 89:4-15.

Because Dr. Isaacson's survey does not replicate market conditions or present a proper stimulus that can test how mobile gaming consumers understand Skillz's messages, Dr. Isaacson's survey should be excluded.

### iv.    Dr. Isaacson used improper leading questions aimed to push Papaya's theory of liability.

Dr. Isaacson's survey is further inadmissible due to its use of leading questions aimed to push respondents toward Papaya's interpretation of Skillz's statements. Litigation surveys "should avoid the use of leading questions which suggest an answer to the respondent." *Volkswagen Astiengesellschaft v. Uptown Motors*, 1995 WL 605605, at *2 (S.D.N.Y. May 11, 1995). A survey cannot assist the trier of fact where it poses "an obvious leading question in that it suggested its own answer." *Universal City Studios, Inc. v. Nintendo Co.*, 746 F.2d 112, 118 (2d Cir. 1984) (excluding survey in trademark case based on its improper universe and leading questions); *see also Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 277–78 (4th Cir. 2002) (survey's use of "highly leading questions," among other design flaws, "render[ed] the results utterly unreliable on

the question of whether the [challenged advertisement] conveys a false message"); *In re KIND LLC "Healthy & All Natural" Litig.*, 627 F. Supp. 3d 269, 287–88 (S.D.N.Y. 2022), *aff'd sub nom. Bustamante v. KIND, LLC*, 100 F.4th 419 (2d Cir. 2024) (excluding survey which "improperly direct[ed] survey participants to the 'correct' answer").

    *In re KIND* is instructive. There, the expert surveyed respondents regarding only "one potential definition of 'All Natural' – the definition that plaintiffs selected for this case" and "only allow[ed] survey participants to select from finite choices agreeing, disagreeing, or not having an expectation about this definition." 627 F. Supp. 3d at 288. The court excluded the survey, holding that the "limited inquiry" conducted was "insufficient to determine in any meaningful sense how reasonable consumers understand the 'All Natural' claim, or to test plaintiffs' theory" and that "[a]ll plaintiffs have done here is show that consumers, when provided with the definition of [the challenged term] that plaintiffs' counsel constructed for this litigation, will click a check box saying that they agree to it." *Id.* at *288,* 290–91.

    Dr. Isaacson's closed-ended question (Question 4) mirrors those rejected by the *In re KIND* court. In a series of four subparts, he asked consumers whether Skillz's website "communicate[d] or impl[ied]" particular statements advancing only Papaya's interpretations of the website:



Ex. J (Isaacson Rpt.), Ex. 3 at 43.[4] Like the survey challenged in *In re KIND*, all Dr.

Isaacson's survey has done is "show that consumers, when provided with [Papaya's definition of

the challenged advertisements]... will click a check box saying that they agree to it." *In re KIND*

at 290–91. Dr. Isaacson's survey provided no alternate interpretation for the challenged statements

and made no effort to understand whether respondents understood the statements to understand

them as *Skillz* interprets them. Survey results gleaned from such blatantly leading questions are of

no use to the trier of fact. *Universal City Studios*, 746 F.2d at 118. Because leading questions rest

at the heart of Dr. Isaacson's survey and conclusions, his survey should be excluded.

---

[4] Dr. Isaacson's survey inquired about four statements in this exact format: (1) "Every match is between players who have the same likelihood of winning;" (2) "Players are always matched with other players who are equally skilled at a game;" (3) "The longer I wait to be matched with another player, the less likely it will be that the other player will be at my skill level;" and (4) "If I am on a winning streak, I will be matched with another player in a way that makes it likely that I will lose my next match." Ex. J (Isaacson Rpt.), Ex. 3 at 43-47.

v.    **Dr. Isaacson's improper, biased coding did not accurately report the data gathered by his survey.**

Dr. Isaacson's survey is further called into question by his coding of verbatim responses, which reflects obvious biases. To be admissible, a survey must be conducted "in accordance with generally accepted standards of objective procedure and statistics in the field of such surveys" and its data must be "accurately reported." *Coty*, 277 F. Supp. 3d at 449–50 (quoting *Gucci*, 831 F. Supp. 2d at 738). Biased coding undermines both principles.

