```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------- X
                                       :
SKILLZ PLATFORM INC.,                  :
                                       :
                        Plaintiff,     :    24cv1646 (DLC)
              -v-                       :
                                       :    OPINION AND
PAPAYA GAMING, LTD., et al.,           :        ORDER
                                       :
                        Defendants.    :
                                       :
-------------------------------------- X
```

APPEARANCES:

For the plaintiff Skillz Platform Inc.:

Amy Katherine Nemetz
Curtis Ryan Crooke
Jessica C. Benvenisty
Kathleen Elizabeth McCarthy
Craig Carpenito
King & Spalding LLP
1185 Avenue of the Americas
New York, NY 10036

Barry Antoine Kamar
King & Spalding
200 South Biscayne Blvd.
Suite 4700
Miami, FL 33131

Lazar Pol Raynal
Michael Anthony Lombardo
King & Spalding
110 N Wacker Drive, Suite 3800
Chicago, IL 60606

For the defendants Papaya Gaming, Ltd. and Papaya Gaming, Inc.:

Anthony Joseph Dreyer
Jordan Adam Feirman
Skadden, Arps, Slate, Meagher & Flom LLP
One Manhattan West
New York, NY 10001

David B. Leland
Margaret E. Krawiec
Michael A. McIntosh
Skadden Arps Slate Meagher & Flom LLP
1440 New York Avenue, NW
Washington, DC 20005

Allison M. Brown
Kirkland & Ellis LLP
601 Lexington Avenue
New York, NY 10022

DENISE COTE, District Judge:

Plaintiff Skillz Platform Inc. ("Skillz") brings this action against competitors Papaya Gaming, Ltd. and Papaya Gaming, Inc. (together, "Papaya") for violations of the Lanham Act, 15 U.S.C. § 1125(a)(1), and New York General Business Law ("GBL"), § 349. Skillz asserts that Papaya engaged in false advertising by stating or implying that its games pit human players against each other when in fact Papaya employed bots against human players. Papaya has moved for summary judgment on both of Skillz's claims. For the following reasons, Papaya's motion is denied.

## **Background**

The following facts are largely taken from the documents submitted in connection with this motion. Only those facts necessary to decide the parties' motions are stated. They are

taken in the light most favorable to the plaintiff, as the non-moving party, unless otherwise noted.

Skillz, founded in 2012, operates in the real-money skill-based mobile gaming ("RMSB") market.  Its games are available for users to download on the Apple App Store and Samsung Galaxy Store.  In RMSB games, players are matched by the platform with other users on games created by third parties and compete to win cash prizes or for game rewards.

Papaya was founded in 2016 and entered the RMSB market as a direct competitor to Skillz in 2019.  Papaya's games are also available on the Apple and Samsung app stores and are similar to those offered on the Skillz platform.  But while Skillz most commonly offers head-to-head competition between two players, Papaya offers multi-player tournaments with larger cash prizes.

Papaya has described its games are "fair" and "skill-based," represented that Papaya has "no vested interest" in and does not "profit" from who wins or loses its tournaments, and refers to "players," "individuals," and ultimately "winners" as the users on its platform.  Papaya advertised that its games are for "players" who are "over the age of 18".  Papaya released video advertisements showing images of humans playing games. One such video stated that Papaya's games "are directly

determined by your level of skill."  Another advertised that

Papaya will "match [you] against players with similar skills."

    In the FAQ section of its website for Solitaire Cash,

Papaya stated that the game

    isn't considered gambling as the outcome of our
    Tournaments is based on the <u>skill</u> of the <u>players</u>
    rather than luck or chance.  Solitaire Cash has <u>no</u>
    <u>vested interest</u> in who wins or loses, nor does it
    <u>profit</u> on the outcome of a Tournament that we provide.
    We are solely in the business of creating and managing
    tournaments.

(Emphasis supplied.)  The Help section of the app stated that

Papaya

    match[es] <u>players</u> against others with a similar <u>skill</u>
    level to ensure a fun and <u>fair</u> experience for
    everyone.  The matchmaking becomes more accurate the
    more you play, as the algorithm learns your <u>skill</u>
    better.  It's important to note that we cannot
    actively alter or manage the matchmaking manually --
    the algorithm is completely automated.

(Emphasis supplied.)  It also stated that Papaya takes "time to

review gameplay and account logs to ensure fairness at all

times, prevent fraudulent activities, and protect all of our

players' funds."

    The Apple App Store preview pages for Papaya's 21 Cash and

Bingo Cash both stated that users will "be matched with other

players within the same skill level . . . so the game is totally

fair and skill-based."  The Apple App Store preview page for

Bubble Cash similarly stated that the "multiplayer game"

leverages users' "skills" and that all users "receive the same layout."

