Case 1:24-cv-01646-DLC    Document 611    Filed 02/12/26    Page 1 of 32

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------- X
                                           :
SKILLZ PLATFORM INC.,                      :
                                           :
                          Plaintiff,       :        24cv1646 (DLC)
                 -v-                        :
                                           :        OPINION AND
PAPAYA GAMING, LTD., et al.,               :            ORDER
                                           :
                          Defendants.      :
                                           :
----------------------------------------- X

APPEARANCES:

For the plaintiff Skillz Platform Inc.:

Amy Katherine Nemetz
Curtis Ryan Crooke
Jessica C. Benvenisty
Kathleen Elizabeth McCarthy
Craig Carpenito
King & Spalding LLP
1185 Avenue of the Americas
New York, NY 10036

Barry Antoine Kamar
King & Spalding
200 South Biscayne Blvd.
Suite 4700
Miami, FL 33131

Lazar Pol Raynal
Michael Anthony Lombardo
King & Spalding
110 N Wacker Drive, Suite 3800
Chicago, IL 60606

For the defendants Papaya Gaming, Ltd. and Papaya Gaming, Inc.:

Anthony Joseph Dreyer
Jordan Adam Feirman
Skadden, Arps, Slate, Meagher & Flom LLP
One Manhattan West
New York, NY 10001

David B. Leland
Margaret E. Krawiec
Michael A. McIntosh
Skadden Arps Slate Meagher & Flom LLP
1440 New York Avenue, NW
Washington, DC 20005

DENISE COTE, District Judge:

In this Lanham Act lawsuit, defendant Papaya Gaming Ltd. ("Papaya") has moved to exclude portions of the expert report of Dr. Jose Zagal, an expert in the field of gaming, offered by plaintiff Skillz Platform Inc. ("Skillz"). Skillz, in turn, has moved to exclude the testimony of two experts on whom Papaya relies: Dr. Christoffer Holmgard, a video game expert, and Randal Heeb, an economist. For the following reasons, each of the Daubert motions is granted in part.

## Background

Skillz and Papaya are competitors in the real-money skill-based mobile gaming industry ("RMSB"). Skillz asserts that Papaya employed bots to play against humans without disclosing that fact to the public and thereby engaged in false advertising.

A brief description of Papaya's platform will help to place these Daubert motions in context. Users of Papaya's platform paid cash to enter tournaments and were able to win either cash prizes or rewards to use in playing more games on Papaya's

2

platform.  They played games such as Solitaire and were assigned to tournaments according to their skill levels.  Papaya no longer contests that it used bots in its RMSB games until some point in late 2023 or early 2024 without disclosing that fact to the public.  Because Papaya's tournaments involved many players, Papaya often used bots instead of humans to fill out a roster of players.  Sometimes, Papaya controlled whether a human player won or lost by assigning the player to a tournament that included only bots and the single human player.

Skillz had entered this market before Papaya and only offers tournaments in which two human players compete against each other.  In contrast, Papaya offers tournaments in which multiple players purportedly compete against each other.  Skillz asserts that Papaya's commercial success, and Skillz's loss of market share, was attributable in large part to Papaya's employment of undisclosed bots.

Relying on Papaya's undisclosed use of bots, Skillz's Lanham Act claim asserts that Papaya's advertising was false and misleading when it asserted that Papaya's games are fair and skill-based, that Papaya matches players against similarly-skilled players, and that its games "are directly determined by your level of skill."  Skillz also asserts that Papaya's public statements that it has "no vested interest" in and does not

3

"profit" from who wins or loses its tournaments were false and misleading.  As additional examples of false advertising, Skillz points to Papaya's statements about "players", "individuals" and "winners" as the users of its platform.  An Opinion of October 27, 2025, denied Papaya's motion of summary judgment on Skillz's claims and further describes the parties' positions in this lawsuit.  It is incorporated by reference and familiarity with it is assumed.  <u>Skillz Platform Inc. v. Papaya Gaming, Ltd.</u>, No. 24CV1646 (DLC), 2025 WL 3012836 (S.D.N.Y. Oct. 27, 2025).

