**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SKILLZ PLATFORM INC., a Delaware corporation, | Case No.: 1:24-cv-01646 |
| *Plaintiff*, | Hon. Denise L. Cote |
| v. | |
| PAPAYA GAMING LTD., a foreign corporation, and PAPAYA GAMING, INC., a Delaware corporation, | |
| *Defendants*. | |

**DEFENDANTS' PRETRIAL MEMORANDUM OF LAW**

**TABLE OF CONTENTS**

**Page**

INTRODUCTION.............................................................................................................................1

STATEMENT OF FACTS...............................................................................................................2

I.      PAPAYA GAMING.............................................................................................................2

II.     PAPAYA'S USE OF BOTS TO IMPROVE PLAYER EXPERIENCE.......................3

III.    PAPAYA'S ADVERTISING STATEMENTS..................................................................5

IV.     CONSUMERS' AWARENESS OF BOTS........................................................................7

V.      SKILLZ'S BUSINESS FAILURE.....................................................................................8

ARGUMENT...................................................................................................................................9

I.      SKILLZ WILL FAIL TO PROVE A LANHAM ACT VIOLATION .........................9
        A.      Skillz Cannot Prove Falsity. ................................................................................9
        B.      Skillz Cannot Prove Materiality.........................................................................11

II.     SKILLZ IS NOT ENTITLED TO DAMAGES ............................................................12
        A.      Bergman's Enterprise-Value Damages Model Is Legally Invalid.........................13
        B.      Bergman's Damages Analysis Is Fundamentally Unsound...................................16

III.    The Jury Should Only Consider Actual Damages, Not Disgorgement.......................19
        A.      The Jury Cannot Award Disgorgement. ..............................................................19
        B.      An Advisory Jury on Disgorgement Is Not Warranted. ......................................21

IV.     PRETRIAL ORDER ISSUES.........................................................................................23

CONCLUSION ..............................................................................................................................25

**INTRODUCTION**

This lawsuit is a faltering company's attempt to reverse the financial consequences of its own actions, by attributing that decline to the advertising of one of its competitors. The evidence will show, however, that Skillz's loss of market share has nothing to do with Papaya's accurate claims that its mobile games were "fair," "skill-based," and included "players," or with Papaya's historic use of bots. As Skillz's own executives have acknowledged, Papaya's success and Skillz's failures are based on Papaya's superior user experience, pricing, and marketing███████████ ████████████████████████████████████ The jury will recognize just how implausible it is that Papaya's boilerplate statements somehow caused Skillz—a company that has failed to turn a profit in even a single reporting period during its entire existence—to suffer over half a billion dollars in damages (many multiples of what Papaya has ever made). As a result, Skillz will fail to prove that Papaya's advertising violated the Lanham Act.

*First*, Skillz cannot prove the elements of falsity, materiality, and injury necessary for liability under the Lanham Act. The evidence will confirm that Papaya's games were in fact skill-based and that Papaya's matchmaking practices were fair. None of the advertising statements that Skillz challenges claimed Papaya's games were bot-free, and Skillz has no competent evidence to prove players interpreted them that way. The only survey evidence Skillz offered for falsity and materiality is fatally flawed: it used no control group, tested fabricated statements rather than actual advertisements, and, by the survey designer's own admission, tested an "omission" theory rather than the affirmative misrepresentation claims Skillz pleaded. Skillz also cannot prove any supposed "no bots" message was material to players' decisions to use Papaya's games, particularly given that players ███████████████████████████. Papaya succeeded through better user experiences and smarter business decisions—not through alleged deception.

*Second*, the damages opinion put forward by Skillz's expert Jim Bergman suffers from

1

multiple fatal errors, including a threshold legal flaw. Instead of calculating lost profits, as in a typical Lanham Act case, Bergman estimated how much higher Skillz's "enterprise value" would be if it had not lost revenue because of Papaya's historic use of bots. But enterprise value damages are available only when the defendant's alleged conduct *destroyed* the plaintiff's business, which indisputably did not happen here. Awarding Skillz enterprise-value damages would, therefore, compensate Skillz for a loss it never suffered. And beyond the legal invalidity of Skillz's damages model, Bergman's methodology is riddled with errors that, when corrected, show Skillz suffered no harm at all. ██████████████████████████████████████████ ████████████

*Finally*, the Court should join the overwhelming consensus of appellate and district courts and hold that a jury cannot award disgorgement, which is an equitable rather than legal remedy, under the Lanham Act. Instead, the Court should assess the claim for disgorgement, if necessary, in a bench trial held after the jury trial on Skillz's liability and damages claims.

## STATEMENT OF FACTS

### I.    PAPAYA GAMING

Founded in 2016 by three young entrepreneurs, Papaya has grown into an industry-leading developer of skill-based mobile games that offers customers an engaging user experience and the opportunity to earn cash prizes through their performance. Papaya owes its success to its focus on providing the best possible user experience. Unlike competitors, such as Skillz, who rely on third-party developers, Papaya develops its games in-house, allowing it to ensure consistent quality on its platform across different game offerings. And while Skillz offers thousands of games, which leads to inconsistent quality, Papaya focuses on a few, select, high-quality games. Papaya's games feature best-in-class matchmaking technology, engaging visuals, an enjoyable gaming interface, and a positive social media community. This dedication to quality has made Papaya one of the

2

most popular apps in the market.