Dr. Isaacson collected open-ended, verbatim responses to Question 1 of his survey, which asked respondents to provide the "main messages" communicated by the stimulus. Ex. J (Isaacson Rpt.), Ex. 3 at 8. After gathering these responses, Dr. Isaacson and his staff coded them into categories representing "certain themes that are disputed in this matter." *Id*. ¶ 68. Dr. Isaacson modified the coding categories as he coded the responses. Ex. T (Isaacson Dep.) 106:11-23, 220:10-16. He was the final arbiter of all coding decisions. *See* Ex. J (Isaacson Rpt.) at 28 n. 35 ("I personally assigned or confirmed every code assigned to every response").

Dr. Isaacson's coding decisions reflected clear bias and his categories curiously excluded the main disputed theme in this case: using undisclosed bots to control the outcomes of cash tournaments. Therefore, the many respondents who viewed Skillz's website—which conspicuously emphasizes that there are "No Bots Guaranteed"—and recalled Skillz's main message that only human players will be involved in its games, were coded by Dr. Isaacson as concerning bots only if they literally said "bots" or "real people." Dr. Isaacson effectively discarded the portions of any answer by a respondent who used a different synonym for a real person (e.g., "someone," "people," or even "humans")'. Similarly, Dr. Isaacson inappropriately lumped responses mentioning the "same" and "similar" skill level together, without regard for the fact that Papaya's counterclaims assert that Skillz's advertising is false because Skillz purportedly

does not match players of "equal" or "identical" skill; therefore, Dr. Isaacson boosted the ranks of people who, he claims, interpret Skillz's advertising consistent with Papaya's theory. Ex. J (Isaacson Rpt.) Ex. 7 at 1; Ex. T (Isaacson Dep.) 214:17-215:18, 140:24-141:5; 146:15-149:1. Dr. Isaacson further coded responses stating that Skillz would "try to match" players with similarly-skilled opponents in the same category as responses stating that Skillz did in fact match players with similarly-skilled opponents. Ex. T (Isaacson Dep.) 215:19-216:10. Once again, his categorization will not be helpful to the trier of fact because he mixed respondents who agree with opposing theories in this case (Skillz's point that it attempts to match players as fairly as possible under the circumstances, and Papaya's point that Skillz does not actually match identically-skilled players with each other) into the same groups.

These biased coding decisions, spearheaded by Dr. Isaacson himself, are improper and the conclusions that Dr. Isaacson draws from the verbatim responses to Questions 1 and 4 in his survey are unreliable. *Revlon Consumer Prods. Corp. v. Jennifer Leather Broadway, Inc.*, 858 F. Supp. 1268, 1276 (S.D.N.Y. 1994), *aff'd*, 57 F.3d 1062 (2d Cir. 1995) (holding that survey was "so unreliable that it is entitled to no weight," in part due to improper coding of responses); *see also Dyson, Inc. v. Bissell Homecare, Inc.*, 951 F. Supp. 2d 1009, 1020 (N.D. Ill. 2013) (noting that coding in a double-blind manner "significantly undercuts" alleged bias). These improper coding decisions further support exclusion of Dr. Isaacson's survey.

### vi. The cumulative flaws in Dr. Isaacson's survey warrant exclusion.

Even where "each methodological flaw, standing alone, may not mandate exclusion," such flaws may individually diminish a survey's probative value and, when viewed cumulatively, may nonetheless warrant exclusion. *Malletier*, 525 F. Supp. 2d at 574. "[A] survey should be excluded where it is so flawed in methodology that its probative value is substantially outweighed by its