As of December 27, 2023, Papaya's Terms of Use stated:

All competitions and tournaments offered on the
Services are games of <u>skill</u>.  <u>Winners</u> are determined
solely by the objective criteria described in the
Rules, including, without limitation, scoring and any
other applicable documentation associated with the
competitions.  The <u>individuals</u> who better use their
relevant skill and knowledge and accumulate the
highest scores will be the <u>winner(s)</u>.  The Services
may not be used for any form of gambling.

(Emphasis supplied.)

It is undisputed that Papaya used bots in its games from 2019 until at least November 2023.  Papaya employed two types of bots: liquidity bots and tailored bots.  Liquidity bots fill in user slots to ensure that a tournament "won't stay open for too long" as it awaits players.  In other words, liquidity bots "close tournaments faster, even if there are not enough players."  A Papaya document explains that liquidity bots serve Papaya's desire to have tournaments "finish in a reasonable time, so that players can use their winnings to enter additional tournaments."

Tailored bots, on the other hand, are used to create "a predetermined outcome."  Tailored bots are employed in sessions where Papaya "want[s] the player to finish at some predefined rank," which requires "control[ling] the scores of the rest of

the players."  In these sessions, Papaya wants "to guarantee a
specific outcome (win/lose/specific rank) to the user in a
tournament.  To control the outcome, all players in a tailored-
instance outside the 'receiving' player" are bots.

Papaya customers inquired between 2021 and 2023 whether
they were playing against other human beings or against a
computer or a bot.  Papaya's responses generally emphasized that
it matched players with similar skill levels and assured the
complaining customers over 200 times that "we do not use bots."
A Papaya internal policy memorandum instructed customer service
representatives to escalate any complaints to management that
reference "bot" or "AI," or where the user accuses Papaya of
matching them with non-human opponents.  Papaya does not dispute
that it closed the accounts of two players who expressed
suspicion about Papaya's use of bots.  For one of these players,
Papaya co-founder and chief technology officer Andrey Birman
instructed the Papaya customer service team to issue a
"[c]lassic 'while we do not comment on allegations . . .'
response" and to close the account because the player "smells
like trouble."  Some players who complained that Papaya was
using bots requested that their accounts be closed.

In internal documents, Papaya regularly identified Skillz
as its largest direct competitor and benchmark for performance

6

assessments.  During the period in which Papaya used bots, Skillz saw a decrease in market share while Papaya saw an increase.

Skillz initiated this action on March 4, 2024.  An Opinion of July 23, 2024 denied Papaya's motion to dismiss Skillz's complaint.  Skillz Platform Inc. v. Papaya Gaming, Ltd., No. 24CV1646(DLC), 2024 WL 3526853 (S.D.N.Y. July 23, 2024).  During discovery, Papaya executives did not respond to questions concerning this action, asserting their Fifth Amendment right to remain silent.  Following the completion of discovery, Papaya moved for summary judgment and to exclude the report and testimony of Skillz's experts Dr. Andreas Groehn and Jim Bergman on June 27, 2025.  The motions became fully submitted on August 8.[1]

## Discussion

Skillz brings two claims against Papaya: a claim of false advertising under the Lanham Act and of deceptive practices under GBL § 349.  Papaya has moved for summary judgment on both claims.

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the

---

[1]  The parties have made additional summary judgment motions which are not addressed in this Opinion.

movant is entitled to judgment as a matter of law."  Fed. R.
Civ. P. 56(a).  Material facts are those that "might affect the
outcome of the suit under the governing law."  <u>Choi v. Tower
Rsch. Cap., LLC</u>, 2 F.4th 10, 16 (2d Cir. 2021) (citation
omitted).  "[S]ummary judgment must be rejected if the evidence
is such that a reasonable jury could return a verdict for the
nonmoving party."  <u>Indemn. Ins. Co. of N. Am. v. Unitrans Int'l
Corp.</u>, 98 F.4th 73, 77 (2d Cir. 2024) (citation omitted).

A court's role with respect to a summary judgment motion
"is not to resolve disputed questions of fact but solely to
determine whether, as to any material fact, there is a genuine
issue to be tried."  <u>Moll v. Telesector Res. Grp., Inc.</u>, 94
F.4th 218, 227 (2d Cir. 2024) (citation omitted).  The court
must "review the record taken as a whole," and "may not make
credibility determinations or weigh the evidence."
<u>Id.</u> (citation omitted).

I.   Lanham Act

In its Lanham Act claim, Skillz asserts that Papaya made
false statements about the presence of bots on its platform,
illustrated by the following examples:

> - Video advertisements showing human players
>   playing games with text stating that Papaya's
>   games "are directly determined by [users'] level
>   of skill" and that Papaya will "match [users]
>   against players with similar skills."

8

- The FAQ page on Papaya's Solitaire Cash website, which states that the game "is based on the skill of the players" and that Papaya "has no vested interest in who wins or loses, nor does it profit on the outcome."

- The Help section of the Solitaire Cash App, which states that Papaya takes "time to review gameplay and account logs to ensure fairness at all times, prevent fraudulent activities, and protect all of our players' funds."