The <u>Daubert</u> motions addressed in this Opinion principally address specific analyses which the parties wish to present at trial.  After setting out the governing legal standards, this Opinion will address Papaya's motion to strike portions of Dr. Zagal's report.  It will be followed by a discussion of the motions brought by Skillz to strike Dr. Holmgard's and then Dr. Heeb's reports.

## **Discussion**

Federal Rule of Evidence 702 governs the admission of expert testimony.  Rule 702 allows a "witness who is qualified as an expert by knowledge, skill, experience, training, or education" to testify, "in the form of an opinion or otherwise," if:

4

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  Under this rule, the trial judge must first address "the threshold question of whether a witness is qualified as an expert by knowledge, skill, experience, training, or education to render his or her opinions."  Nimely v. City of New York, 414 F.3d 381, 396 n.11 (2d Cir. 2005) (citation omitted).

If the trial judge finds the witness is qualified, she then has a "gatekeeper function," which requires her to ensure that any and all scientific testimony or evidence admitted "is not only relevant, but reliable."  Restivo v. Hessemann, 846 F.3d 547, 575 (2d Cir. 2017) (citing Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 589 (1993)).  Expert testimony is relevant where it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  Amorgianos v. Nat'l R.R. Passenger Corp., 303 F.3d

256, 265 (2d Cir. 2002) (citation omitted).  To determine whether expert testimony has a sufficiently reliable foundation to be admissible at trial, a district court should consider the "indicia of reliability identified in [Rule] 702."  Clerveaux v. E. Ramapo Central School Dist., 984 F.3d 213, 233 (2d Cir. 2021) (citation omitted).

A district court may consider as well the Daubert factors in its assessment of the reliability of expert testimony.  These factors include:

> (1) whether the methodology or theory has been or can be tested; (2) whether the methodology or theory has been subjected to peer review and publication; (3) the methodology's error rate; and (4) whether the methodology or technique has gained general acceptance in the relevant scientific community.

Id. (citing Daubert, 509 U.S. at 593-94).  "Daubert instructs a district court to focus on the principles and methodology employed by the expert, without regard to the conclusions the expert has reached or the district court's belief as to the correctness of those conclusions."  Bustamante v. KIND, LLC, 100 F.4th 419, 427 (2d Cir. 2024) (citation omitted).

Moreover, "nothing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert."  Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997).

6

"[W]hen an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, Daubert and Rule 702 mandate the exclusion of that unreliable opinion testimony." Amorgianos, 303 F.3d at 266 (citation omitted).

Under Rule 403, courts may exclude relevant evidence "if its probative value is substantially outweighed by a danger of ... unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. The term unfair prejudice refers to the capacity of some concededly relevant evidence to lure the factfinder into finding liability on a ground different from proof specific to the claim at issue. See United States v. Massino, 546 F.3d 123, 132-33 (2d Cir. 2008).

I.   Dr. Zagal

Dr. Jose Zagal is an expert in the mobile/electronic gaming industry. He has written and lectured on issues of game engineering and ethics in gaming. Papaya does not challenge Dr. Zagal's expertise in gaming and game engineering. It does challenge his expertise in ethics and morality.

A. Dr. Zagal's Report

In his report of April 18, 2025, Dr. Zagal first describes the gaming industry, explaining how to distinguish between games

7

of skill and games of chance.  He defines games of skill as games that emphasize player proficiency and that reject a player playing against the house.  He describes the characteristics of the RMSB industry, which is the industry in which the plaintiff and defendant compete.  Dr. Zagal explains the incentives that exist to describe one's RMSB game as a game of skill as opposed to a game of chance or gambling.

Next, Dr. Zagal describes issues of fairness and the ethics of competition and matchmaking.  These principles include ensuring that the outcome of a specific match is determined by skill, that players in competition are matched with players of similar skill, and that the players share an understanding of the game experience in which they are participating.

In 2013, Dr. Zagal and two colleagues published an article entitled "Dark Patterns in the Design of Games," which discussed ethical considerations in game design.  It defined a dark game design as "a pattern used intentionally by a game creator to cause negative experiences for players which are against their best interests and likely to happen without their consent."  One dark pattern discussed in the article is impersonation, which occurs when a game assumes parts of a player's identity.  In his expert report, Dr. Zagal describes the fake multiplayer as another dark patten that has appeared in video games since the

8

article was published.  The fake multiplayer refers to games that simulate multiplayer experiences using artificial intelligence ("AI") or bots instead of real human players without a player's knowledge or consent.