## II.   PAPAYA'S USE OF BOTS TO IMPROVE PLAYER EXPERIENCE

Developers of skill-based games all confront the problem of timely and accurate matchmaking: ensuring that players can be matched with opponents of similar skill, despite the wide skill distribution of players available for a tournament at a given time.[6]  As was common in the gaming industry at the time, Papaya in its early days chose to address that issue by,

Papaya

---

[1] DX0225, SKILLZ_PAPAYA00004603 at 4604.

[2] DX0268, SKILLZ_PAPAYA000000008852 at 8871–72.

[3] DX0268, SKILLZ_PAPAYA000000008852 at 8871–72.

[4] DX0268, SKILLZ_PAPAYA000000008852 at 8871-72.

[5] DX0256, SKILLZ_PAPAYA00007954 at 7955.

[6] Holmgård Rpt., p. 8.

[7] DX0163, PGSKZ-010-00014863 at -14880.

[8] Heeb Rebuttal Rpt., p. 34.

[9] DX0163, PGSKZ-010-00014863 at -14871.



Contrary to Skillz's characterization, Papaya ████████████████████████████████████████████████████████████████████████████. Like Skillz, Papaya makes money by taking a percentage of player entry fees—known as taking a "rake"; the amounts remaining from entry fees fund the prize pools that Papaya pays out in the tournaments.  The prizes for any individual tournament are pre-set and are not affected by the amount collected in entry fees from the players in that tournament.  Because ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████.  In the aggregate, ████████████████████████████████████████████████████████████████████████████████████████

In November 2023, after over a year of planning and investment, Papaya's ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

---

[10] DX0163, PGSKZ-010-00014863 at 14870, 78

[11] Heeb Rebuttal Rpt., Fig. 19.

[12] DX0163, PGSKZ-010-00014863 at -14870.

[13] Heeb Rebuttal Rpt., p. 11.

[14] Orszag Rebuttal Rpt., p. 21.

[15] Heeb Rebuttal Report, Fig. 19.

4

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

█████████████ ██ ███████████████████████████████████████

███████████████████████████████████████. Papaya became the first mobile gaming company to obtain independent certification—and remains one of the only companies to do so—confirming that its games do not incorporate bots. And Papaya's success has only continued without bots, demonstrating its superior user experience and business model.

## III.    PAPAYA'S ADVERTISING STATEMENTS

The crux of Skillz's claims is that Papaya publicly advertised its games as "bot free," but Papaya never did so. So instead, Skillz cobbles together statements from various webpages and app interfaces that described Papaya's games as being "skill based" or "fair," referring to matching "players" or "individuals," and stating Papaya had "no vested interest" in the outcome of games.[17] Even collectively, those statements do not create a "no bots" message. *See* ECF No. 1 ("Compl.") ¶¶ 100–03, 118–21. Papaya's use of "skill based" refers to the fact that random elements are removed, giving all players the same conditions and arrangement of game features: for example, giving each player the same deck in Solitaire or the same layout in Bubble Cash, allowing the player's score to depend on speed, dexterity, game knowledge, and strategy—not luck or chance.[18] Skillz itself defines "skill-based" in the same way: a game where the outcome is predominately

---

[16] DX0152, PGSKZ-010-00003081; PGSKZ-010-00014863 at 14868.

[17] To-date, Skillz has refused to identify the list of purportedly false statements it intends to present to the jury. Papaya's proposed jury instructions and verdict form list the statements that Skillz relied on in its Complaint, but the Parties must have clarity before trial regarding which alleged false advertisements Skillz intends to present at trial.

[18] *See* Solitaire Cash U.S. App Store page, https://apps.apple.com/us/app/solitaire-cash/id1446254576 ("[Y]ou will all get the same deck – so the game is totally fair and skill-based."); Bubble Cash U.S. Apple App Store Page, https://apps.apple.com/us/app/bubble-cash/id1475514684 ("All users receive the same layout . . . .").

or totally influenced by the skill of the players and in which a player is able to improve over time.[19]
Contrary to Skillz's claims, Papaya's historic use of bots is irrelevant to whether this statement is
true—a skill-based game remains skill-based regardless of opponent.

Papaya's description of its games as "fair" incorporates the structural fairness of the games'
design, and also reflects that ████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████

For these reasons, Papaya's statement that "Solitaire Cash has no vested interest in who
wins or loses, nor does it profit on the outcome of a tournament that we provide"—a statement that
appeared in only one Papaya "Solitaire Case FAQ" webpage[20]—was accurate. As explained,
Papaya's games were designed ████████████████████████████████████████

███████████████████ Papaya's business model turned on collecting a rake on entry fees █

███████████████████████████████████████████████████████████████████████

Finally, Papaya's references to matching users "with other players" and "individuals," and
its cash games being available to "players over the age of 18," are true. They say nothing about
whether opponents are human or bots, and in any case, ████████████████████████

███████ Moreover, ████████████████████ the statements accurately describe how winners

---

[19] DX0305, SKILLZ_PAPAYA00011193 at 11198.

[20] ECF No. 459-49 (at p. 4)

[21] Orszag Rebuttal Rpt., p. 21.