prejudicial effect." *Friesland Brands*, 221 F. Supp. 2d at 460 (S.D.N.Y. 2002); *see also Schering*, 189 F.3d at 228; *Starter Corp. v. Converse, Inc.*, 170 F.3d 286, 297 (2d Cir. 1999); *Arche, Inc. v. Azaleia, U.S.A., Inc.*, 882 F. Supp. 334, 336 (S.D.N.Y. 1995). Taken together, the flaws in Dr. Isaacson's survey and analysis point to one conclusion: his survey should be excluded. While Papaya may argue that Dr. Isaacson's design errors should only go to the weight of his testimony, Papaya "cannot side-step this Court's 'task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand by claiming that the deficiencies are methodological.'" *In re KIND*, 627 F. Supp. 3d at 292 (quoting *Daubert*, 509 U.S. at 597). Exclusion is therefore warranted under Federal Rule of Evidence 702.

> **2.      Healey Whitsett's survey should be excluded because she surveyed the improper universe, used a flawed stimulus, and the cumulative flaws in her survey warrant exclusion.**

This Court should likewise exclude the survey and opinions of Healey Whitsett, whose survey is tainted by the flaws in Dr. Isaacson's survey. Ms. Whitsett's survey purports to "evaluate whether statements describing certain [] matchmaking features impact consumers' likelihood of playing games on the Skillz mobile gaming platform where players can pay cash entries and compete for cash prizes." Ex. K (Whitsett Rpt.) ¶ 6. She describes her survey as "based in part on a study designed by" Dr. Isaacson. *Id.* ¶ 7. In fact, her survey shows the same website homepage and Players page shown by Dr. Isaacson, and tests the materiality of the four statements chosen by Dr. Isaacson' (none of which appear in Skillz's advertising): (1) "Every match is between players who have the same likelihood of winning;" (2) "Players are always matched with other players who are equally skilled at a game;" (3) "The longer I wait to be matched with another player, the less likely it will be that the other player will be at my skill level;" and (4) "If I am on a winning streak, I will be matched with another player in a way that makes it likely that I will lose my next match." *Id.* ¶ 8.

### i.    Ms. Whitsett failed to survey the appropriate universe.

Like Dr. Isaacson's survey, Ms. Whitsett's survey is devoid of probative value because she did not survey the proper universe. *See supra* at 42–44. Ms. Whitsett's survey, like Dr. Isaacson's survey, targeted the incorrect universe by surveying only respondents using a desktop computer, laptop computer, or tablet, ignoring that Skillz's mobile games can only be played on a mobile phone or tablet. Ex. U (Whitsett Dep.) 43:4-44:25; Ex. T (Isaacson Dep.) 202:18-25. Yet, Ms. Whitsett's survey excluded users who use only smartphones—potentially excluding a substantial portion of potential Skillz customers necessary to test the relevant universe. *Id*. Ms. Whitsett testified that she did not research whether the relevant universe of consumers would use a desktop computer, laptop computer, or tablet to access the Skillz website. Ex. U (Whitsett Dep.) 45:19-23. She conceded that it would have been appropriate to include mobile phone users in her survey, had she not chosen to include the 10-page desktop website stimulus used in Dr. Isaacson's survey (which was not even a stimulus but merely "context"). *Id*. 44:14-25. In short, like Dr. Isaacson's survey, Ms. Whitsett's survey contains some purported views of an artificially constrained subset of potential Skillz users who may have never seen the stimulus in question, and which offer no probative value to the trier of fact. "[E]ven if the proper questions are asked in a proper manner, if the wrong persons are asked, the results are likely to be irrelevant." 6 J. Thomas McCarthy, McCarthy On Trademarks And Unfair Competition § 32:159 (4th ed. 2015). Ms. Whitsett's survey asked questions of the "wrong persons," rendering her survey results unreliable and irrelevant. Therefore, Ms. Whitsett's survey should be excluded.