- The Apple App Store preview pages for Papaya's 21 Cash and Bingo Cash, which state: "You'll be matched with other players within the same skill level . . . so the game is totally fair and skill-based."

- Papaya's terms of use, which stated that "individuals who better use their relevant skill and knowledge and accumulate the highest scores will be the winner(s)."

Papaya seeks summary judgment on Skillz's Lanham Act claim, arguing that Skillz has no competent extrinsic evidence that any of these statements communicated a false message to consumers. It argues as well that Skillz has not shown that these statements were material to consumers, or that Skillz was injured because Papaya made these statements. Papaya's motion fails. Skillz has submitted evidence in opposition to this motion that would permit a jury to find in its favor.

Section 43(a) of the Lanham Act provides, in relevant part, that

any person who, on or in connection with any goods or services, . . . uses in commerce . . . [a] false or

> misleading description of fact, or false or misleading
> representation of fact, which
>
> in commercial advertising or promotion, misrepresents
> the nature, characteristics, [or] qualities . . . of
> his . . . services, or commercial activities,
>
> shall be liable in a civil action by any person who
> believes that he or she is or is likely to be damaged
> by such act.

15 U.S.C. § 1125(a)(1). "To prevail on a Lanham Act false

advertising claim, a plaintiff must establish that the

challenged message is (1) either literally or impliedly false,

(2) material, (3) placed in interstate commerce, and (4) the

cause of actual or likely injury to the plaintiff." Zesty Paws

LLC v. Nutramax Lab'ys, Inc., -- F.4th --, 2025 WL 2810078, at *2

(2d Cir. Oct. 3, 2025) (citation omitted).

   A.  Falsity

   Papaya argues that Skillz has failed to show that Papaya's

advertising was either literally or impliedly false.  "A

plaintiff can demonstrate falsity either by showing: (1) literal

falsity, i.e., that the challenged advertisement is false on its

face, or (2) implied falsity, i.e., that the advertisement,

while not literally false, is nevertheless likely to mislead or

confuse consumers."  Int'l Code Council, Inc. v. UpCodes Inc.,

43 F.4th 46, 57 (2d Cir. 2022) (citation omitted).

1. Literal Falsity

A plaintiff may establish literal falsity either by showing that the statement is expressly false or by establishing that the statement is "false by necessary implication, meaning that the advertisement's words or images, considered in context, necessarily and <u>unambiguously</u> imply a false message." <u>Zesty Paws</u>, 2025 WL 2810078, at *2 (citation omitted). "In other words, if the language or graphic is susceptible to more than one reasonable interpretation, the advertisement cannot be literally false." <u>Id.</u> (citation omitted). "At all times, [the] inquiry is into what reasonable consumers would understand the advertisement to mean." <u>Id.</u> (citation omitted). When analyzing literal falsity by necessary implication, the court must be careful not to "engage in disputatious dissection." <u>UpCodes Inc.</u>, 43 F.4th at 57 (citation omitted).

Once literal falsity is established, the plaintiff is not required to produce extrinsic evidence showing consumer deception. <u>Merck Eprova AG v. Gnosis S.p.A.</u>, 760 F.3d 247, 256 (2d Cir. 2014). In other words, when a statement is literally false, consumer deception and confusion is presumed and the falsity element is met. <u>See</u> <u>id.</u> at 256-57; <u>Apotex Inc. v. Acorda Therapeutics, Inc.</u>, 823 F.3d 51, 63 (2d Cir. 2016). The burden thus shifts to the defendant to demonstrate "the absence

11

of consumer confusion." <u>Merck</u>, 760 F.3d at 256 (citation
omitted).

Skillz has shown that a reasonable juror may find that
Papaya's statements were literally false.  Papaya's
representations that its tournaments are "fair," "skill-based,"
only between "players" and "individuals" who are "over the age
of 18," that it has "no vested interest" in who wins or loses,
and that it does not "profit on the outcome of a Tournament,"
could be construed by a reasonable jury as either expressly
false or false by necessary implication.  When Papaya made these
statements to consumers, it is undisputed that it deployed bots
across its games.  Some of these bots provided liquidity to the
entry rosters of tournaments.  Other bots entered games so that
Papaya could control the results of the tournament.  A jury
could thus conclude from the record that statements that the
games were "fair" and "skill-based" were literally false.
Further, references to "players" and "individuals" "over the age
of 18" could likewise be found as false because Papaya employed
bots in tournaments against human players.  Finally, a jury
could find statements that Papaya "had no vested interest" or
did not "profit" in the outcome of a game to be literally false
because there is evidence that Papaya used bots to control the
outcomes of tournaments.  At bottom, a reasonable jury could

12

find that a statement was either expressly false, or false by necessary implication because a consumer in the RMSB gaming market would unambiguously conclude from Papaya's statement, for example, that its games only involved human players whose individual skill would determine the outcome of a tournament.