A host of an RMSB game faces a particular challenge, which is the time it takes to find players with similar skill levels. The number of players available to play a game at a particular moment is referred to as player liquidity.  The more participants in a game, the lower the player liquidity.  Dr. Zagal explains that Papaya used bots to solve the problem of player liquidity.  Dr. Zagal distinguishes between AI bots, which have artificial intelligence, and bots like those used by Papaya.  He describes Papaya's bots as a static score preselected by an algorithm.

Dr. Zagal examined Papaya game logs for a multi-year period.  He concluded that Papaya's use of bots was widespread, was implemented to benefit Papaya, was deceptive, empowered Papaya to control the outcomes of tournaments, and was intentional.  During the period he studied, Papaya had over 11 million human player accounts.  During this same period, over 50% of users (counting both bots and humans) in Papaya's tournaments were bots.  A significant majority of Papaya's tournaments that used bots occurred when Papaya was experiencing

9

its fastest growth, that is, in early 2021.  The tournaments Papaya ran averaged 5.3 participants (humans and bots) in 2021, grew to an average of 6.1 participants in 2022 and 2023, and then shrank somewhat in 2024.  When the use of bots disappeared from the data that Dr. Zagal analyzed, which was in late 2023, the number of players in Papaya tournaments decreased.

In roughly one-quarter of its tournaments, Papaya awarded a cash prize as opposed to its game currency, which it calls gems. In the cash tournaments that occurred in early 2021, a significant majority of the cash tournaments had bots; from late 2021 until early 2023, two-thirds to three-quarters of the cash tournaments had bots; and from early 2023 to October 2023, over half of the cash tournaments had bots.

Dr. Zagal also analyzed Papaya data linked to a Tailored Session, which is a tournament in which Papaya controlled the outcome of the tournament.  In these sessions, all the participants but one are Papaya bots.  Tailored Sessions accounted for almost 24% of all Papaya tournaments, with the highest percentage (48%) occurring in 2021, and the percentage declining thereafter.  Roughly two-thirds of the 11 million players who participated in Papaya's tournaments played in at least one Tailored Session, and over 50% played in at least one Tailored Session in which they lost.  As a result of its

10

extensive use of bots, Papaya paid out less than 30% of the prizes that it promised players.

Relying on his analysis of the Papaya tournament data as well as Papaya's internal documents and the testimony of its Rule 30(b)(6) witness, Dr. Zagal concluded that Papaya's use of bots was intentionally deceptive and unethical.

Dr. Zagal also opined regarding two third-party reports that Papaya commissioned. Papaya hired Gaming Laboratories International ("GLI") to perform a "skill assessment" for certain of its games. Dr. Zagal opines that the GLI statements that "Papaya Gaming is strictly a head-to-head multiplayer/tournament gaming platform" in which "there is no playing against the house" are incorrect. Similarly, GLI's statement that in "no event will players ever be involved in a game in which they are playing against Papaya Gaming or any automated system established for such purpose" is also incorrect.

Papaya also hired FTI Consulting ("FTI") to opine on whether Papaya was using bots in 2024. Dr. Zagal explains why FTI's analysis was insufficient to determine whether Papaya was still using bots in 2024. He acknowledges, however, that as of the Fall of 2023 Papaya had reasons to remove bots from its tournaments after four years of ubiquitous bot use. The

apparent removal of bots from Papaya's tournaments had various effects, including a decrease in user retention.

B.  The Motion to Strike

Papaya moves to exclude several categories of opinions contained in Dr. Zagal's report.  Papaya, however, does not seek to exclude Dr. Zagal's analysis of the Papaya tournament data, including Papaya's widespread use of bots.  It does object, however, to his use of the Dark Patterns framework and his opinions that Papaya engaged in intentionally deceptive and unethical conduct through an undisclosed use of bots.  Papaya's motion is largely granted.

1.  Reliance on Papaya's Internal Communications

Papaya moves to strike those portions of Dr. Zagal's testimony that recite the internal communications among Papaya employees and Papaya's non-public communications with its customers.  Papaya's motion is granted.