[22] Compl. ¶¶ 69, 77, 79; see, e.g., Solitaire Cash U.S. Apple App Store page,
https://apps.apple.com/us/app/solitaire-cash/id1444254576.

or losers were determined in those games—that is, winners were the "individuals who better use[d] their relevant skill and knowledge"[23]—not what sorts of opponents each player might have faced. And the rule that players above 18 can access Papaya's games says nothing about whether such players might face bots during the gameplay.

## IV.    CONSUMERS' AWARENESS OF BOTS



directly undercutting Skillz' arguments that Papaya's statements duped consumers on this issue.

Skillz also publicly alleged that two other competitors used bots in their mobile games, which refutes Skillz's contention that Papaya's use of bots was somehow uniquely harmful.[27]

---

[23] Papaya Terms of Use, https://www.papaya.com/terms-of-use.

[24] DX044, SKILLZ_PAPAYA00022300 at 22375.

[25] Peleg Tr. at 117:21-25.

[26] DX0286, SKILLZ_PAPAYA00010309 at 10312.

[27] Second Amended Complaint for Patent Infringement, *Skillz Platform Inc. v. AviaGames Inc.*, No. 5:21-cv-02436-BLF, ECF No. 483 ¶¶ 82–92 (N.D. Cal. Nov. 8, 2023) (alleging that "Avia used . . . bots to defraud Avia's own customers and boost its own profits in order to gain an advantage in competing with Skillz"); First Amended Complaint, *Skillz Platform Inc. v. Voodoo SAS*, No. 1:24-cv-04991-VSB-JW, ECF No. 48 ¶¶ 159–204 (S.D.N.Y. Oct. 2, 2024) (alleging claims under Lanham Act and New York General Business Law against Voodoo for alleged use of bots in matchmaking algorithms); Bergman Rpt. at 36 (graph showing Avia with larger market share than Papaya in every listed month).

## V.    SKILLZ'S BUSINESS FAILURE

Skillz operates in a rapidly growing and ████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████ Skillz has never

posted a profit in any reporting period since its inception in 2012.[31] ████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████ That same

year, Tether Studios—whose games accounted for nearly *half* of Skillz's 2024 revenue—notified

Skillz it was terminating all agreements, costing Skillz its two most popular games: Solitaire Cube

and Blitz 21.[34]  Skillz's recent quarterly reports disclose net losses of tens of millions of dollars.[35]

Skillz has ████████████████████████████████████████████

████████████████████████████████████████████████ Unlike

Papaya, Skillz does not develop its own games—it focuses on quantity over quality, selling

software that hosts and supports mobile games created by third-party developers.[37]  ████████

---

[28] DX0206, SKILLZ_PAPAYA00002824 at 2837; DX0315, SKILLZ_PAPAYA00011667 at 11668.

[29] DX0267, SKILLZ_PAPAYA00008630 at 8636.

[30] DX0191, Skillz 2022 10-K; DX0187, Skillz 2023 10-K; DX0298, SKILLZ_PAPAYA00010791; DX0316, SKILLZ_PAPAYA00012107; DX0313, SKILLZ_PAPAYA00011561-66.

[31] Skillz 2025 10-K, p. 34.

[32] Paradise Tr. at 111:11-112:4.

[33] Skillz 2025 10-K, p. 34; Paradise Tr. at 114:14-19.

[34] Skillz 2025 10-K at p. 17-18.

[35] Skillz Inc., Quarterly Report (Form 10-Q) at 1 (Dec. 11, 2025), https://investors.skillz.com/financials/sec-filings/sec-filings-details/default.aspx?FilingId=18991347.

[36] DX0315, SKILLZ_PAPAYA00011667.

[37] Compl. ¶¶ 2, 20, 27.



And Skillz's platform-only business model means

Skillz has

## ARGUMENT

### I.    SKILLZ WILL FAIL TO PROVE A LANHAM ACT VIOLATION

"To prevail on a Lanham Act false advertising claim, a plaintiff must establish that the challenged message is (1) either literally or impliedly false, (2) material, (3) placed in interstate commerce, and (4) the cause of actual or likely injury to the plaintiff." *Church & Dwight Co., Inc. v. SPD Swiss Precision Diagnostics, GmBH*, 843 F.3d 48, 65 (2d Cir. 2016).  Skillz will fail to carry its burden on falsity, materiality, and injury.

#### A.    Skillz Cannot Prove Falsity.

Skillz's claims rest on the theory that Papaya's references to "skill-based" games, "fair" gameplay, "players," and "no vested interest" communicated that Papaya's games were bot-free. But none of these statements—standing alone or read in context—convey the message that Papaya's games never have bots.  Skillz cannot establish falsity because the challenged statements

---

[38] DX0225, SKILLZ_PAPAYA00004603; DX0224, SKILLZ_PAPAYA00004509 at 4513-16; DX0268, SKILLZ_PAPAYA00008852; DX0256, SKILLZ_PAPAYA00007954; DX0444, SKILLZ_PAPAYA00022300 at 22377-78.

[39] Peleg Tr. at 200:12-24, 318:20-319:11.

[40] DX0444, SKILLZ_PAPAYA00022300 at 22375-76.