### ii.    Ms. Whitsett's survey used an inappropriate stimulus.

Ms. Whitsett also used the same stimulus selected by Dr. Isaacson for her survey, and she showed respondents the Skillz website homepage and the Skillz Players page before directing them

to answer substantive questions.[5] Just like Dr. Isaacson's survey, Ms. Whitsett's survey's stimulus failed to replicate the market conditions under which a potential consumer of a real-money mobile gaming app would decide whether to play one of the games on the Skillz platform. "[A] survey must use a stimulus that, at a minimum, tests for confusion by roughly simulating marketplace conditions." *Trouble*, 179 F. Supp. 2d at 308. Ms. Whitsett acknowledged that false advertising surveys in Lanham Act cases are tasked with "replicating marketplace conditions." Ex. U (Whitsett Dep.) 45:6-18. She nonetheless doubled down on Dr. Isaacson's selection of a stimulus that mobile gamers would be unlikely to encounter in real-world marketplace conditions, undermining the reliability of her survey.

Ms. Whitsett's decision to rely on Dr. Isaacson's website stimulus makes even less sense in light of her survey's timing. At the time she purportedly decided to use the same webpages selected by Dr. Isaacson, Ms. Whitsett had no idea whether any consumers thought those webpages actually communicated the messages that she was going to test, as she had not seen any results from his survey. Ex. U (Whitsett Dep.) 11:17-24; 125:8-126:18. Given that her survey asked no questions about the website stimulus itself, she had no reason to use it at all. *Id*. 136:15-25. She had no understanding of why Dr. Isaacson picked the statements he selected to test. *Id*. 125:13-23. Ms. Whitsett was told by Papaya that her job was to "assess[] the materiality of four different statements that Papaya alleges to be false and misleading." *Id*. 18:1-8.

Ms. Whitsett also conducted no analysis of what the four messages she was testing actually mean in context. She testified that she "didn't need to" consider any other potential wording for

---

[5] Ms. Whitsett initially testified that she showed respondents these website pages as "context," which she purportedly showed "to orient respondents to my survey to the general types of games that Skillz offers, to provide them with relevant context to evaluate [the statements she tested for materiality]." Ex. U (Whitsett Dep.) 38:4-12. She later testified that these pages were "the stimulus" of her survey. Ex. U (Whitsett Dep.) 44:4-45:23, 60:13-61:11, 136:15-25, 161:8-22. Her report also refers to these webpages as "the same stimuli that I understand Dr. Isaacson tested in his survey." Ex. K (Whitsett Rpt.) ¶ 39. She also explicitly asked consumers to answer questions while "thinking about" these webpages. Ex. U (Whitsett Dep.) 60:6-12.

the statements tested by Dr. Isaacson, because she found the language selected by Dr. Isaacson "clear"—despite the fact that key terms remained undefined in the statements tested by both Dr. Isaacson and Ms. Whitsett. Ex. U (Whitsett Dep.) 159:2-161:22, 125:24-126:18. She made no effort to determine whether the statements tested could be proven true or false. *Id.* 128:3-19. She further testified that her survey measured ***not the materiality of the actual language used on the Skillz website***, but the four statements alleged by Papaya. *Id.* 161:14-22. And she cannot tie the two statements reflecting alleged omissions to any affirmative statement by Skillz.[6] *Id.* 121:15-122:19.

Like Dr. Isaacson, Ms. Whitsett's understanding of the mobile gaming industry was entirely provided by Papaya's counsel. She did not interview anyone in the mobile gaming industry, including a single Papaya employee; did not interview any mobile gaming consumers; has never used any Skillz or Papaya games; and does not use any mobile gaming apps (nor does anyone on her team, to her knowledge). Ex. U (Whitsett Dep.) 40:5-22; 52:16-20. She testified that she has no understanding of the significance of the Skillz website to Skillz's overall advertising efforts. *Id.* 154:16-155:14. Against the backdrop of her lack of knowledge (or even curiosity) regarding the relevant industry and how consumers use Skillz's products, it is perhaps unsurprising that Ms. Whitsett's survey so entirely missed the mark in terms of replicating real-world market conditions, using an appropriate stimulus, and determining whether the "messages" she tested were understood by all respondents in the same way. Because Ms. Whitsett's survey does not replicate market conditions or present a proper stimulus, it should be excluded.