Papaya first argues that it is entitled to summary judgment on a claim of literal falsity since it never expressly stated in its advertisements that there were no bots in its games. This argument fails. The issue is what a reasonable consumer would understand Papaya's statements to mean. Should a jury find, for instance, that the advertising necessarily and unambiguously implied that only human players competed in Papaya's games, it would be entitled to find that the advertising was literally false.

Papaya next argues that its use of the terms "skill-based," "fair," "players," and "individuals" were not literally false because those terms are susceptible to multiple interpretations. While a word or phrase may have multiple meanings when considered in isolation, a jury will be asked to determine whether Papaya's statements "considered in context" were literally false. Zesty Paws, 2025 WL 2810078, at *2 (citation omitted). Skillz has shown that a jury may find that they were.

In seeking summary judgment, Papaya additionally relies on its expert, Dr. Randal Heeb, whose report concluded that skill played a greater role than chance in the outcome of Papaya's tournaments, regardless of bot usage.  This expert report, even if admissible,[2] does not entitle Papaya to summary judgment on the issue of literal falsity regarding the statements that Papaya made in its advertising.  It is undisputed that Papaya used tailored bots to control the outcomes of tournaments.  By doing so, Papaya could prevent players from winning -- or allow them to win -- no matter how they performed in the game.  A jury may weigh all the admissible evidence to determine if Papaya's use of the term "skill-based" was unambiguously false.

Finally, Papaya contends that its statement that it has "no vested interest" in and that it does not "profit" on tournament outcomes accurately describes its games.  Papaya relies on the testimony of its Rule 30(b)(6) witness, who stated that Papaya made less money in sessions with bots because bots do not pay entry fees.  Papaya also refers to the conclusions in the reports submitted by its experts Dr. Heeb and Dr. Jonathan Orszag[3] that human players received more in total cash prize

---

[2]  Skillz has moved to strike Dr. Heeb's report.  That motion is not addressed in this Opinion.

[3]  Skillz has also moved to strike Dr. Orszag's report.

awards due to Papaya's use of bots.  Again, a jury must
determine whether Papaya's statements, taken in context, were
literally false.  While Papaya has shown that it will dispute
that fact, it has not shown that it is entitled to summary
judgment on this issue.

      2. Implied Falsity

Alternatively, a plaintiff can show that a statement that
is not literally false may be false by implication and thereby
mislead or confuse consumers.  Tiffany (NJ) Inc. v. eBay Inc.,
600 F.3d 93, 112 (2d Cir. 2010).  "[A]n impliedly false message
leaves an impression on the listener or viewer that conflicts
with reality."  UpCodes, 43 F.4th at 57 (citation omitted).  It
requires "a comparison of the impression left by the statement,
rather than the statement itself, with the truth."  Apotex, 823
F.3d at 63 (citation omitted).

There are two ways to demonstrate that a statement, which
may be an ambiguous statement, is false my implication.  The
falsity may be demonstrated through either "extrinsic evidence
of consumer confusion" or "evidence of the defendant's
deliberate deception."  UpCodes, 43 F.4th at 57 (citation
omitted).  To constitute deliberate deception the defendant's
conduct must be "egregious."  Merck, 760 F.3d at 256 (citation
omitted).  Evidence of deliberate deception "creates a

rebuttable presumption of consumer confusion."  <u>UpCodes</u>, 43
F.4th at 57 (citation omitted).

### a. Intentional Deception

To begin with, Skillz has presented sufficient evidence
from which a jury could conclude that Papaya deliberately and
intentionally sought to deceive consumers, entitling Skillz to a
presumption of consumer confusion.  Papaya responded to over 200
consumer complaints about bots with denials of their existence.
As an example, when one player asked, "Is every single player I
play against in a tournament a real player or are there
computers playing at times?", Papaya responded, to "clarify that
we do not use bots or computer players" and that "if it were
possible to control [tournaments] manually, it would not be fair
to other players."  Papaya also terminated accounts of users who
raised suspicion abouts bots, referring to one user who
complained as "smell[ing] like trouble" and instructing the
customer service team to close the account with a statement
skirting the allegation.  Papaya customer service
representatives were instructed to raise with management any
complaints that referenced bots.  In one such instance, an
employee stated that a customer service representative
"displayed poor judgment" by keeping open an account of a
consumer who had complained about bots and demanded a refund.

16

Emails show that Papaya had an internal policy of removing posts in its Facebook group that mentioned bots and that Papaya acted upon that policy.  A jury would be entitled to find that Papaya's sustained effort to prevent the public from learning about its use of bots was egregious commercial misconduct.