Dr. Zagal's testimony about these communications is largely a vehicle for summarizing evidence.  That summary is more properly made by counsel in summation; it does not reflect an application of his expertise.  Of course, Papaya's cross examination of Dr. Zagal at trial may permit him to refer to those communications as confirmatory of his opinions.

12

2.   Dark Patterns Framework

Papaya has moved to exclude Dr. Zagal's testimony about his Dark Patterns framework and his opinion (derived from the application of that framework) that Papaya engaged in intentional, unethical behavior.  The specific statements to which Papaya points include Dr. Zagal's opinions that Papaya's use of bots was designed to benefit Papaya's interest, that its intent was to deceive customers, that the bots were used to manage the outcome of tournaments to maximize Papaya's profits, and that its misrepresentation of its product was intentional. In making this motion, Papaya makes several related arguments. These include that Dr. Zagal has no expertise in ethics, that his Dark Patterns framework is an impermissible legal conclusion, and that the framework is not a scientific test capable of replication.

This portion of the motion is granted in part.  Dr. Zagal's explanation of the role of bots in solving certain RMSB design issues is relevant, helpful to the jury, and admissible.  Dr. Zagal's testimony about the Dark Patterns framework itself, however, is excluded.

Dr. Zagal uses the Dark Patterns framework, which he authored, to label Papaya's use of bots unethical and intentionally deceptive.  Dr. Zagal's opinion that Papaya

13

engaged in unethical behavior is inadmissible as beyond his expertise.  Skillz has the burden to prove that Papaya violated the Lanham Act by making materially false statements that injured Skillz.  See Zesty Paws LLC v. Nutramax Lab'ys, Inc., 157 F.4th 194, 197 (2d Cir. 2025).  A judgment as to whether Papaya's activities were deceptive is an issue the jury will have to decide based upon the entirety of the evidentiary record.  Dr. Zagal's creation of a framework to assess ethics in gaming does not qualify him as an expert in ethics or imbue him with the ability to assess Papaya's intentions or motives. Moreover, an expert's opinion on intent and motive will, to the extent these issues are relevant, invade the jury's role at trial.  Finally, any probative value that Dr. Zagal's opinion regarding intentional deception might have is substantially outweighed by the danger of misleading and confusing the jury. See Fed. R. Evid. 403.

3.   FTI Letter

Finally, Papaya moves to exclude the entirety of Dr. Zagal's discussion of the FTI letter as an unhelpful quibble about methodology.  It points out that Dr. Zagal's own analysis indicates that Papaya was not using bots in the period FTI examined, which is 2024.

14

In the event the FTI letter is admitted at trial, Dr. Zagal may opine about the reliability of that letter.  Papaya has not shown that Dr. Zagal's proposed testimony is beyond his field of expertise or that it would not assist the jury.

II.  Dr. Holmgard

Papaya's expert Dr. Christoffer Holmgard has a Ph.D. in artificial intelligence for games.  He works in the game industry and is a co-founder of AI company modl.ai, which provides AI bots to the video game industry.

A.  Dr. Holmgard's Report

In his report, Dr. Holmgard explained that AI bots are a game design feature that can be used to create an engaging player experience.  They may be used to help with a First Time User Experience ("FTUE") so that new players become familiar with the rules and typical strategies in games.  They may also be used in multiplayer games to increase liquidity.  Game developers can use skill-adjusted AI bots for players to play against, which allows a player match to be made faster than waiting for a human opponent with the relevant skill level.

Flow Theory, which Dr. Holmgard also describes, measures a player's experience and satisfaction.  The fundamental tenet of flow theory is that humans experience a satisfying state of being when solving tasks where there is an appropriate balance

15

between the challenge and their level of skill, reducing both anxiety and boredom.

The use of AI bots in modern online multiplayer video games is widespread and generally applied to improve the player experience and optimize matchmaking through increased player liquidity.  It is neither anomalous nor nefarious.  Their presence does not signify any positive or negative behavior by the game developer.  Dr. Holmgard gives three examples of video games that use AI bots and discusses public complaints about that use of AI bots.  He concludes that the criticism arose because of the quality of the AI bots.