[41] DX0224, SKILLZ_PAPAYA00004509; DX0267, SKILLZ_PAPAYA00008630.

are literally true. Papaya's "skill-based" characterization is literally true under Skillz's own definition: a game is skill-based if a player is able to improve over time.[42] Skillz's gaming expert Jose Zagal made no effort to measure whether Papaya's games are skill-based. Papaya's "fairness" statements are similarly true: Papaya's matchmaking algorithm ████████████████████████

████████████████████████████████ ██ ████████████████████████████████

████████████████████████████████████████████████████████████

██████ No consumer would interpret Papaya's references to "players" and "individuals" to implicitly convey a "no bots" message, "as if it had been explicitly stated." *Time Warner Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d 144, 158 (2d Cir. 2007) (quotation omitted). And Papaya's "no vested interest" statement was also literally true: ████████████████████████████████

████████████████████████████████ Papaya's revenue model was based on collecting entry fees, so it was indifferent about who won the prizes; ████████████████████

████████████████████████████████████████████████ ██

Even putting the foregoing aside, Skillz challenges statements that are at the very least ambiguous, such that Skillz must prove implied falsity through extrinsic evidence of actual consumer confusion. *Int'l Code Council, Inc. v. UpCodes Inc.*, 43 F.4th 46, 57 (2d Cir. 2022). It cannot do so. Dr. Groehn's "Perception Survey" did not test the advertising statements that are actually challenged by Skillz; instead, the survey relied on an amalgamated and highly biased "super-ad" using cherry-picked and context-stripped language.[45] His survey suffers from other fatal methodological flaws, including failure to use a control group or representative samples and

---

[42] DX0305, SKILLZ_PAPAYA00011193 at 11198.

[43] *See* Revah Tr. at 38:24–44:23 (describing how, in a successful algorithm, user RTP would equal system RTP); PGSKZ-010-00018516 (showing user and system RTP).

[44] Orszag Rpt. ¶ 49.

[45] Groehn Tr. 244:10–18; 247:10–20.

10

the use of a biased design that by his own admission did not attempt to replicate the real world.[46] And fatally, Dr. Groehn admitted his survey tested *only* an "omission" theory—that is, Papaya's purported failure to affirmatively disclose bots—*not* whether consumers interpreted any affirmative statement (like "fair" or "skill-based") as conveying a "no bots" message.[47]

Nor is Skillz entitled to any presumption of consumer deception based on Papaya's supposed intent. Although an intent to deceive may give rise to such a presumption, the Second Circuit has made clear that it applies only when there is particularized evidence tying the defendant's intent to the *specific advertisements* at issue. *Church & Dwight*, 843 F.3d at 68. Skillz can identify no evidence showing that Papaya personnel expressed concern about the accuracy of its advertisements or—given the fatal deficiencies in the Groehn surveys—that any consumers might be confused by the contents of those advertisements. Absent evidence that Papaya intended to deceive consumers through the specific advertisements at issue, no presumption applies, and Skillz must produce extrinsic evidence of actual consumer confusion. It has none.

Although Skillz ███████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███ █ ███████████████████████████████████████████████████████

███████████████████████

## B.    Skillz Cannot Prove Materiality.

Skillz cannot prove Papaya's statements "would influence consumers' purchasing decisions." *Turbon Int'l, Inc. v. Hewlett-Packard Co.*, 769 F. Supp. 2d 262, 268 (S.D.N.Y. 2011).

---

[46] *Id.* at 249:10-20

[47] *See, e.g.*, *id*. at 130:7–11, 177:15–19.

[48] Revah Tr. 80:21–81:7; 156:22–157:3.

To the contrary, ███████████████████████████████████████. Ms. Peleg

testified that ███████████████████████████████████████████



Perhaps most obviously, any "no-bots" message would not have been critical to the

decision to play Papaya's games, ████████████████████████████

███████████. Papaya's expert Jonathan Orszag will show that ████████████████

Dr. Groehn's "Likelihood Survey" does not help Skillz demonstrate materiality. By Dr.

Groehn's own admission, his survey does not measure whether bots are material to consumers.

Instead, it measures *how consumers react upon being told they were lied to*, and Dr. Groehn

conceded he cannot "disaggregate" reactions to feeling deceived (as his survey was set up to elicit)

from reactions to learning bots exist.[53]

## II.    SKILLZ IS NOT ENTITLED TO DAMAGES

Even if Skillz could establish liability (it cannot), it could not prove that it was damaged

by Papaya's allegedly false marketing. There is a fundamental problem with Skillz's damages

theory:  it improperly seeks to recover "enterprise value" damages—a measure reserved for

---

[49] Peleg Tr. at 117:21–25.

[50] DX0263, SKILLZ_PAPAYA00008523 at 8527.

[51] Bergman Rpt. ¶ 49.

[52] DX044, SKILLZ_PAPAYA00022300 at 22375.

[53] Groehn Tr. at 321:11–325:20.

plaintiffs whose businesses have been destroyed—even though Skillz remains in business.  And even if the enterprise-value theory could be applied, Bergman's application of the theory is pervaded by methodological errors that, when corrected, show no damages to Skillz.

### A.        Bergman's Enterprise-Value Damages Model Is Legally Invalid.

Skillz improperly seeks to recover "enterprise value" damages—a measure reserved for plaintiffs whose businesses have been destroyed by the defendant's misconduct—even though Skillz remains in business.  Because any jury award based on Bergman's enterprise-value damages model will be legally invalid, his damages opinion cannot be submitted to a jury.