---

[6] Ms. Whitsett's survey tested two alleged omissions: "The longer I wait to be matched with another player, the less likely it will be that the other player will be at my skill level" and "If I am on a winning streak, I will be matched with another player in a way that makes it likely that I will lose my next match." Ex. K (Whitsett Rpt.) ¶ 42.

### iii.    The cumulative flaws in Ms. Whitsett's survey warrant exclusion.

Like Dr. Isaacson's survey, Ms. Whitsett's survey is "so flawed in methodology that its probative value is substantially outweighed by its prejudicial effect." *Friesland Brands*, 221 F. Supp. 2d at 460. In short, Ms. Whitsett's survey measures the materiality of statements *not made by Skillz* to an artificially constrained universe of *respondents which does not capture the audience for Skillz's advertisements.* Such a survey cannot assist the trier of fact. Ms. Whitsett's survey should be excluded.

### C.    The Court Should Exclude the Testimony of Dr. Randall Heeb Because He Is Unqualified, His Testimony Is Irrelevant and Misleading, and His Methodology Is Inconsistent and Unreliable.

Papaya intends to offer the testimony of Dr. Randal Heeb, an economist and the senior managing director for FTI Consulting, to testify that [REDACTED]

---

[7] The word "games" here refers to the actual rules and aspects of each underlying game (i.e. Solitaire Cash or Bingo Cash), whereas "tournaments" refers to configurations of opponents playing those games against each other for cash prizes, which necessarily affects the *outcomes* of each iteration of those games. As explained further below, Dr. Heeb improperly analyzes the underlying *games* themselves rather than the *tournaments*, making his analysis irrelevant.

Dr. Heeb's opinions and testimony do not satisfy the strictures of Rules 702 and 403 for at least two reasons, and they should be excluded entirely. ████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████████████   ███████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████ His opinion

therefore fails to satisfy both Rule 702 and Rule 403, and should be excluded.

      **1.**     **Dr. Heeb's testimony should be excluded because he is unqualified to opine on the use of ████ in real-money skill-based mobile games.**

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████ "To determine

whether a witness qualifies as an expert, courts compare the area in which the witness has superior knowledge, education, experience, or skill with the subject matter of the proffered testimony." *Estate of Jaquez v. City of New York*, 104 F. Supp. 3d 414, 427 (S.D.N.Y. 2015), *aff'd sub nom. Estate of Jaquez by Pub. Adm'r of Bronx Cnty. v. City of New York*, 706 Fed. Appx. 709 (2d Cir. 2017) (excluding testimony of emergency room physician on bullet trajectory and police handling of emotionally disturbed persons). An expert must support his claim of expertise in a specific area with reference to his actual experience, must be careful to "stay within the reasonable confines of his subject area, and cannot render expert opinion on an entirely different field or discipline." *M.B. v. CSX Transp., Inc.*, 130 F. Supp. 3d 654, 671–672 (N.D.N.Y. 2015); *Shreve*, 166 F. Supp. 2d at 392 (expert must possess "some special skill, knowledge or experience concerning the *particular issue before the court*") (emphasis added); *Koehler v. Infosys Techs. Ltd. Inc.*, 628 F. Supp. 3d 835, 877–78 (E.D. Wis. 2022) (excluding economist because although his "general qualifications" were not disputed, he had no expertise in the particular issue of the litigation).

So-called "hired gun[s]" whose expertise was developed solely through testifying in litigation and not in the real world are routinely excluded. *E.g.*, *In re Mirena IUS Levonorgestrel-Related Prods. Liab. Litig.* (No. II), 341 F. Supp. 3d 213, 242 (S.D.N.Y. 2018) (excluding expert who had "been deposed as an expert witness 14 times" because "[o]utside of this litigation, he has never conducted research on" the hormone at issue); *Shreve,* 166 F. Supp. 2d at 394 (excluding a "classic 'hired gun,' with no particular expertise" with the topic at issue, because "one does not necessarily become an expert on a topic simply by testifying about it in court"); *Lebron v. Sec'y of Fla. Dept. of Child. & Fams.*, 772 F.3d 1352, 1369 (11th Cir. 2014) (excluding expert because "in an area that he did not otherwise specialize in, [expert] 'developed [his] opinions expressly for purposes of testifying'"); *Wood v. Credit One Bank*, 277 F. Supp. 3d 821, 858 (E.D. Va. 2017)

(expert not qualified to opine on the Fair Credit Reporting Act because his only experience with it was "as a 'litigation consultant' for three to five cases... more than ten years ago").