Papaya argues that Skillz is not entitled to a presumption of deception for two reasons.  It first argues that Skillz has failed to provide evidence that any intent to deceive was linked to a specific challenged statement.  In making this argument, Papaya relies on Church & Dwight Co. v. SPD Swiss Precision Diagnostics, GmBH, 843 F.3d 48 (2d Cir. 2016).  But Church & Dwight provides little support for Papaya's argument.  In finding intentional deception, Church & Dwight relied on internal statements by executives and the company's awareness of consumer confusion, among other things.  Id. at 67-68.  Here, similarly, there is evidence that Papaya and its executives recognized that its use of bots "did not align" with its public statements and that this "misalignment" confused customers.  Id. at 67.  Papaya's advertising led customers to make pointed inquiries about Papaya using bots and to fling angry accusations at Papaya.  Papaya did not respond to the inquiries and accusations by acknowledging bot usage, but by denial.  For example, executives decided to respond to a consumer who asked

17

for a direct answer on whether Papaya used bots by informing the user that the platform has "real players" and placing the blame on "rare cases where players use automated systems." Recognizing that consumers noticing bots on the platform was a growing issue and impacted "trust in our fairness," Papaya executives modified its bots' performance to make bot profiles appear more human so that fewer users would detect their usage going forward. As one Papaya employee explained, "While understanding the need for bots, the margin of their winnings should be smaller and less obvious to our players." At bottom, a reasonable juror could conclude that in crafting its advertising and describing its platform to the public, Papaya intentionally sought to deceive its customers about its employment of bots.

Papaya next refers to the testimony of its Rule 30(b)(6) witness, who stated that instances in which Papaya told customers that it did not use bots were "an unfortunate mistake" committed by the customer support vendor and "not Papaya's position." Papaya's executives have not made similar representations. They invoked their Fifth Amendment privilege to remain silent during their depositions and have not offered affidavits in support of this motion. In any event, Skillz has offered sufficient evidence from which a jury could conclude

that Papaya intended in its public statements to deceive
consumers regarding its use of bots.

                    b. Extrinsic Evidence of Consumer Confusion

    Skillz has also offered extrinsic evidence of consumer
confusion created by Papaya's use of the terms "skill-based,"
"fair," "players," "winners," "individuals," and "no vested
interest," in its advertising.  Because it is undisputed that
Papaya used bots to provide liquidity in tournament rosters and
to control the outcomes of tournaments, until at least November
2023, Skillz need only demonstrate that there is sufficient
evidence from which a jury could find that consumers were
confused about Papaya's bot usage -- i.e., that consumers
expected that Papaya's games would only involve human
competitors.

    Skillz relies on both evidence of actual confusion and
expert testimony to support its claim that consumers were
confused.  Evidence of actual confusion has already been
described and will not be further discussed.

    Skillz's expert witness, Dr. Andreas Groehn, holds advanced
degrees in economics and has worked for over thirty years as an
expert in support of complex litigation.  He conducted two
surveys for Skillz: a perception survey to determine whether
consumers perceive, based on Papaya's marketing material, that

19

they are playing against human or bots; and a likelihood survey, to determine how consumers react to learning that the games include previously undisclosed bots.  Skillz relies on the first survey as extrinsic evidence of consumer confusion.

Dr. Groehn conducted a quasi-random internet survey of 400 individuals that was fielded between April 13 and 15, 2025.  The respondents had played at least one of four games that Skillz and Papaya offer on their platforms.  Groehn first showed the respondents one of Papaya's video advertisements for Solitaire Cash.  Upon watching the video, 45.8% of respondents indicated that they believed that the game used solely human players.  The survey next presented respondents with a mock app store description of Solitaire Cash.  This description was constructed from Papaya's public statements:[4]

> Solitaire cash makes sure to match <u>players</u> against other opponents with a similar <u>skill</u> level to ensure a fun and <u>fair</u> experience for everyone.  You'll be matched with other <u>players</u> within the same <u>skill</u> level, and you will get the same deck -- so the game is totally <u>fair</u> and <u>skill-based</u>.  The outcome of Solitaire cash is based on the <u>skill</u> of the players, rather than luck or chance.  Solitaire cash has <u>no vested interest</u> in who wins or loses, nor does it <u>profit</u> on the outcome of a tournament that we provide.

---

[4]  Groehn drew directly from four statements in the Solitaire Cash FAQ, Help section, and Apple App Store Preview.

(Emphasis supplied.)  Upon reading the description, 60% of respondents indicated that they thought the game included only human players.

Papaya does not challenge Groehn's qualifications to serve as an expert and to devise a survey.  It does move to exclude the confusion survey, on the grounds that is inadmissible for, principally, three reasons.[5]  Papaya's motion is denied.

Papaya contends the survey is inadmissible because it did not use a control, stripped the statements to which respondents reacted of their "real world" context, and did not survey the appropriate populations, excluding prospective game players and thereby including too many men.[6]  These areas may be explored on cross-examination of Dr. Groehn at trial, but do not require exclusion of the survey.  As for its first objection, Papaya has not explained what kind of control could be used to improve the

---

[5]  The well-established Rule 702 and <u>Daubert</u> standards are set forth below.