Dr. Holmgard opines that a company's disclosure of the presence of AI bots is a question of choice and not of moral obligation.  A company may determine that the presence is a trade secret.  There is a high variability within the video game industry as to whether to make the disclosure.  He notes that even when real money is at stake, the use of AI bots may enhance the user experience even if it does not enhance the likelihood of a player winning a prize.  Psychophysiological studies show that the human motivational system does not treat money as a unique kind of reward.

Dr. Holmgard relies on the deposition of the Papaya Rule 30(b)(6) witness for his understanding of Papaya's use of bots,

16

including liquidity bots and tailored bots for designated wins and losses. He reports his understanding that Papaya did not "expressly disclose" the use of the bots. He opines that its use of bots "supported greater player satisfaction." He opines that Papaya's inclusion of bots was "a completely industry standard game design without representing to players that the bots were known or identifiable human players."

Dr. Holmgard contrasts Papaya's use of bots with the mechanisms that Skillz employs in matchmaking. He explains that the "the relevant question" is not whether using bots is problematic but, rather, whether matchmaking itself constitutes an issue and how that matchmaking is implemented. He concludes that Papaya's matchmaking system is technologically superior to Skillz's because it provides a better experience to the customer.

B. Motion to Strike

Skillz seeks to exclude the entirety of Dr. Holmgard's testimony. It does not dispute that he is an expert in video game design and in particular in the design of artificially intelligent computerized players or AI bots. Skillz contends that his testimony is irrelevant, however, since Papaya did not employ AI bots and Dr. Holmgard has no experience in the RMSB industry or its practices. Papaya's bots were simply, as Skillz

17

describes them and Papaya does not dispute, a score chosen from a score table by Papaya's algorithms and placed on tournament leaderboards next to assigned usernames.

Skillz has shown that the majority of Dr. Holmgard's testimony must be stricken as beyond his field of expertise, as irrelevant to the issues to be tried, and as creating a substantial danger of misleading and confusing the jury.  To the extent that Dr. Holmgard describes Flow Theory and player liquidity challenges in game design, however, that testimony is admissible.

1.  Disclosure of AI Bots in Video Games

Skillz is correct that Dr. Holmgard's testimony is largely irrelevant.  He is an expert in video games and his discussion is largely about and tethered to that industry.  As his deposition revealed, he has little knowledge of the RMSB industry in which Skillz and Papaya operate.  While ordinarily this weakness could be explored on cross examination, many of his opinions are inadmissible not only because he lacks the expertise to render them, but also because the opinions are inadmissible for other reasons as well.

Dr. Holmgard's discussion of whether to disclose the use of AI bots to players of video games is irrelevant; Papaya did not employ AI bots as players in its tournaments and it did not

offer video games.  It is also barred by Rule 403.  Whatever the practices are in the video game industry, it would mislead the jury to suggest that a decision to disclose the use of bots to consumers is a discretionary one to be made exclusively by a developer of an RMSB game and without regard to a company's public statements.  A jury could conclude that Papaya is liable under the law for making materially false statements in its advertising by failing to disclose its use of bots in its cash tournaments.  Dr. Holmgard will not be permitted to suggest otherwise.  Moreover, a false statement is not legally protected because it is commonly made by industry participants.

Papaya contends that Dr. Holmgard's expertise in the field of gaming generally qualifies him to provide expert testimony about RMSB games.  It argues that he should be allowed to testify that Papaya's decision not to "proactively disclose its" use of bots is "consistent with industry practice."  For the reasons just explained, these arguments fail.  Industry practice, even if Dr. Holmgard were qualified to describe a practice within the RMSB industry (which he is not), is not a defense against a violation of the Lanham Act and it would mislead the jury to suggest that it is.

19

2. Papaya's Practices

Dr. Holmgard's relatively brief discussion of Papaya must also be stricken.  Dr. Holmgard did no independent examination of Papaya's use of bots and does not comment on the accuracy of the study done by Dr. Zagal.  He relies entirely on Papaya's Rule 30(b)(6) witness for his understanding of how Papaya employed bots.  Accordingly, his opinions about the impact of the bots in Papaya's games on the player experience and Papaya's motives in employing its bots are without foundation.  They also fail to reflect the application of his expertise.