Under the Lanham Act, a plaintiff may recover "any damages [it] sustained" as a result of the defendant's false advertising.  15 U.S.C. § 1117(a).  A plaintiff's "actual damages" may include (1) "profits lost by the plaintiff on sales actually diverted to the false advertiser"; (2) "profits lost by the plaintiff on sales made at prices reduced as a demonstrated result of the false advertising"; (3) "the costs of any completed advertising that actually and reasonably responds to the defendant's offending ads"; and (4) "quantifiable harm to the plaintiff's good will, to the extent that completed corrective advertising has not repaired that harm."  *Merck Eprova AG v. Gnosis S.p.A.*, 760 F.3d 247, 265 (2d Cir. 2014) (quoting *ALPO Petfoods, Inc. v. Ralston Purina Co.*, 913 F.2d 958, 969 (D.C. Cir. 1990)).  Bergman, however, did not use any of those damages metrics.  Instead, in calculating the "actual damages" that Skillz suffered due to Papaya's alleged false advertisements, Bergman first purported to quantify the amount of "revenue that otherwise would have been received by Skillz" between 2020 and 2025, which he claims would amount to ██████████.[54]    Ordinarily, a Lanham Act plaintiff would then estimate its lost profits by subtracting what it would have cost to generate that revenue.  *See, e.g.*, *Murphy Door Bed, Co. v.*

---

[54] Bergman Rpt. ¶ 172.

*Interior Sleep Systems, Inc.*, 874 F.2d 95, 103 (2d Cir. 1989) ("[I]n computing plaintiff's lost profits . . . , costs necessary to generate the income should be deducted from sales revenue" (citation omitted)).  But Bergman did not assess Skillz's costs at all.  Instead, he determined that, because that ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████ The total enterprise value of companies is sometimes expressed in terms of a multiple of annual revenue (*e.g.*, the company could be valued at two, three, or four times its most recent annual revenue).  Accordingly, Bergman took ███████████████████████████████████████████████████████ ███████████████████████████████████████████████ Bergman then determined that Papaya's use of bots caused Skillz to ████████████████████ in enterprise value.[57]

Skillz cannot present Bergman's damages opinion to a jury because enterprise value damages are unavailable as a matter of law to an existing business.  Enterprise value damages are available *only* when the plaintiff's money-making capacity is *permanently* destroyed—that is, when it goes out of business or exits a market entirely.  *See, e.g.*, *Indu Craft*, 47 F.3d at 496 (explaining that "when [a] breach of contract results in the complete destruction of a business enterprise," courts measure damages by "applying an earnings multiplier to fix the value of a business that was completely terminated").  When a plaintiff is driven out of business, enterprise-value damages may be necessary to restore the *status quo ante*.  And lost profits might be inadequate in those circumstances, because the plaintiff lost more than just profits—it lost the ability to earn money in the future as well, even after the defendant ceased its misconduct.  In that

---

[55] *Id.* ¶ 173.

[56] *Id.* ¶¶ 175-78.

[57] *Id.* ¶ 183.

case, the plaintiff may recover "both lost profits and damages to its going concern value" by proving "that he first lost business [lost profits] and was then driven from the market [enterprise value]." *Ne. Tel. Co. v. Am. Tel. & Tel. Co.*, 651 F.2d 76, 95 n.30 (2d Cir. 1981).

But when the plaintiff remains in business, which is indisputably the case here, lost profits are a fully adequate remedy, and any damages based on a diminution in enterprise-value would compensate the plaintiff for a loss—of the ability to generate revenue *in the future*—that it has not suffered. For this reason, the court in *Stanacard, LLC v. Rubard LLC*, granted the defendant's motion *in limine* and excluded the plaintiff's expert testimony on enterprise value damages. No. 12 Civ. 5176 (CM), 2016 WL 6820741, at *4 (S.D.N.Y. Nov. 10, 2016). The court there recognized that "lost business value is an appropriate measure of damages when business value is completely or almost completely destroyed." *Id.* But because the plaintiff did not "contend that its business value ha[d] been completely or almost completely destroyed," the "impairment of [its] business value [was] not an appropriate measure of damages." *Id.*

So too here. Skillz does not claim a complete destruction of its business value. Its CEO Andrew Paradise testified ████████████████████████████████████████
████████████████████████████ ████████████████████████████████████
████████████████████████████ █████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
███████ █████████████████████████████████████████████████████████

---

[58] Paradise Tr. at 112:12–16, 405:3–5.

[59] *Id.* at 138:12–18.

[60] *Id.* at 140:1–7.

████████████████████████████████████████████████

Any award of enterprise value damages to Skillz would result in dramatic overcompensation. Skillz has not been destroyed. It continues to operate and generate revenue in the same market as Papaya. And there is no analysis or evidence showing that Skillz ██ ████████████████████████████████████ lost users who went to Papaya due to its allegedly false advertising. Because Skillz still has its business, it cannot recover for damages premised on having lost that business.[62]

### B.    Bergman's Damages Analysis Is Fundamentally Unsound.

Putting aside the fact that enterprise-value damages are unavailable to Skillz as a matter of law, there are other serious flaws in Bergman's analysis. To start, Bergman entirely ignores the myriad reasons in the record, apart from Papaya's historical bot use, that caused players to choose Papaya over Skillz. Such reasons include, for example, the fact that Papaya offered more attractive tournament-style games, a superior customer experience, and better pricing with bonus cash offers.