Ex. V (Heeb Dep.) 15:2–10, 25:1–31:11. This is exactly the "hired gun" experience that courts find

insufficient to satisfy Rule 702. *See, e.g., Mirena,* 341 F. Supp. 3d at 242; *Shreve,* 166 F. Supp. 2d

at 394; *Lebron,* 772 F.3d at 1369; *Wood,* 277 F. Supp. 3d at 858.

**2.      Dr. Heeb's opinions should be excluded because they lack any factual support.**

In addition, Dr. Heeb's report contains numerous factual assertions and ultimate opinions

that find zero support in the factual record and therefore must be excluded. Even if a trial court is

convinced that an expert is qualified to opine and the expert's opinions may be helpful to the trier

of fact, the proponent of the witness must also show that "the testimony is based on sufficient facts

or data." Fed. R. Evid. 702(b). In other words, in order for an expert's opinions to be admissible,

they must be "adequately supported by the evidence [he] cites." *B & R Supermarket, Inc. v. Visa

Inc.*, 2024 WL 4252031, at *26 (E.D.N.Y. Sept. 20, 2024) (excluding certain expert opinions where

"the citations [the expert] provides for this statement do not support this conclusion"). Courts

regularly exclude expert opinions "without factual basis and... based on speculation or conjecture."

*Buckley,* 888 F. Supp. 2d at 412. "An expert who simply regurgitates what a party has told him

provides no assistance to the trier of fact through the application of specialized knowledge." *Arista

Recs.*, 608 F. Supp. 2d at 424 (excluding an expert "who simply repeat[ed] the hearsay of the client

who retained him, without any independent investigation or analysis").

Further, "[e]xperts are not permitted to testify to an actor's state of mind," *U.S. Commodity Futures Trading Comm'n v. Wilson*, 2016 WL 7229056, at *8 (S.D.N.Y. Sept. 30, 2016), but may "reference an actor's state of mind *when that state of mind is in the record* and is the basis for the expert's ultimate opinion." *United States v. Patel*, 2023 WL 2643815, at *39 (D. Conn. Mar. 27, 2023) (emphasis added) (cleaned up). *See also Bd. of Trs. of AFTRA Ret. Fund v. JPMorgan Chase Bank, N.A.*, 2011 WL 6288415, at *8 (S.D.N.Y. Dec. 15, 2011) (expert's statement regarding a party's knowledge was "permissible because it is clearly based on the record").

███████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

---

**▌** ██ Heeb offers countless other opinions as to Papaya's state of mind throughout his report, some of which he frames as simply being "████████████████████████████ This is a transparent attempt to sidestep the rule against baseless expert opinions on states of mind and to invoke an exception: "an expert can testify to whether a given practice is consistent with a given state of mind." *Commodity Futures Trading* Comm'n, 2016 WL 7229056, at *8. But in each case, he fails to explain how his expertise (devoid of any experience in the relevant industry) qualifies him to draw these inferences, or where in the record he finds any support for these claims.

and then put him forward as the mouthpiece for executives who refused to testify as to their own states of mind for fear that doing so would incriminate them.



Dr. Heeb provides no adequate foundation for his opinions and ignores plainly relevant evidence. His opinions are therefore not "adequately supported by the evidence he cites," as is

required by *B & R Supermarket*. Dr. Heeb opines on parties' states of mind and intentions without any reference to the record—while nevertheless accusing Dr. Zagal of "pure speculation"—and improperly "regurgitates" the metrics and data provided to him by Papaya inconsistent with the very experience that he claims qualifies him as an expert to conduct this analysis in the first place. Dr. Heeb's speculative and conjectural opinions are not admissible under *Daubert* and should be excluded.