[6]  Papaya's expert Dr. Bruce Isaacson contended in a rebuttal report that Dr. Groehn did not survey the appropriate demographic distribution of consumers because his filter questions screened for past players of RMSB games, not prospective consumers whom the advertisements are directed towards.  In response, Dr. Groehn filed a supplemental report testing Dr. Isaacson's critique by removing randomly selected male respondents to match the ratio of male to female respondents in Dr. Isaacson's own survey of Skillz's actual customers.  The differences in Dr. Groehn's survey results after the demographic recalibration were statistically insignificant.

reliability of the survey.  The survey is designed to test the
impression created by the words Papaya chose to describe its
games.  Testing responses to statements that Papaya did not use
in its advertising would be neither relevant nor illuminating.

B.  Materiality

Papaya next argues that Skillz has failed to produce
sufficient evidence that Papaya's advertisements concerned
inherent and material qualities of Papaya's tournaments.  Papaya
is incorrect.

Proof of falsity alone is not sufficient to succeed on a
false advertising claim.  Under any theory of falsity, "the
plaintiff must also demonstrate that the false or misleading
representation involved an inherent or material quality of the
product." Apotex, 823 F.3d at 63 (citation omitted).  This
requirement is "essentially one of materiality." Id. (citation
omitted).  For a statement to be material, it must be "likely to
influence purchasing decisions." UpCodes, 43 F.4th at 63
(citation omitted).

The issue of materiality and injury may overlap when the
parties are direct competitors.  While the materiality of the
falsity and the injury to the plaintiff resulting from the
defendant's falsity are "separate essential elements . . . where
the defendant and plaintiff are competitors in the same market

22

and the falsity of the defendant's advertising is likely to lead consumers to prefer the defendant's product over the plaintiff's," proof of injury to the plaintiff may also demonstrate the materiality of the falsehoods. Church & Dwight, 843 F.3d at 71-72.

To prove Papaya's false statements were material, Skillz relies on evidence that consumers complained to Papaya and closed their accounts with Papaya when they came to believe that Papaya was using bots in its games. It relies as well on Papaya's efforts to deceive consumers about its use of bots. These categories of evidence have already been described. In arguing that Skillz has failed to present evidence of materiality, the parties principally debate the merits of the second survey Dr. Groehn conducted, which was of 500 individuals.

Dr. Groehn sought to measure the likelihood of consumers continuing to play if they learned that some of their opponents in real-money games whom they thought were human were actually bots. Half the respondents were randomly asked if they would "continue" to play if they were informed that some of their opponents were bots, and the other half were asked if they would "stop" playing. Of the former group, 51.2% of respondents indicated they would be unlikely or very unlikely to continue

playing.  Of the latter, 66.8% indicated they would be likely or very likely to stop playing.

As a control, half the respondents were also asked if they would continue -- with the other half being asked if they would stop -- playing if they were informed that they had to wait one hour to learn the results of the game.  On this second question, 40.8% of the former group responded they were unlikely or very unlikely to continue playing and 54.8% responded they were likely or very likely to stop playing.  At bottom, regardless of how the question was phrased, a significant number of respondents showed a propensity to cease playing when they learned there were bots in the games.

Papaya contends that Dr. Groehn's report is inadmissible and, in any event, does not measure the materiality to consumers of the presence or absence of bots in RMSB games.  Instead, Papaya argues, it measures their responses to being told they had been intentionally deceived.  Skillz has shown that Dr. Groehn's survey is admissible and relevant to the question of whether Papaya's failure to disclose that its games employed bots concerned a material quality of its games.  Papaya's attacks go to the weight to be given to the survey and can be explored during cross examination of Dr. Groehn.

Finally, Papaya argues that bots are so ubiquitous in the
industry that consumers "fully expect" them to be deployed.  It
explains its decision not to disclose its use of bots as in line
with industry practice.  These arguments fail to engage with the
evidence of deception and materiality offered by Skillz.
Accordingly, Skillz has offered sufficient evidence of
materiality to raise a question of fact for the jury to resolve.

C.  Injury

Finally, Papaya argues that Skillz fails to create a
genuine issue of material fact as to the injury it suffered due
to Papaya's false advertising.  It is wrong.

To prevail on this element of its claim, the plaintiff must
demonstrate injury to a "commercial interest in reputation or
sales."  Lexmark Int'l, Inc. v. Static Control Components, Inc.,
572 U.S. 118, 132 (2014).  That injury must be proximately
caused by the Lanham Act violation.  Id.  The plaintiff
"ordinarily must show economic or reputational injury flowing
directly from the deception wrought by the defendant's
advertising," which "occurs when deception of consumers causes
them to withhold trade from the plaintiff."  Id. at 133.  See
also Souza v. Exotic Island Enters., Inc., 68 F.4th 99, 119 (2d
Cir. 2023).  Injury "can be established when defendant and
plaintiff are competitors in a relevant market and plaintiff

25

demonstrates a logical causal connection between the alleged false advertising and its own sales position." Church & Dwight, 843 F.3d at 71 (citation omitted).