Papaya argues that Dr. Holmgard should be allowed to explain that Papaya's use of bots offered "significant benefits to consumers by improving player experience."  As explained, however, his opinions about Papaya are without foundation.  Therefore, while Dr. Holmgard may testify to factors that go into game creation, including issues of player liquidity and Flow Theory, as a general matter, he may not testify that Papaya's use of bots was consistent with industry practice or that it improved the player experience.

3. Skillz's Practices

Similarly, Dr. Holmgard's opinions about Skillz and his comparison of its player experience with Papaya's are inadmissible.  Dr. Holmgard does not describe any investigation

20

he undertook of the two parties' platforms to support his opinions.  Moreover, the issue for the jury will be whether Papaya falsely described its games to the public, not whether Papaya delivered a better player experience than Skillz. Therefore, his opinions do not reflect the application of his expertise to the issues at hand, are irrelevant, and also fail to pass muster under Rule 403.

III. Dr. Randal Heeb

Skillz has moved to strike the testimony of Dr. Randal Heeb.  Dr. Heeb is an economist and works as the Senior Managing Director at FTI Consulting Inc., where he leads its litigation practice.  His lengthy report includes his analysis of Papaya's game logs.  Some of his most significant analyses and opinions are described next.

A.  Dr. Heeb's Report

In his report, Dr. Heeb describes his analysis of the game logs for five different Papaya games (e.g., Solitaire).  His analysis is focused on the individual games that had a cash entry fee.  Applying certain filters to the data, he calculated that the tournaments between December 1, 2023 and September 31, 2024 had entry fees that totaled over $11 million.  He concluded that the majority of human players played what he describes as a

relatively small number of Papaya tournaments, which for one of the five games he measured was 200 tournaments or fewer.

Dr. Heeb also used a metric labeled RTP, which he describes as a metric that compares the cash prizes earned by human players relative to the cash entry fees they paid. His calculations led to the conclusion that RTP is "slightly" higher in tournaments with bots than in human-only tournaments. From this he concluded that human players "collectively benefit financially from Papaya's implementation of bots."

To rebut Dr. Zagal's opinions about Papaya's intent in using bots, Dr. Heeb argues that Papaya's use of bots improved skill-based matchmaking and was therefore consistent with an intent to enhance players' gaming experience. To support that thesis, Dr. Zagal explained that Papaya used liquidity bots as seat fillers when not enough human players were immediately available for a tournament. He calculates that a human player was 5.7 times more likely to have a human player as an opponent than a liquidity bot, and that a human-only tournament was 2.4 times more likely than a tournament with liquidity bots.

In response to Dr. Zagal's discussion of tailored bots, where a human player plays against bots only, Dr. Heeb opines that Dr. Zagal exaggerated the prevalence of tailored bots by measuring the percentage of tournaments that were tailored. Dr.

22

Zagal argues that it is more appropriate to measure the frequency with which a player experiences a tailored tournament. He calculates that tailored wins were 4.3 times as frequent as tailored losses.  He concludes from this that Papaya was willing to lose money because tailored bots supported the efficient skill-based matchmaking process.

Dr. Heeb calculates that the use of tailored bots shifted human players' RTP higher, implying that their returns were higher with bots than without them.  He concludes that, contrary to Dr. Zagal's opinion that Papaya used bots to advance its interests, Papaya's use of bots reduced its profits.  As a result of bots, Papaya paid out more cash prizes, reduced latency, increased player participation, and provided better skill-matching.  According to Dr. Heeb, Papaya would have been aware of these impacts when it designed and implemented its use of bots.

Dr. Heeb also offers a rebuttal to Dr. Zagal's assertion that Papaya's use of bots was unethical.  He contends that the use does not demonstrate an intent to deceive.  Instead, it increased skill-based matchmaking efficiency.

Responding to an assertion in the complaint (as opposed to Dr. Zagal's report), Dr. Heeb asserts that skill predominates over chance in Papaya's games even when Papaya's use of bots is

considered.  In a detailed presentation, Dr. Heeb describes the properties of the players in tournaments, including the properties of tailored bots.  He also applies tests to measure the extent to which skill was involved in the Papaya games. This portion of the report is complex and lengthy.  It is described in more detail below, when Skillz's motion to exclude it is addressed.