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████ Rather than attempting to address these factors, Bergman assumes ████████████████████████ ████████████████████████████ The jury will reject that implausible

---

[61] *Id.* at 107:8–12, 108:12–109:2.

[62] Papaya's complete argument for the exclusion of Bergman's enterprise-value damages is contained in its Motion *in Limine* No. 2.

assumption and conclude, based on the evidence discussed above, that Skillz's loss of revenue is due to its own business failings, rather than Papaya's generic marketing claims.

In addition to those obvious factual issues, when corrected for clear errors, Bergman's own methodology shows that ███████████████████████████████████

*First*, all of Bergman's ████████████████████████████████████
██████████████████████████████████ ████████████████████████████
████████████████████████████████████████████████████████████
████████████ ██████████████████████████████████████████████
████████████████████████████████████████████████████████████
█████████████████ ████████████████████████████████████████
██████████████████████████████████████████████████████ When just those obvious mistakes are corrected, there are *zero* damages under Bergman's own model.

████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████

---

[63] Bergman Rpt. ¶ 136.

[64] *Id.*

[65] *Id.*

███████████████████████████████████████████████

████████ There is no justification for Bergman's obviously erroneous approach.

████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████ No reasonable jury could reject that analysis in favor of Bergman's.

*Second*, even if ██████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████

*Third*, on top of these fundamental errors with Bergman's damages model, his calculation of actual damages to Skillz is tainted by other significant failures. █████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

---

[66] Bergman Rpt. ¶ 199.

18



This approach is implausible for several reasons.

## III.    THE JURY SHOULD ONLY CONSIDER ACTUAL DAMAGES, NOT DISGORGEMENT[72]

### A.    The Jury Cannot Award Disgorgement.

Skillz seeks to recover both its own damages and disgorgement of Papaya's profits.[73]

Setting aside the problem that awarding both would constitute an impermissible double recovery,[74]

---

[67] *Id*. ¶¶ 171–72.

[68] *See, e.g.*, DX0266, SKILLZ_PAPAYA00008615 at 8617

[69] Orszag Rpt. ¶ 109.

[70] Bergman Rpt. ¶ 58.

[71] Groehn Rpt. ¶¶ 47-48

[72] There are additional, important legal issues that will be relevant to disgorgement, but Papaya will address those issues in a later filing, prior to any bench trial.

[73] Compl. at 36.

[74] *See Church & Dwight Co. v. SPD Swiss Precision Diagnostics GmbH*, No. 14-CV-585 (AJN), 2018 WL 4253181, at *16 (S.D.N.Y. Sept. 5, 2018) (because "[a] plaintiff seeking compensation for the same injury under different legal theories is of course only entitled to one recovery," "awarding the disgorgement of the defendant's

Skillz is entitled to a jury trial only on its actual damages.

Because the Lanham Act is silent on the jury issue, any jury trial right must flow from the Seventh Amendment. *See Diamond Resorts U.S. Collection Dev., LLC v. Wesley Fin. Grp., LLC*, No. 20 Civ. 251 (DCLC) (DCP), 2025 WL 1334625, at *4–5 (E.D. Tenn. May 7, 2025) (collecting cases). The Seventh Amendment guarantees a trial by jury for "suits at common law"—*i.e.*, "suits in which *legal* rights are to be ascertained and determined, in contradistinction to those where equitable rights alone are recognized, and equitable remedies are administered." *Chauffeurs, Teamsters & Helpers, Loc. No. 391 v. Terry*, 494 U.S. 558, 564 (1990) (cleaned up). A claim for actual damages under the Lanham Act is a legal remedy to which the jury right attaches. *See Lee Pharms. v. Mishler*, 526 F.2d 1115, 1116 (2d Cir. 1975). But every court of appeals to squarely address the question has held that disgorgement of profits under the Lanham Act is an equitable remedy. *See Hard Candy, LLC v. Anastasia Beverly Hills, Inc.*, 921 F.3d 1343, 1358 (11th Cir. 2019); *Fifty-Six Hope Rd. Music, Ltd. v. A.V.E.L.A., Inc.*, 778 F.3d 1059, 1074–76 (9th Cir. 2015); *Ferrari S.p.A. v. Roberts*, 944 F.2d 1235, 1248 (6th Cir. 1991); *see also Liu v. Sec. & Exch. Comm'n*, 591 U.S. 71, 80 (2020) (explaining that "disgorgement of improper profits" is "traditionally considered an equitable remedy").

The Second Circuit has strongly suggested, consistent with the consensus, that disgorgement is an equitable remedy that falls outside the Seventh Amendment right to a jury trial. In *Gucci Am., Inc. v. Weixing Li*, the Second Circuit considered whether a district court could issue injunctive relief in a trademark case—a question which turned on whether the plaintiff sought at least one equitable remedy. 768 F.3d 122, 131–33 (2d Cir. 2014). The Second Circuit concluded

---

profits and plaintiff's own lost profits based on the same sales would constitute an impermissible double recovery" (cleaned up)).

that the district court indeed had that power because the plaintiff sought disgorgement of the defendant's profits under the Lanham Act. *Id.* at 133. More recently, the Second Circuit observed that "the question whether disgorgement is warranted under the Lanham Act ordinarily should be left to the court." *Lexington Furniture Indus., Inc. v. Lexington Co., AB*, No. 22-2993, 2023 WL 8889514, at \*2 n.2 (2d Cir. Dec. 26, 2023). That question depends on the balancing of "equitable factors," which is "properly assigned to the district court, rather than to the jury, because that best comports with the Lanham Act's command that any award be made 'subject to the principles of equity' and 'according to the circumstances of the case.'" *Id.* (quoting 15 U.S.C. § 1117(a)). District courts in this Circuit have recently agreed with that position, relying on the Second Circuit's guidance in *Gucci. See, e.g.*, *Van Leeuwen Ice Cream LLC v. Rebel Creamery LLC*, No. 21 Civ. 2356 (EK), 2024 WL 1072046, at \*3 (E.D.N.Y. Mar. 11, 2024).