### 3. Dr. Heeb's opinion that the underlying games offered by Papaya when played ▮▮▮▮▮▮ re games of skill is irrelevant and unhelpful to the trier of fact.

Dr. Heeb's main assignment in this case is to prove that Papaya's *underlying games* (*e.g.*, Solitaire Cash or Bingo Cash) are skill-based. Ex. L (Heeb Rpt.) ¶ 8. This not responsive to Skillz's claims, which are centered on ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ and should be excluded as unhelpful and confusing even if Dr. Heeb is otherwise allowed to testify. Each opinion offered by an expert must be "sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute," because "[e]xpert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Daubert*, 509 U.S. at 591. This "helpfulness" requirement focuses on "the proffered connection between the scientific research or test result to be presented, and particular *disputed* factual issues in the case." *Downing*, 753 F.2d at 1237 (emphasis added). Even methodology that is otherwise reliable and generally accepted does not satisfy the "helpfulness" requirement if its application it "does not bear on the relevant inquiry" of the claims at issue and, under those circumstances, is inadmissible. *Fin. Guar. Ins.*, 2020 WL 4251229, at *9–10 (excluding economic analyses that did not "assist the trier of fact to understand" the specific questions at issue and only showed facts "that neither party disputes"); *Magallon v. Robert Half Int'l, Inc.*, 743 F. Supp. 3d

1237, 1252 (D. Or. 2024) (excluding economist from testifying because his testimony concerned already-stipulated issues and other issues "not germane" to the question at hand).



████████████████████████████████████████████████████

██████████████████████████████████████████

In fact, Dr. Heeb's testimony is more likely to confuse the jury than to help. Federal Rule of Evidence 403 permits the exclusion of relevant evidence "if its probative value is substantially outweighed by the danger of... confusion of the issues, or misleading the jury." Fed. R. Evid. 403. Rule 403 and Rule 702 are often considered in tandem, because "[e]xpert evidence can be both powerful and quite misleading because of the difficulty in evaluating it. Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 of the present rules exercises more control over experts than over lay witnesses." *Daubert*, 509 U.S. at 595.

████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

    **D.**    **The Court Should Exclude the Testimony of Cristoffer Holmgård Because His General Assertions About Artificial Intelligence in Video Games Do Not Apply to** [REDACTED] **He Simply Repeats Hearsay from Papaya, and His Testimony Is Unreliable and Unhelpful.**

Papaya intends to offer the testimony of Cristoffer Holmgård, who seeks to testify at trial that [REDACTED]

[REDACTED]

[REDACTED]

[REDACTED] Dr. Holmgård fails to apply his general assertions about bots in the video game industry to Papaya's actual practices in the RMSB gaming industry at issue in this litigation, untethering the majority of his opinions from any facts in this case and rendering them inadmissible. To the extent Dr. Holmgård does acknowledge Papaya's practices, he simply regurgitates talking points from Papaya devoid of any foundation. His

testimony is therefore not sufficiently tied to the facts of the case and will not assist the trier of fact. Dr. Holmgård should be excluded entirely from testifying under Rule 702.

> ### 1.    Dr. Holmgård's assertions about bots in the video game industry are not "sufficiently tied to the facts of the case" because they plainly do not apply to Papaya's practices or Skillz's claims in this litigation.

An expert relying on his experience "must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience reliably applied to the facts." *523 IP LLC v. CureMD.Com*, 48 F. Supp. 3d 600, 643 (S.D.N.Y. 2014). While an expert may opine about industry practices or expectations generally, those opinions are only admissible to the extent they are applied to "the specific facts of this case." *Orbital Eng'g, Inc. v. Buchko*, 578 F. Supp. 3d 736, 743 (W.D. Pa. 2022) (excluding testimony "regarding the responsibilities of chief operating officers in general with respect to IT or cybersecurity" where expert did not apply such standards to the actual "role and responsibilities" at issue). *See also Bazarian Int'l Fin. Assocs., LLC v. Desarrollos Aerohotelco, C.A.*, 315 F. Supp. 3d 101, 119 (D.D.C. 2018) (rejecting argument that "testimony 'regarding common understandings and practices in the industry' would 'provid[e] necessary background to help the jury understand the issues in this case and the testimony of fact witnesses'" where expert opined about "industry standard" fees but failed to apply that opinion to the facts at issue).