It is undisputed that Skillz and Papaya are direct competitors in the RMSB market. Skillz has produced evidence reflecting that Papaya regularly identified Skillz as its largest competitor and benchmark for performance assessments. Further, there is record evidence that Papaya's growth in market share in 2021 coincides with Skillz's decline in market share. Even if Skillz were unable to quantify its damages with sufficient certainty to recover those damages, it could seek injunctive relief and disgorgement of the defendant's ill-gotten profits. See Lexmark, 572 U.S. at 135. Here, Skillz relies on the expert report from Jim Bergman to quantify its damages.

Bergman is an economist and financial analyst. He opines that, conservatively, Skillz suffered actual damages in an amount over $637 million, and that Papaya was unjustly enriched in an amount between $650 and $719 million, depending on whether that profit is measured by Papaya's cost savings from its use of bots or measured by how much less it would have earned without deception. In connection with its summary judgment motion, Papaya moves to exclude Bergman's report and testimony. That motion is denied.

Federal Rule of Evidence 702 governs the admission of expert testimony in federal court.  Rule 702 allows a "witness who is qualified as an expert by knowledge, skill, experience, training, or education" to testify, "in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that":

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702.  In addition, courts analyze admissibility under Rule 702 using the principles articulated in Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993).

A court's discretionary gatekeeping inquiry must, of course, "be tied to the facts of a particular case."  United States v. Requena, 980 F.3d 30, 47 (2d Cir. 2020) (citation omitted).  Expert testimony should be excluded "if it is speculative or conjectural or based on assumptions that are so unrealistic and contradictory as to suggest bad faith or to be in essence an apples and oranges comparison."  Zerega Ave.

27

Realty Corp. v. Hornbeck Offshore Transp., LLC, 571 F.3d 206, 214 (2d Cir. 2009) (citation omitted).  Contentions that an expert's "assumptions are unfounded," however, "go to the weight, not the admissibility, of the testimony."  Id. (citation omitted).

Papaya does not challenge Bergman's expertise.  It contends, however, that his damages analysis must be stricken for many reasons.  Its principal arguments are addressed below; none of them succeed.[7]  Before addressing Papaya's arguments, Bergman's calculations are described.

To begin with, Bergman calculated the amount of Papaya's unjust enrichment based on the additional profit it was able to achieve from its use of bots.  Bergman compared Papaya's user acquisition cost per paying monthly active user ("PMAU") in 2021 through 2022[8] against Skillz's costs per PMAU in 2019 through 2020, explaining that those periods capture user acquisition costs at similar stages of the companies' development, growth, and nominal revenue.  The ratio between the averages of user

_____

[7]  Papaya also challenges Bergman's lengthy description of the RMSB market and other introductory portions of his report. Those passages provide Papaya with an explanation of Bergman's assumptions and the bases for his calculations.  The parties may address in their motions in limine, should there be a dispute, the extent to which these passages may be a component of Bergman's direct testimony.

[8]  Papaya did not produce PMAU data for earlier periods of time.

acquisition costs ("UA Spend Ratio" or "Ratio") was 2.10, that is, Skillz spent 2.10 times as much as Papaya to acquire its users. Bergman then divided Papaya's actual revenue growth rate each year by the UA Spend Ratio to estimate growth rates for each year without bot usage, and then applied those growth rates to the new model. Through further calculations, including crediting Papaya for a portion of its actual costs, Bergman estimated Papaya's additional profits from its use of bots as $719 million.

As an alternative measure of unjust enrichment, Bergman also calculated the amount of Papaya's cost savings from its use of bots. To do so, Bergman multiplied Papaya's actual user acquisition costs by the UA Spend Ratio, reasoning that Papaya would have had to spend user acquisition costs similar to that spent by Skillz in order to achieve the revenue growth without bots. Through this method, Bergman estimated Papaya's cost savings from its use of bots as $652.6 million.

Finally, Bergman calculated Skillz' actual damages. Bergman took the measure of Papaya's revenue attributable to its use of bots, which he had calculated in the unjust enrichment model, and multiplied it by Skillz's 2021 market share in the RMSB gaming market excluding Papaya. Applying further

29

calculations, Bergman concluded that Skillz suffered $637.5 million in damages.

In moving to exclude Bergman's report and testimony, Papaya first argues that Bergman has committed a fundamental error of analysis. It contends that the but-for world in a false advertising case must be one in which the false statements were never made and cannot be one in which the accused business practice did not occur. Papaya has not shown that Bergman's choice was unreasonable. There is evidence that Papaya may not have been able to operate in the RMSB marketplace at all if it publicly and accurately disclosed its use of bots. With the employment of bots, Papaya may have then been classified as a gambling platform. Gambling platforms differ from RMSB platforms in that gambling platforms hold a stake in the results. In gambling, the outcomes are determined by the players' chance or luck. In RMSB games, however, the platform is not supposed to have a stake in the result of a tournament; it is supposed to collect the same revenue regardless of who wins, whether from entry fees, advertising revenue, or in-app purchases. Players in RMSB games do not play against the house, thereby removing any incentive for the house to manage players' returns, and all players have the same starting conditions. In other words, the outcome of an RMSB game is supposed to be based

on players' skill.  Accordingly, had Papaya disclosed its use of
bots, Papaya may have been faced with the regulatory and tax
requirements with which gambling platforms must comply.  In
addition, it may have lost access to app stores and payment
processors and have been excluded from the RMSB market.[9]