In the sections of his report that follow, Dr. Heeb identifies various deficiencies in Dr. Zagal's report, such as his speculation about Papaya's state of mind.  He argues that Dr. Zagal should only have analyzed data and trends in data.  He complains that Dr. Zagal failed to consider Papaya's interests, and the extent to which those interests coincide with the interests of players.

Turning to the FTI Letter, Dr. Heeb states that he is offering no opinion on its validity.  He explains, however, that the game log data showed that Papaya essentially eliminated its use of bots in games after December 1, 2023 and that no bots appeared in tournaments after April 1, 2024.

Finally, Dr. Heeb contends that Papaya's use of bots benefitted human players.  For example, it improved their gaming experience and the prizes it paid to them (relative to entry fees) were larger in tournaments with bots.  He explains that

Dr. Zagal miscalculated the extent to which Papaya used bots because he counted bots that Papaya never deployed in games. Applying his filters, Dr. Heeb calculates that the percentage of bot sessions ranged from 38% to 62%, depending on which of the five games was played and that tailored bot sessions comprised 17% of the five games.

B.   Motion to Strike

Skillz moves to strike Dr. Heeb's report.  It attacks his expertise and his opinions.  Many of Skillz's arguments are well taken.

1.  Expertise

Skillz first argues that Dr. Heeb is not qualified to serve as an expert in this case because he lacks experience in the RMSB industry and with how bots may be used in that industry. It contends as well that he is not qualified to draw sweeping conclusions about Papaya's intent.

Although Dr. Heeb has no expertise in the RMSB industry, he is qualified by education and experience to analyze Papaya's game data and to make calculations based on that analysis.  He is not qualified to opine on several of the topics covered in his report, however, as described below.

2. Opinions About State of Mind

Skillz argues that Dr. Heeb's report must be stricken to the extent it offers assertions and opinions without factual support in the record.  This includes his opinions and assertions about either Papaya's or users' states of mind.

Skillz's motion is granted.  None of the three experts will be allowed to opine on the intent or motive of a company or individual.  To the extent those issues are relevant, the jury must make those assessments based on the evidence and not expert opinion.  It is particularly inappropriate for Papaya's experts to explain Papaya's intentions and motivations since all of Papaya's executives invoked their Fifth Amendment privilege instead of submitting to depositions.[1]  Papaya cannot replace their absent testimony with the statements of its experts. Papaya's lawyers may, of course, during their summation, ask the jury to draw appropriate inferences from the trial evidence. But they may not ask experts to opine on intent and motive, which are beyond the scope of their expertise, impinge on the role of the jury, and would unfairly prejudice the plaintiff.

3. RTP

Skillz next moves to strike Dr. Heeb's testimony about the RTP or the return-to-player metric, and his opinions linked to

---

[1] Papaya's 30(b)(6) witness did provide deposition testimony.

that metric.  These include Dr. Heeb's testimony that users benefited from Papaya's use of bots.  Skillz points out that Dr. Heeb had never used the RTP metric before in his career and that he does not explain why this is the correct metric to apply in the RMSB industry, particularly to a company that employs bots as players.[2]

This portion of Skillz's motion is granted.  Papaya does not address the arguments made by Skillz to strike this testimony.  It does not explain the genesis of the RTP measurement or explain how the analysis is relevant.  Papaya principally justifies Dr. Heeb's discussion of RTP as responsive to Dr. Zagal's assertion that Papaya used bots to make its system "maximally profitable," and to "ensure that, over time, players lose more money than they win in Papayas' tournaments." But, as already explained, no expert will be permitted to opine about Papaya's motivations.  As a result, this testimony is not appropriate rebuttal testimony.

4.  Skill-based Games

Skillz moves to strike those portions of Dr. Heeb's report that are designed to show that Papaya's five games (e.g.

---

[2] As described in a separate Opinion, Papaya's expert Jonathan Orszag will be permitted to present his RTP calculation.

Solitaire) are skill based.  Skillz contends that his analysis is irrelevant and will confuse the jury.  It is correct.