### B.    An Advisory Jury on Disgorgement Is Not Warranted.

Under Federal Rule of Civil Procedure 39(c), "[i]n an action not triable of right by a jury, the court . . . may try any issue with an advisory jury." Courts typically empanel advisory juries (1) to "promote judicial economy" or (2) when "special factors suggest that a jury composed of members of the community would provide the Court valuable guidance in making its own findings and conclusions," *In re Currency Conversion Fee Antitrust Litig.*, No. 04 Civ. 5723 (WHP), 2012 WL 4361443, at \*1 (S.D.N.Y. Sept. 11, 2012) (cleaned up). Neither circumstance is present here.

To start, empaneling an advisory jury on Skillz's entitlement to the equitable remedy and the amount (if any) of Papaya's profits to be disgorged would not further judicial economy. An advisory jury would not spare the Court the burden of independently evaluating the evidence and making its own findings of fact and conclusions of law. *See* Fed. R. Civ. P. 52(a)(1). And it would require the Court to "expend resources addressing voir dire, jury instructions, and potentially unnecessary evidentiary rulings" on a claim the jury has no authority to decide. *Bauer-Ramazani*

21

*v. Tchrs. Ins. & Annuity Ass'n*, No. 11 Civ. 89, 2013 WL 6189802, at \*11 (D. Vt. Nov. 27, 2013).

Nor would an advisory jury avoid any duplication of effort. In making its determination, the Court may rely on the evidentiary record developed during the jury trial, supplemented as necessary by any additional evidence or argument bearing on the relevant equitable factors and Papaya's finances. Indeed, courts often proceed in such a manner. *See, e.g.*, *Ultra Recs. LLC v. Ultra Int'l Music Publ'g*, No. 22 Civ. 9667 (AS) (S.D.N.Y.); *Chanel, Inc. v. WGACA, LLC*, No. 18 Civ. 2253 (LLS) (S.D.N.Y.); *Khan v. Bd. of Directors of Pentegra Defined Contribution Plan*, No. 20 Civ. 7561 (PMH) (S.D.N.Y.). There is, in short, no judicial-economy rationale for empaneling an advisory jury when the alternative would be both simpler and more efficient.

Worse still, submitting disgorgement to the jury would require the jury to hear more evidence than otherwise necessary, and to consider evidence that is irrelevant to the actual damages claim it *must* decide, which could confuse its deliberations and verdict if liability is found. Bergman's profit disgorgement theory assumes that,



The jury's confusion would only be compounded by the relationship between Mr. Bergman's disgorgement theories and his actual damages model.

---

[75] Bergman Rpt. ¶¶ 127–45.

[76] *Id.* ¶¶ 146–51.

████████████████████████████████████████████████████████

██████ ██ ██████████████████████████████████████████████████

████████████████████████████████████████████████████████

█████████████████████████████ Asking a jury to evaluate all three theories—two of which are premised on mutually exclusive factual assumptions, and one of which logically negates the actual damages claim the jury is charged with deciding—would create a substantial risk of confusion and prejudice, and would certainly lengthen the jury trial.

What's more, the "special factors" present in this case actually *discourage* the use of an advisory jury. A party's entitlement to disgorgement under the Lanham Act depends on the balancing of various equitable considerations that a court—not a jury—is particularly suited to undertake. *See George Basch Co. v. Blue Coral, Inc.*, 968 F.2d 1532, 1540 (2d Cir. 1992) (explaining that the "district court's discretion lies in assessing the relative importance of [equitable] factors"—such as the "availability and adequacy of other remedies"—and "determining whether, on the whole, the equities weigh in favor of an accounting"). Indeed, the Second Circuit has explained that "[t]he balancing of these factors is properly assigned to the district court, rather than to the jury, because that best comports with the Lanham Act's command that any award be made 'subject to the principles of equity' and 'according to the circumstances of the case.'" *Lexington Furniture*, 2023 WL 8889514, at *2 (quoting 15 U.S.C. § 1117.). This multifactor equitable balancing is precisely the type of determination for which district courts are best suited—and for which an advisory jury would provide little, if any, useful guidance.

## IV.    PRETRIAL ORDER ISSUES

As part of the Parties' preparation of the Joint Pretrial Order, Papaya sought to raise certain

---

[77] *Id.* ¶¶ 169–84.