Dr. Holmgård's testimony in this regard is all the more dangerous because it carries a significant risk of confusing the jury. *See Daubert*, 509 U.S. at 595.



### 2.    Dr. Holmgård's opinions will not assist the trier of fact because he relies only on Papaya's own representations without any independent analysis.

Like Papaya's other experts, Dr. Holmgård's paltry analysis of Papaya's actual conduct lacks foundation and amounts to inappropriate narrative testimony. Under the helpfulness requirement of *Daubert*, an expert "cannot forgo his own independent analysis and rely exclusively on what an interested party tells [them]." *Orthoflex, Inc. v. ThermoTek, Inc.*, 986 F. Supp. 2d 776, 798 (N.D. Tex. 2013) (excluding proposed rebuttal expert who lacked "particularized knowledge" about the case and "only reviewed documents handpicked by... counsel"). *See also State Farm*, 980 F. Supp. 2d at 1049 ("[D]espite the fact that this data... supposedly came from [party] itself, [expert] admittedly did nothing to independently verify the reliability of this information before she used it in her calculations. This renders her statistical analysis unreliable and justifies excluding the opinions that rely on this information.").

For example, in *Arista Recs.*, 608 F. Supp. 2d at 426, the court excluded a technical expert's testimony where the expert "simply accepted conclusions" provided to him and failed to conduct any "independent analysis" of the defendants' system. The expert had read notes provided by the defendant and reviewed an operations manual, but admitted he had not examined the system firsthand or verified key technical details, such as the number or type of servers or the software used. *Id.* at 424. The court concluded that his opinions were "merely a restatement of [defendant's] views," and were therefore inadmissible under Rule 702, because "[a]n expert who simply repeats

the hearsay of the client who retained him, without any independent investigation or analysis, does not assist the trier of fact in understanding matters that require specialized knowledge." *Id.* at 429.



### V.    CONCLUSION

For the foregoing reasons, Skillz respectfully submits that the Court grant Skillz's Omnibus *Daubert* Motion to Exclude Certain Expert Opinions and Testimony.

Dated: June 27, 2025

KING & SPALDING LLP

By: /s/ Craig Carpenito

Craig Carpenito
ccarpenito@kslaw.com
Kathleen McCarthy
kmccarthy@kslaw.com
Amy Nemetz
anemetz@kslaw.com
KING & SPALDING LLP
1185 Avenue of the Americas
34th Floor
New York, NY 10036-2601
Tel: (212) 556-2100
Fax: (212) 556-2222

Lazar P. Raynal (*pro hac vice*)
lraynal@kslaw.com
Michael A. Lombardo (*pro hac vice*)
mlombardo@kslaw.com
KING & SPALDING LLP
110 N. Wacker Drive
Suite 3800
Chicago, IL 60606
Tel: (312) 995-6333
Fax: (312) 995-6330

Barry Kamar
bkamar@kslaw.com
KING & SPALDING LLP
Southeast Financial Center
200 S Biscayne Boulevard, Suite 4700
Miami, FL 33131

*Attorneys for Skillz Platform Inc.*

## WORD COUNT CERTIFICATION

I, Craig Carpenito, hereby certify that the foregoing memorandum of law complies with the word count limitations set forth in the Court's ruling in ECF No. 410 in this Action, and contains 22,760 words, exclusive of the caption, table of contents, table of authorities, signature blocks, and this certificate.

Dated:  June 27, 2025
   New York, New York

            /s/ Craig Carpenito
            Craig Carpenito