     Papaya also argues that the UA Spend Ratio, a key input in
all three of Bergman's models, is fatally flawed and unreliable.
To generate the Ratio, Bergman compared acquisition costs per
user spent by Skillz and Papaya during two periods of time that
Bergman concluded placed them at similar stages of overall
development.  Papaya contends that Bergman's reasoning ignores a
multitude of factors that could influence why Skillz would need
to spend more to acquire a user than Papaya, such as Papaya's
superiority in user interface, social media strategy, and
loyalty programs.  Instead, Bergman attributed the entire
differential to Papaya's use of bots.  While other factors
could, as a theoretical matter, impact on the Ratio, Papaya has
not shown that Bergman overlooked any factor that would
materially alter his analysis.  To the extent Papaya's
contentions about Bergman's failure to disaggregate confounding

---

[9]  Papaya provided certifications to app stores and payment
processors that its "skill-based" games would likely not fall
under federal and most state gambling laws.  The certifications
did not disclose Papaya's use of bots.

factors are relevant, they go to the weight of Bergman's testimony, not its admissibility.[10]  See Daubert, 509 U.S. at 596; Zerega, 571 F.3d at 214.

Papaya further contends that Bergman erred in calculating the UA Spend Ratio.  When calculating user acquisition expense per player, Bergman included Skillz's spending on engagement marketing but did not do so for Papaya, thereby, in Papaya's view, inflating the Ratio.  Papaya has not shown that Bergman's calculation fails to reflect a reliable application of the principles and methods of his discipline to the facts of this case.  Bergman explained in his deposition that, under his review of the available evidence, Skillz's spending on engagement marketing involved marketing necessary to retain users.  In contrast, the financial reports that Papaya provided did not meaningfully mention engagement marketing costs, let alone disaggregate them from general sales and marketing expenses.  Bergman's explanation was reasonable given the documentary record available to him.

Papaya next argues that Bergman improperly calculated the companies' user acquisition costs per PMAU by relying on year-

---

[10]  Papaya similarly argues that Bergman's models inaccurately assume a RMSB gaming market where Skillz and Papaya are the only two significant competitors.  That argument mischaracterizes Bergman's report.

end figures for Papaya and monthly averages over the relevant year for Skillz. Bergman, however, explained that disaggregated monthly data was unavailable for Papaya.

Papaya also takes issue with Bergman's comparison of Papaya's financials from 2021 through 2022 with Skillz's financials from 2019 through 2020. Papaya, however, did not provide the PMAU data from earlier years. Further, Bergman explained that a comparison of these timeframes was reasonable because Skillz entered the market earlier than Papaya and Skillz's revenue growth during that period was similar to Papaya's in 2021, when it began to rely heavily on bots to expand its business. Critically, had Bergman used Skillz's financials from 2021 to 2022 in his model, he would have calculated a UA Ratio of approximately 2.44, which would have increased his calculation of Skillz' damages.

At bottom, Skillz has shown that Bergman employed a level of rigor in his methodology that is sufficiently reliable to pass muster under Rule 702 and Daubert. See Clerveaux, 984 F.3d at 233. Accordingly, Papaya may seek to demonstrate the limitations of Bergman's models in its cross-examination of him at trial.

33

## II.  GBL § 349

Section 349 of the GBL prohibits "deceptive acts or practices in the conduct of any business, trade, or commerce in the furnishing of any service in this state."  N.Y. Gen. Bus. Law § 349(a).  To demonstrate a violation of § 349, a plaintiff must establish "that a defendant has engaged in (1) consumer-oriented conduct that is (2) materially misleading and that (3) plaintiff suffered injury as a result of the allegedly deceptive act or practice."  McCracken v. Verisma Sys., Inc., 91 F.4th 600, 607 (2d Cir. 2024) (citation omitted).  "The elements [of § 349] are similar in substance to those of a false advertising claim under the Lanham Act."  UpCodes, 43 F.4th at 56 n.3.

Papaya treats the GBL claim and the Lanham Act claim as identical for purposes of this motion and makes no separate argument regarding disputes of material fact concerning the GBL claim.  Accordingly, the summary judgment motion on the GBL claim fails as well.

## Conclusion

Papaya's June 27, 2025 motions for summary judgment on Skillz's claims and to exclude the testimony of Dr. Andreas

Groehn and Jim Bergman are denied.

Dated:    New York, New York
          October 27, 2025

                              _____
                                     DENISE COTE
                         United States District Judge