A substantial portion of Dr. Heeb's report is dedicated to tests he conducted purportedly to measure the extent to which Papaya's games, such as Solitaire, are skill-based games as opposed to games of chance.  To do so, Dr. Heeb began with a study of human players' scores in tournaments in which there were no bots.  When he examined human players' scores in tournaments in which bots were players, he did not analyze bots' scores, conceding that it would make no sense to do so.  Therefore, he removed from his analysis of tournaments in which bots were participants the scores that Papaya assigned to the bots as well as the outcomes of the tournaments.  Through his analysis of human players' scores, Dr. Heeb demonstrated that the scores of human players improve the more games they play.  He also tracked the scores of "high and low" skilled human players.  He explained in his deposition that he could not run his simulations between a human and a bot because you wouldn't be measuring "anything" and "there would be no point in doing it."  Accordingly, his analysis did not include the outcomes of tournaments in which humans played against bots for money.

Skillz points out that it is not claiming that Papaya's five games (e.g. Solitaire) are not skill-based when only played

28

by humans.  Accordingly, it reasons, Dr. Heeb's analysis is both beside the point and will cause confusion.  The issue, as Skillz correctly explains, is whether Papaya's use of bots in its tournaments changed the competitive experience for users "such that their exercise of skill was not determinative of the outcomes of cash tournaments" and Papaya was falsely representing that winnings from its tournaments were "directly determined by your level of skill."

Papaya faces many challenges in its tender of Dr. Heeb's opinion that its games are skill-based.  First, Papaya has not shown that Dr. Heeb is a qualified expert on this topic.  Papaya relies on the fact that Dr. Heeb has testified in several cases that the particular game at issue was a game of skill.  His testimony about whether a particular game, usually poker, is a game of skill or chance, however, does not reflect any expertise in analyzing whether tournaments that include both bots and human players are games of skill.  That is the issue here, as Papaya rightfully acknowledges in its brief.

Second, Papaya has not shown that Dr. Heeb's method for measuring Papaya's product offerings as games of skill is scientifically sound when Papaya's cash tournaments included bots.  Dr. Heeb himself identified no basis to find that his

29

methods for measuring skill, when the tournaments at issue include both bots and human players, is an accepted methodology.

Dr. Heeb's extremely complex presentation is also misleading and confusing. The misleading nature of Dr. Heeb's analysis is amplified by the number of steps he takes in his analysis. When the dust settles, those many steps say little more than a particular game such as Solitaire is a game of skill, that some human beings are better at it than others, and that at least some humans can improve their scores over time by playing it repeatedly. But the issue here is not whether Solitaire per se is a game of skill or some humans are more skilled than others, and it is misleading and confusing to suggest that his elaborate resolution of those questions is relevant. While this defect could be explored on cross-examination, Rules 401, 403 and 702 dictate that the testimony be excluded. Put another way, Dr. Heeb's measurement of human skill -- when humans play humans or a human being plays the same game repeatedly -- is irrelevant where it is undisputed that a substantial percentage of Papaya's cash reward tournaments included bots.

The misleading nature of Dr. Heeb's presentation is exacerbated by the part of his presentation in which he compares human beings' scores in tournaments in which humans play each

30

other with scores of those players in games involving bots.  As Skillz points out, those supposed comparisons make it appear that he has actually measured whether tournaments involving bots are skill-based when he is decidedly not measuring that. Plotting a human player's scores over time and in different tournaments does not address whether the outcome of a particular tournament in which bots were also players was driven by the skill of the human participants.

Finally, Dr. Heeb's testimony is not just misleading, it threatens to impose an unreasonable burden on the jurors.  Dr. Heeb has developed an exceptionally lengthy and intricate presentation, supported by many charts.  It will take him a great deal of time to present his analysis and perhaps a great deal of time for cross examination to demonstrate that he has no expertise in this area, that there is no precedent for his analysis as applied to RMSB tournaments with bots, and that none of his many charts and graphs actually measure whether tournaments in which humans played against bots were games of skill.  Rule 403 concerns dictate that the jury be spared this wasteful exercise.

## Conclusion

Papaya's June 27, 2025 motion to exclude the testimony of Dr. Jose Zagal is granted in part.  Skillz's June 27, 2025

31

motions to exclude the testimony of Dr. Christoffer Holmgard and Randal Heeb are granted in part.

Dated:    New York, New York
          February 12, 2026

_____
DENISE COTE
United States District Judge