23

issues to the Court's attention therein, to be addressed at the forthcoming pretrial conference, but Skillz refused to file the Joint Pretrial Order with Papaya's positions included.  Therefore, Papaya's positions are set forth in this memorandum:

**Skillz's Witness List:** Papaya objects to Skillz introducing deposition testimony of any witness who is available to testify live at trial, including witnesses who will or should be presented live during Skillz's case.  See Fed. R. Civ. P. 32.  This includes testimony from Andrew Paradise, Skillz's CEO, who is an agent of Skillz and under its control.  Skillz has listed Mr. Paradise's mode of testimony as "Deposition (will call)."  Joint Pretrial Order, Skillz's Witness List, Ex. 1 at 4.  To the extent Skillz wishes to introduce testimony from Mr. Paradise, Skillz must call him live at trial.

**Trial Stipulations:** To promote efficiency during trial, Papaya proposed the following exhibit admission stipulation, which Skillz rejected:  The Parties will not object on hearsay grounds to exhibits produced by either party or by a third party pursuant to Court order or subpoena that appear on their face to be business records (e.g., internal emails, financials, PowerPoint presentations created by the producing party in the ordinary course of their business), unless the party has a good faith belief disputing the exhibits' authenticity. Where a party raises an authenticity or hearsay objection to a document that was produced and created by that party, that party will bear the burden of establishing said document is not authentic or is not a business record. For clarity, the produced documents are  documents that were timely served on the other party (via document production, email, deposition exhibit, court filing, or discovery response). Such documents are admissible if used with a witness, including an expert witness, subject to resolution of other objections to the admissibility of these exhibits, including but not limited to Fed. R. Evid. 106, 401, 402, 403, 408, 805 (hearsay within hearsay objections), 1002, and any applicable order granting a *Daubert* motion or motion in *limine*, as well as objections on the grounds that the

24

documents were not timely produced, were not timely disclosed, or were not within the scope of an expert's report, pursuant to Fed. R. Civ. P. 26 or 37. The Parties will not object on foundation grounds to the admission of such business records exhibits through an expert witness as long as the requirements of Fed. R. Civ. P. 26 and Fed R. Evid. 703 have been met, while preserving the parties' other objections to exhibits admitted through an expert witness.

Also to promote efficiency and reduce the burden on the Court and the Parties during trial, Papaya proposed additional standard stipulations regarding trial exchanges, which Skillz rejected, which will result in needing to raise objections on numerous issues at trial, before the jury, because Skillz refuses to exchange information beforehand. For example, Papaya proposed that the Parties exchange opening exhibits and demonstratives the day before the start of trial. Skillz refused to exchange earlier than the morning of the first day of trial, which does not provide sufficient time to address potential objections between the Parties and then with the Court. Similarly, Papaya proposed an agreement to disclose witnesses to be called live or by deposition in the order of call two days prior to the date the witness plans to testify. But Skillz will only agree to disclose that information the day before the witness testifies, which leads to trial-by-ambush issues (let alone availability issues to the extent a party intends to call an adverse witness). Skillz also refuses to disclose direct examination exhibits, demonstratives, and deposition designations in advance, which will again lead to ambush issues and numerous logistical issues and potential objections before the jury.

Papaya respectfully requests that the Court order Skillz to engage in good faith to create reasonable pretrial exchange and exhibit admission protocols to streamline the issues for trial.

## **CONCLUSION**

For the foregoing reasons, a judgment for Papaya will be warranted.

Dated: March 13, 2026

*/s/ Devora W. Allon*

Devora W. Allon
Gilad Bendheim
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
(212) 446-5967
(212) 446-4900
devora.allon@kirkland.com
gilad.bendheim@kirkland.com

Allison M. Brown
KIRKLAND & ELLIS LLP
2005 Market Street, Suite 1000
Philadelphia, PA 19103
(212) 268-5100
(215) 268-5001
alli.brown@kirkland.com

George W. Hicks, Jr. (*pro hac vice*)
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, NW
Washington, DC 20004
(202) 389-5031
(202) 389-5200
george.hicks@kirkland.com

Cole T. Carter (*pro hac vice*)
KIRKLAND & ELLIS LLP
333 West Wolf Point Plaza
Chicago, IL 60654
(312) 862-1951
(312) 862-2200
cole.carter@kirkland.com

Samuel Carno Leifer
KIRKLAND & ELLIS LLP
200 Clarendon Street
Boston, MA 02116
(617) 385-7707
(617) 385 7501
samuel.leifer@kirkland.com

Michael W. De Vries  (*pro hac vice*)
Argie Mina (*pro hac vice*)
Kirkland & Ellis LLP
695 Town Center Drive, Suite 1700
Costa Mesa, California 92626
(213) 680-8590
(714) 982-8844
michael.devries@kirkland.com
argie.mina@kirkland.com

Sharre Lotfollahi (*pro hac vice pending*)
Kirkland & Ellis LLP
2049 Century Park East, Suite 3700
Los Angeles, California 90067
(213) 680-8673
(310) 552-5900
slotfollahi@kirkland.com

*Counsel for Defendants Papaya
Gaming Ltd. and Papaya Gaming, Inc.*

27

## LOCAL RULE 7.1(C) CERTIFICATION

I, Devora W. Allon, hereby certify that the foregoing memorandum of law complies with the word count limitations set forth in Rule 7.1(c) of the Local Rules of the of the United States District Court for the Southern District of New York, and contains 7,910 words, exclusive of the caption, table of contents, table of authorities, signature blocks, and this certificate.

Dated: March 13, 2026
New York, NY

/s/Devora W. Allon
Devora W. Allon

28