```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------- X
                                           :
SKILLZ PLATFORM INC.,                      :
                                           :
                        Plaintiff,         :      24cv1646 (DLC)
                 -v-                        :
                                           :      OPINION AND
                                           :        ORDER
PAPAYA GAMING, LTD., and PAPAYA            :
GAMING, INC.,                              :
                                           :
                        Defendants.        :
                                           :
----------------------------------------- X
```

APPEARANCES:

For the plaintiff Skillz Platform Inc.:

Craig Carpenito
Amy Katherine Nemetz
Curtis Ryan Crooke
Jessica C. Benvenisty
Kathleen Elizabeth McCarthy
King & Spalding LLP
1185 Avenue of the Americas
New York, NY 10036

Lazar Pol Raynal
Michael Anthony Lombardo
King & Spalding
110 N Wacker Drive, Suite 3800
Chicago, IL 60606

Barry Antoine Kamar
King & Spalding
200 South Biscayne Blvd.
Suite 4700
Miami, FL 33131

For the defendants Papaya Gaming, Ltd. and Papaya Gaming, Inc.:

Devora Whitman Allon
Gilad Bendheim
Giancarlo Francis Carozza
Kirkland & Ellis LLP

601 Lexington Avenue
New York, NY 10022

Allison M. Brown
Kirkland & Ellis LLP
2005 Market Street,
Suite 1000
Philadelphia, PA 19103

Cole Carter
Kirkland & Ellis LLP
300 N. LaSalle
Chicago, IL 60654

Adam R. Alper
Kirkland & Ellis LLP
555 California Street
San Francisco, CA 94104

George W. Hicks, Jr.
Quinn Zhang
Kirkland & Ellis LLP
1301 Pennsylvania Avenue, NW
Washington, DC 20004

Samuel Carno Leifer
Kirkland & Ellis LLP
200 Clarendon Street
Boston, MA 02116

Argie Lagrimas Mina
Michael W De Vries
Kirkland & Ellis LLP
695 Town Center Drive
Suite 1700
Costa Mesa, CA 90067

Sharre Lotfollahi
Kirkland & Ellis LLP
2049 Century Park East
Suite 3700
Los Angeles, CA 90067

Danielle Renee Sassoon
Jeffrey Thalhofer
Clement & Murphy, PLLC

2

767 Fifth Avenue
Ste 15th Floor
New York, NY 10153

I.   Evidence at Trial ........................................ 4
II.  Procedural History ...................................... 13
Discussion.................................................... 14
I.   Papaya's Motions ........................................ 14
  A. Motion for Judgment as a Matter of Law ................. 14
    1. Harm Must Flow from Deception ........................ 16
    2. Enterprise Damages ................................... 20
    3. Lanham Act Claim ..................................... 26
    4. GBL Claim ............................................ 33
  B. New Trial ............................................. 34
  C. Remittitur ............................................ 35
    1. Intrinsically Excessive Award ....................... 36
    2. Attacks on Bergman's Damages Model .................. 40
II.  Skillz's Motions ........................................ 47
  A. Disgorgement and Request for Enhanced Monetary Relief.. 47
    1. Legal Standard ....................................... 48
    2. The Disgorgement Award .............................. 51
  B. Attorney's Fees, Prejudgment Interest, and Costs ....... 68
    1. Attorney's Fees ...................................... 68
    2. Prejudgment Interest ................................. 76
    3. Costs ............................................... 77
Conclusion.................................................... 78

DENISE COTE, District Judge:

In this hard-fought false advertising lawsuit, the plaintiff Skillz Platform Inc. ("Skillz") won a substantial award of damages at a jury trial that concluded on April 23, 2026. This Opinion addresses the parties' post-trial motions, including the motions by defendants Papaya Gaming, Ltd. and

Papaya Gaming, Inc. (together, "Papaya") to set aside the verdict and by Skillz for an award of over $1 billion in damages.  For the following reasons, Papaya's attacks on the verdict are rejected and Skillz is awarded $719 million plus its attorney's fees for the years 2024 and 2025 and certain costs.

The parties compete in the real money skill-based mobile gaming ("RMSB") market.  Participants in the market pay money to win cash prizes or game rewards in tournaments run on online platforms.  Skillz created the first RMSB platform in 2012. Papaya entered this market in 2019 and quickly took a significant market share.

Skillz filed this action against Papaya on March 4, 2024, asserting that Papaya's success was due to unfair competition. Skillz brings false advertising claims under the Lanham Act, 15 U.S.C. § 1125, and New York General Business law ("GBL") § 349 against Papaya.  Taken in the light most favorable to Skillz, the evidence at trial showed the following.

I.    Evidence at Trial

Skillz created the first RMSB online platform in 2012.  It permits customers to win cash awards in online tournaments while playing games such as Solitaire against other customers.  To play in a Skillz tournament, Skillz's customers download the Skillz app from an app store, such as the Apple App Store or

4

Samsung Galaxy Store.  Its customers pay entry fees to enter a tournament and Skillz keeps a percentage of those fees, paying the remainder to winners of the tournaments.  For example, in a two-person tournament with a per-person entry fee of $0.60, the winner will receive $1.00 and Skillz will keep $0.20.

There is a significant barrier to entry into the RMSB market.  A successful platform needs a customer base large enough to match players of similar or comparable skill in tournaments within a reasonable amount of time.  This density of players is referred to as "player liquidity" or "liquidity." The expectation is that the quicker a player learns she has won or lost, the more likely the player is to enter another tournament either to win again or to try to win.  Through a substantial investment in advertising and other customer acquisition efforts, Skillz created a sizeable customer base. This customer base was large enough to create a "network effect," making it even easier for Skillz to attract more users and retain existing users.  Nonetheless, while Skillz has invested over $1 billion in its business, it had not yet turned a profit as of the time of the trial.

Skillz considers its tournaments to be games of skill as distinguished from games of chance or gambling.  Online gambling in the United States is regulated by the States and is legally

available to only a fraction of the public.  Skillz is not a licensed gambling business and does not intend to become one. Therefore, to establish its business, Skillz was required to and did represent to app stores, payment processors, and advertising hosts that it was not engaged in gambling and that the outcome of its tournaments was determined by the skill of the players and was not determined by Skillz or due to chance.

Papaya's founders decided to enter the RMSB market in 2019 by deceiving the public and others about the nature of its product.  Instead of running tournaments in which the players who had paid entry fees competed against each other, Papaya decided to solve the problem of building liquidity by running tournaments in which multiple participants were not other human players but were instead "bots."  Papaya's bots were essentially scores designated by Papaya's algorithms; they were not artificially intelligent players.  In these tournaments, a player's score was compared to the scores Papaya assigned to its bots.  In this way, Papaya was always able to run a tournament, including tournaments with what appeared to be a dozen or more participants, at any time of night or day.  Papaya gave its bots usernames and profiles to make them appear to be individual customers.

Broadly speaking, Papaya's bots were of two kinds. Liquidity bots were used to create immediately accessible tournaments of various sizes, including up to 20 or more "players". Thus, a 20-player tournament might have one human player and nineteen bots. This permitted a player in a Papaya game to learn quickly whether it had won or lost a tournament, thereby increasing the odds that he would pay to enter another Papaya tournament. Other bots were used to give a player a designated win or loss. For instance, a player who had a losing streak could be given a "win" to motivate them to keep playing in more tournaments. These bots, called tailored bots, operated in over 630 million Papaya tournaments, or in roughly one-quarter of the 2.6 billion tournaments that Papaya hosted during the years 2021 to 2024.

Overall, between 2021 and 2024, bots accounted for over 13 million of the participants on Papaya's platform, compared to about 11 million human players. More than 6.1 million of those human beings played in at least one tournament where tailored bots were designed to give them a loss, while more than 7.3 million played in tournaments with tailored bots designed to give them a win.

Papaya's use of bots allowed it to build liquidity without the substantial investment that would otherwise have been

7

required.  Not surprisingly then, its reliance on bots was greatest in the initial phases of its business.  In January 2021, for example, Papaya used bots in about 90% of its cash tournaments, or 4.5 million of Papaya's 5 million tournaments.  Because of its use of bots, Papaya only paid customers roughly $2 billion of the $6.7 billion that it advertised had been awarded in prizes.  And just before Papaya stopped using bots near the end of 2023, Papaya was still using bots in roughly 50% of its cash tournaments.  Thus, Papaya quickly achieved a substantial presence in the RMSB market while investing only a fraction of the money expended by Skillz to do so.  When seeking investors, it bragged about this strategy: Papaya described its multiple-player tournaments, its "unique" platform capabilities, and that its revenue growth was "8 times more than the industry leaders."

In its advertising, Papaya never disclosed that it deployed bots in its tournaments.  Instead, it purposely engaged in false advertising.  It claimed that its games were "fair" and "skill-based," that it has "no vested interest" in who wins or loses a tournament, and described the participants in its tournaments with pictures and in terms that apply to human players.  For example, it stated that only "players" above the age of 18 would be allowed on the platform.  It assured consumers that they

8

would be matched with other players within the same skill level to ensure a "fair experience for everyone."

When players complained to Papaya that they suspected it was deploying bots, Papaya flatly denied it was doing so.  For example, it told complainants that it "want[s] to clarify that we do not use bots or computer players."  Papaya's executives were intimately involved in the deception.[1]  Papaya instructed its staff to escalate complaints about bot use to management. Papaya removed posts complaining about its suspected use of bots from its Facebook group.

Papaya not only misrepresented its tournaments in its advertising to and communications with consumers, it misrepresented them to app stores, its payment processers, and its advertising channels.  As had been true for Skillz, these entities required assurance from Papaya that it was not offering an online platform for gambling.  For example, Papaya obtained a sixty-one page legal opinion for use with payment processors that explained why its RMSB product was not prohibited as illegal gambling under four federal laws and the laws of most States.  It did not disclose Papaya's use of bots as players in

---

[1] For example, in response to a complaint about bot use, co-founder and CTO Andrey Birman directed staff to close the complainant's account, stating that the user "smells like trouble."

its tournaments, instead emphasizing that Papaya's games are "games of skill" and not games of chance.  According to the opinion, Papaya "eliminates" elements of chance by giving "each player" the same hand and having them compete against each other "head-to-head."  The letter explained, "Papaya is strictly a head-to-head, multiplayer, or tournament gaming platform. Players do not play against the house or bank, and players will never be involved in a game in which they are playing against Papaya."

Papaya did not stop using bots until late 2023.  By that time, Skillz's revenue had fallen by 60% in just two years, tumbling from $384 million in 2021 to $152 million, while Papaya's revenue skyrocketed from $163 million to $461 million over the same period.

Skillz's witnesses at trial included its co-founder and former Chief Strategy Officer Casey Chafkin, survey expert Dr. Andreas Groehn, gaming expert Dr. Jose Zagal, and damages expert James Bergman.  Papaya called its damages expert Jonathan Orszag and gaming expert Dr. Christoffer Holmgard as its witnesses. Papaya also introduced excerpts from the depositions of Skillz CEO Andrew Paradise, former Skillz Vice Presidents Orit Peleg and Kate Paiz, and former Skillz Head of Engineering Meidad Glory.

Because there was overwhelming evidence at trial that Papaya intentionally engaged in an advertising scheme to deceive consumers about the nature of its product and was liable under both the Lanham Act and the GBL,[2] the parties principally litigated before the jury the amount of damages to award to Skillz. And, because the Court had determined that it would receive an advisory jury verdict on disgorgement, 2026 WL 812016 (S.D.N.Y. Mar. 23, 2026), Skillz sought a jury award of both damages and disgorgement. The jury was instructed that "Skillz is not entitled to duplicative monetary recoveries and the Court will ensure that Skillz only recovers once for any injury it has shown it suffered."

Skillz's damages expert Bergman presented two theories of disgorgement: the amount of Papaya's unjust profits and Papaya's unfairly obtained cost savings.[3] He also presented his calculation of the actual damage to Skillz.

Bergman's models relied on his calculation of Skillz's and Papaya's costs of acquiring and retaining users. He divided

---

[2] During Papaya's summation, its counsel apologized to the jury. "Now, I am the first to acknowledge that the response to these [customer] complaints was not the right response." Defense counsel later stated: "Papaya has taken responsibility for its actions. It stopped giving those customer complaint responses. It stopped using bots."

[3] In its post-trial motions, Skillz pursues an award relying on the unjust profits model.

11

those costs by the number of paying monthly active users ("PMAU"). He performed this calculation for Papaya for the years 2021 and 2022; he did the same for Skillz in the years 2019 and 2020. Comparing the two numbers, he calculated that Skillz spent 2.1 times as much as Papaya to acquire and retain a user ("UA Acquisition Ratio" or "Ratio").

Bergman used the Ratio to calculate Papaya's cost savings as $652.6 million. Bergman also used the Ratio to calculate Papaya's unjust profits, which he opined were $719 million.

Finally, for the actual damages model, Bergman calculated the enterprise value of Skillz as of 2025, or in other words, what Skillz would have been valued in 2025 if Papaya had not engaged in illegal activity. Bergman calculated Skillz's lost enterprise value as $637.5 million.

The jury found Papaya liable for false advertising under both the Lanham Act and the GBL.[4] It awarded Skillz $420 million in damages, or two-thirds of the requested amount. It awarded

---

[4] On April 17, after the plaintiff had rested, Papaya moved for judgment as a matter of law pursuant to Rule 50(a), Fed. R. Civ. P. With respect to damages, Papaya argued that Skillz is unable to recover enterprise value damages as a matter of law because it was not completely destroyed and that all of Skillz's theories of damages flow from bot usage, not false advertising. It also argued that Skillz had not proven any element of false advertising under the Lanham Act -- falsity, materiality, or injury -- and therefore had failed to prove a GBL violation as well. That motion was denied.

an advisory disgorgement verdict of $719 million for Papaya's unjust profits and $652 million for Papaya's unfair cost savings.

II.  Procedural History

Skillz filed this lawsuit on March 4, 2024.  In March of 2025, near the close of the fact discovery period, Papaya's executives invoked their Fifth Amendment right against self-incrimination at their depositions.  About a year later, on the eve of trial, those same executives sought to withdraw their invocation of the Fifth Amendment privilege.  The tortured pre-trial history of this case and in particular Papaya's litigation conduct is set out in Skillz Platform Inc. v. Papaya Gaming, Ltd., No. 24CV1646 (DLC), 2026 WL 915251, at *1 (S.D.N.Y. Apr. 3, 2026) ("Fifth Amendment Privilege Opinion").  The Fifth Amendment Privilege Opinion is incorporated by reference and familiarity with it is assumed.

The trial began on April 13, 2026 and the jury returned its verdict on April 23.  The parties submitted their post-verdict motions on May 15.  Papaya renewed its motion for judgment as a matter of law and moved as well for a new trial and remittitur. Skillz submitted motions for an award of disgorgement, enhanced monetary relief, a corrective advertising injunction, as well as attorney's fees, costs, and prejudgment interest.  Specifically,

13

Skillz seeks an award of twice the disgorgement amount of $719 million, that is, $1.438 billion.  Alternatively, it asks for a trebling of the award of actual damages of $420 million, that is, $1.260 billion.  The motions became fully submitted on June 19.

## Discussion

Papaya's motions challenging the verdict will be addressed first.  For the reasons that follow, Papaya's motions are denied.  This Opinion then grants Skillz's motions in part.  Skillz will be awarded $719 million in disgorgement as well as its attorney's fees accrued in the years 2024 and 2025 and certain costs.  A separate Opinion will address Skillz's request for injunctive relief.

I.   Papaya's Motions

Papaya has filed two post-trial motions.  One is for judgment as a matter of law; the other is for a new trial or remittitur of the damages award.  To the extent the arguments overlap, they will be principally addressed during the discussion of the first motion.

A.   Motion for Judgment as a Matter of Law

Papaya moved at the close of Skillz's presentation of evidence at trial for judgment as a matter of law ("JMOL") and now renews its motion under Rule 50(b), Fed. R. Civ. P.  Papaya

faces a "particularly heavy" burden in seeking to overturn the jury's verdict.  Cross v. New York City Transit Auth., 417 F.3d 241, 248 (2d Cir. 2005).  A court may not grant judgment as a matter of law unless:

> (1) there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or (2) there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded persons could not arrive at a verdict against it.

Ortiz v. Stambach, 137 F.4th 48, 61 (2d Cir. 2025) (citation omitted).  This standard "is a high one, met only in rare occasions."  Conte v. Emmons, 895 F.3d 168, 171 (2d Cir. 2018) (citation omitted).  "The court must draw all reasonable inferences in favor of the nonmoving party and although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe."  Ortiz, 137 F.4th at 61 (citation omitted).  "In ruling on such a motion, the court must bear in mind that the jury is free to believe part and disbelieve part of any witness's testimony."  Zellner v. Summerlin, 494 F.3d 344, 371 (2d Cir. 2007).  Thus, a court must "defer" to the credibility assessments of the jury.  Ortiz, 137 F.4th at 61 (citation omitted).

Papaya makes two arguments in support of its Rule 50(b) motion.  It argues first that judgment must be entered in its favor because Skillz's damages expert erred (1) by measuring bot use and not the impact of any false advertising, and (2) by calculating an enterprise value for Skillz despite the fact that Skillz continues to exist.  It then argues that Skillz failed to present evidence to support each element of its Lanham Act and GBL claims.

1.    Harm Must Flow from Deception.

Papaya argues that Skillz presented no legally competent evidence of an injury that flowed directly from Papaya's false advertising because it relied on the wrong but-for world.  As described by Papaya, Skillz's damages expert Bergman improperly relied on a but-for world in which Papaya did not use bots and its advertising statements were true; in Bergman's models, Papaya's expenses were greater and its profits were diminished because it did not rely on bots to build its business.  Papaya contends that Bergman was required to model a different but-for world, specifically one in which Papaya removed all false statements from its advertising while not altering its business model or its use of bots.  According to Papaya, the only world that should have been measured was one in which it told the world that it was using bots.

16

Papaya fails to explain how any expert could have created the but-for world it describes.  Skillz proved at trial that Papaya could not have entered the RMSB market by using bots in the way that Papaya did -- to create liquidity and determine the outcome of tournaments -- and at the same time truthfully describe that use and its product to consumers in its advertising.  Papaya has offered no authority to suggest that a plaintiff's expert must create a but-for world that could not exist.

If Papaya had not misled consumers in its advertising and instead truthfully disclosed that consumers paying cash to compete in Papaya tournaments would be playing against bots, Skillz proved that Papaya would not have been allowed into the RMSB market.  Papaya's statements to the consuming public -- that its tournaments were games of skill, for instance -- were of a piece with the statements it was required to make to payment processors and others to enter this online industry. Skillz showed that entry into this online world required RMSB companies to demonstrate that their cash tournaments were not gambling.  In other words, the but-for world Papaya proposes could not exist because if Papaya had been truthful, there would have been no Papaya games to play.  Skillz also showed at trial, including through evidence of Papaya's responses to consumer

17

suspicions that it was using bots, that Papaya understood both that consumers did not want to "play" against bots and that it was important to hide its use of bots from consumers.

On the other hand, the but-for world which Bergman posited to create his damages models could exist.  In a world where Papaya had not used bots, its statements would no longer be false, but it would have had to make far larger investments to build a sufficiently liquid player base to begin to be profitable and its profits would have been significantly reduced as it built that liquidity.  That but-for world was the only world available for Skillz's expert to measure.

As significantly, Skillz showed at trial that the damages that Bergman measured flowed directly from Papaya's false advertising.  Papaya used that advertising's false description of its platform to enter the RMSB market, to compete with Skillz, to woo away Skillz customers, and to build market share. That false advertising concerned the very nature of the product; it was not a false statement about some incidental feature.  And Skillz showed that it was that very advertising that caused consumers to complain to Papaya about Papaya's use of bots.

Papaya also argues that Bergman's analysis is flawed because it wrongly assumes that Papaya had a duty to disclose its use of bots.  It points to legal authority for the

proposition that the Lanham Act imposes no affirmative duty of disclosure.  That argument misses the point.  This is not an omission case; it is a false statement case.  The law forbids false advertising.  If a company cannot exist unless it misrepresents the nature of its product to the marketplace, then it cannot exist.  That is a distinct issue from whether there is an independent duty under the law to disclose omitted information.

Finally, Papaya argues that Souza v. Exotic Island Enters., Inc., 68 F.4th 99 (2d Cir. 2023), required Bergman to build a model in which Papaya continued to use bots but made no false statement in its advertising.  Souza is inapposite.  In Souza, the Second Circuit held that the plaintiffs, who were professional models, could not recover damages when a gentleman's club used their images in advertisements without their consent because the models had failed to offer any evidence that they had lost income due to that unauthorized use of their images.  Id. at 120.  The plaintiff here offered substantial evidence that it was directly injured by Papaya's false advertising.  Through the false statements, Papaya was able to attract consumers and build liquidity without having to make the enormous user acquisition investments that Skillz had made.  There was evidence that the RMSB market is a zero-sum

world and that one platform's gain is another platform's loss. That evidence was reinforced by proof that Skillz's revenue fell sharply as Papaya's soared.

### 2.    Enterprise Damages

Papaya also challenges Skillz's right to a damages award based on its lost enterprise value.  In calculating the actual damages that Skillz incurred due to Papaya's false advertising, Skillz's expert Bergman calculated its loss in enterprise value by multiplying Papaya's "additional" revenue in 2025[5] by Skillz's market share of 39% in 2021, the year in which Papaya entered the RMSB market.  Bergman then multiplied that number by the "enterprise multiple" that an investment bank had used when assessing Papaya's enterprise value.[6]  After making other adjustments, Bergman testified that Skillz's lost enterprise value as of 2025 was $637.5 million.  Papaya contends that Skillz may not recover enterprise value damages as a matter of law because enterprise value damages are only available when a

---

[5] Bergman calculated that Papaya's increased or additional revenue from its use of bots was $1.34 billion, which would have been the amount of revenue available to other RMSB companies.

[6] In work done for Papaya in 2022, UBS determined that Papaya's enterprise multiple was 4.1, based on the median enterprise multiple of the gaming industry.  Bergman testified that the enterprise multiples in the industry were "basically the same" in 2025.

business has been completely driven from the market.  Papaya is wrong.

The goal of compensatory damages is to make the victim of tortious conduct whole, that is, to place the victim in a position "substantially equivalent" to that which he would have enjoyed "had no tort been committed."  Anderson Grp., LLC v. City of Saratoga Springs, 805 F.3d 34, 52 (2d Cir. 2015); 16 N.Y. Prac., New York Law of Torts § 21:3; 36 N.Y. Jur. 2d Damages §§ 6, 54; 3 Dan B. Dobbs, Dobbs Law of Remedies § 3.1 ("Dobbs"); Restatement (Second) of Torts § 903.  The goal is to make sure the defendant's breach "does not leave the plaintiff with assets or net worth less than that to which [it] is entitled."  Schonfeld v. Hilliard, 218 F.3d 164, 177 (2d Cir. 2000) (quoting Dobbs § 3.3(3) (General Damages or Market Measures)).  While a plaintiff may not recover damages when it is "uncertain" whether it has been injured by the defendant's wrongdoing, "[o]nce the plaintiff meets this burden, the defendant bears the risk of uncertainty as to the amount of damages."  Anderson Grp., 805 F.3d at 53.  Damages are not limited to past and present injury but may include prospective damages that proximately result from the misconduct and flow from the past harm with reasonable certainty.  New York Law of

Torts § 21:13; N.Y. Jur. 2d Damages §§ 17, 74; Restatement (Second) of Torts § 910.

Many harms are measured by general or "market" damages, "meaning market-measured compensation calculated by the value of the very thing to which plaintiff was entitled." Dobbs § 3.3(1). Market value damages are based on the idea that the plaintiff's asset suffers "a loss of net worth as a result of defendant's" misconduct and are "pervasive" in cases involving fraud and harm to property. Id. § 3.2. The value of the asset in market value damage calculations "is the amount of money for which the subject matter could be exchanged or procured." Restatement (Second) of Torts § 911. Each asset has "its own market value, and it is the diminution in the value of that [asset] that is the measure of the owner's loss." In re Sept. 11 Litig., 802 F.3d 314, 335 (2d Cir. 2015).

A plaintiff may seek to recover an asset's lost value so long as the asset has "a determinable market value." Schonfeld, 218 F.3d at 177. In determining the market value of intangible assets, courts employ the hypothetical market standard, which is "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts." Id. at 178 (citing Dobbs § 3.5

(Constructing Market Value)); see In re Sept. 11 Litig., 802
F.3d at 335.  "If no prior sales history is available, experts
may give their opinion of the asset's value; and evidence of
sales of comparable assets may be introduced."  Schonfeld, 218
F.3d at 178; see Dobbs § 3.5 (Constructing Market Value).

Skillz was entitled to pursue a theory of lost enterprise
value.  The jury found that the asset at issue here -- the
Skillz business -- decreased in value as a result of its
competitor's false advertising.  Skillz offered evidence from
which the jury could find that Papaya's false advertising, in
which it misrepresented the nature of its product, caused Skillz
to lose customers, revenue, market share, and ultimately suffer
a loss in the value of its entire business.  In compensation,
Skillz was entitled to an award equal to the loss in the value
of its enterprise.[7]

In arguing that a loss in enterprise value is unavailable
to Skillz as a matter of law, Papaya primarily relies on the
following language taken from Indu Craft, Inc. v. Bank of
Baroda: "when the breach of contract results in the complete

---

[7] During the trial, Papaya pointed to other reasons for the
decline in the value of Skillz's business, including its
reduction during the years 2022 to 2024 in the amount it spent
on customer acquisition and retention.  It is noteworthy that
the jury awarded Skillz $420 million in damages, which decreased
the amount of lost enterprise value calculated by Bergman
($637.5 million) by one-third.

destruction of a business enterprise and the business is susceptible to valuation methods, [enterprise value] provides the best method of calculating damages."  47 F.3d 490, 496 (2d Cir. 1995).  Papaya's reliance on Indu Craft is misplaced.  Indu Craft does not state that damages measured by a loss in enterprise value are only available when a business is completely destroyed; it states instead that that measure of damages is the best method in those circumstances.  Skillz was entitled to seek compensation from the jury that would restore the enterprise value it lost due to Papaya's false advertising.

Papaya relies as well on a footnote in Ne. Tel. Co. v. AT&T Co., 651 F.2d 76, 95 n.30 (2d Cir. 1981), for the proposition that enterprise value damages are also unavailable to a struggling business.  Papaya misreads the decision.  The plaintiff in that antitrust case sought to recover both lost profits and damages to its "going concern" value.[8]  The court held it could not recover both types of damages "for the same period."  Id.

In a related argument, Papaya contends that Skillz can only recover its lost profits from Papaya's false advertising. Acknowledging that Skillz had still not made a profit as of the

---

[8] Because Skillz is entitled to submit a damages theory based on enterprise value to the jury, Papaya's arguments that Skillz was not an "almost" completely destroyed business are not addressed.

24

time of trial, Papaya argues that Skillz cannot recover enterprise value damages simply because Skillz prioritized growth over profits in the years it was developing its business. The evidence at trial showed that Skillz invested heavily in developing its business and enlarging its customer base to achieve not only substantial liquidity but also a network effect.  Papaya cites no relevant authority for its argument that Skillz can only recover lost profits.  Based on the legal authority recited supra, Skillz was entitled to present the enterprise value theory of damages to the jury, the merits of which the parties robustly debated before the jury.

Finally, Papaya argues that enterprise value damages overcompensate Skillz because Skillz would not have had access to its full business value in cash.  Instead, a public company like Skillz has its enterprise value reflected in its stock price and not in money in its bank account.  Papaya has presented no case law supporting this proposition.  To the contrary, market value damages are a recognized form for valuing harm and compensating an injured party.  The jury weighed the evidence at trial and granted Skillz two-thirds of its requested damages amount.  Papaya could have, but did not, present any alternative model or damages figures for the jury to consider.

Papaya has not met the heavy burden it faces in contending that the jury's verdict should be overturned.

### 3. Lanham Act Claim

Papaya next contends that it is entitled to JMOL because Skillz did not prove that Papaya had violated either the Lanham Act or GBL. Its arguments regarding the Lanham Act will be addressed first. As to the Lanham Act, Papaya contends that no reasonable jury could find that its statements were false or material, or that the statements caused any harm to Skillz. Skillz offered sufficient evidence to support the jury's verdict on each of these issues.

The elements of a Lanham Act claim are well established. A plaintiff must prove that the defendant (1) made a statement that was false or misleading; (2) the statement was material; (3) the statement was placed in interstate commerce;[9] and (4) the statement caused actual injury to the plaintiff. See Lexmark Int'l, Inc. v. Static Control Components, Inc., 572 U.S. 118, 131-32 (2014); Zesty Paws LLC v. Nutramax Lab'ys, Inc., 157 F.4th 194, 197 (2d Cir. 2025).

"A plaintiff can demonstrate falsity either by showing: (1) literal falsity, i.e., that the challenged advertisement is false on its face, or (2) implied falsity, i.e., that the

---

[9] The parties did not contest this element.

advertisement, while not literally false, is nevertheless likely to mislead or confuse consumers." Int'l Code Council, Inc. v. UpCodes Inc., 43 F.4th 46, 57 (2d Cir. 2022) (citation omitted). A plaintiff may establish literal falsity either by showing that the statement is expressly false or by establishing that the statement is "false by necessary implication, meaning that the advertisement's words or images, considered in context, necessarily and unambiguously imply a false message." Zesty Paws, 157 F.4th at 198 (citation omitted). "[I]f the language or graphic is susceptible to more than one reasonable interpretation, the advertisement cannot be literally false." Id. (citation omitted).

There are two ways to demonstrate that a statement, which may be an ambiguous statement, is false by implication. The falsity may be demonstrated through either "extrinsic evidence of consumer confusion" or "evidence of the defendant's deliberate deception." UpCodes, 43 F.4th at 57 (citation omitted).

Papaya describes Skillz's Lanham Act claim as focused on the following phrases in Papaya's advertising: that its games were fair, the games were skill-based, the games included "players" in terms that described the players as human, and that Papaya had no vested interest in the outcome of the games.

Papaya recognizes as well that the false advertising claim was focused on its video advertisements that displayed images of human players.

> i.    Falsity

Papaya first contends that no reasonable jury could find that the above-listed statements that Papaya made in its advertising were either literally false or impliedly false. Skillz, however, presented an abundance of evidence from which a reasonable jury could conclude that Papaya made statements in its advertising that were literally false.  It was undisputed at trial that Papaya populated its tournaments with liquidity bots to bolster the entry rosters and tailored bots to control the outcome of its tournaments.  When a bot "won" one of these tournaments, Papaya kept all entry fees.  The jury could have also concluded that the statements were false by necessary implication because a reasonable consumer in the RMSB market would have unambiguously interpreted the statements to mean that only humans played against each other in Papaya's tournaments. Moreover, there was also evidence to support a finding of implied falsity.  A reasonable juror could have relied on the significant evidence of actual confusion,[10] as well as the

---

[10] The jury also heard testimony from Skillz's survey expert Dr. Groehn.  He conducted a "perception" survey to determine the impact of Papaya's advertisements on players' assumptions about

evidence that Papaya deliberately engaged in the deception of consumers.  That purposeful deception was part and parcel of Papaya's deceit of the third parties, such as app stores and payment processors, whose permission was essential to Papaya's entry into the RMSB market.  Evidence of deliberate deception "creates a rebuttable presumption of consumer confusion." UpCodes, 43 F.4th at 57 (citation omitted).

Papaya argues that at least some of the phrases it used in its advertising are susceptible to a reasonable interpretation that would render them true and not literally false.  To the extent that was so, Papaya had an opportunity to convince the jury of its position.  It has not shown that a rejection of its arguments would have been unreasonable.

Papaya next argues that Skillz failed to show that its advertising statements were impliedly false.  In doing so, Papaya principally challenges the consumer survey evidence offered by Skillz.  Papaya's attacks on that evidence go to its weight and not its admissibility.  Papaya was afforded the opportunity to cross-examine Dr. Groehn, Skillz's survey expert, and present its own survey evidence, which it did not.  It was

---

bots.  He found that 45.8% of respondents watching a Papaya video advertisement and 60% of respondents reading a mock compilation of Papaya's advertising statements believed that only humans played Papaya games.

not error for the jury to weigh the results of Dr. Groehn's surveys or to find those results persuasive.  See <u>Skillz Platform Inc. v. Papaya Gaming, Ltd.</u>, No. 24CV1646 (DLC), 2025 WL 3012836, at *7 (S.D.N.Y. Oct. 27, 2025) (denying motion to exclude Dr. Groehn's survey).  Moreover, there was abundant evidence that Papaya engaged in deliberate conduct "of an egregious nature" to deceive consumers, which created a presumption of deception.  <u>Merck Eprova AG v. Gnosis S.p.A.</u>, 760 F.3d 247, 256 (2d Cir. 2014) (citation omitted).  It was not unreasonable for the jury to find that Papaya failed to overcome the presumption that at least a significant number of consumers were deceived.  <u>Id.</u> at 258.

    ii.  Materiality

Papaya also argues that Skillz failed to meet its burden to prove that the advertising statements were likely to influence a consumer's purchasing decision.  There was abundant evidence, however, that the false statements were material to consumers.[11] As explained above, consumers of Papaya's games complained to Papaya and on social media about Papaya's use of bots.  Some of

---

[11] The jury was instructed that a "material" statement "is one that is likely to influence the purchasing decisions of consumers.  To be material, the statement must involve an essential or inherent quality or characteristic of the product that matters to a reasonable consumer when deciding whether to make a purchase."

the complaints lodged with Papaya refer directly to Papaya's advertising, including Papaya's statements about fairness.  In response, Papaya closed their accounts, deleted their remarks, and lied to them.  The jury was entitled to find that Papaya's own conduct confirmed the materiality of the false statements it had made in its advertising.  In addition, in Dr. Groehn's "likelihood" survey, two-thirds of respondents (66.8%) stated that they would stop playing Papaya's games if they learned that some of their opponents were bots.

Papaya criticizes Dr. Groehn's survey for asking respondents whether they would stop playing the game upon learning that the other players were bots, since the phrasing of the question captures consumers' reactions to learning they had been deceived and does not address their decision about whether to play a game that included bots.  Papaya made this point during its cross examination of Dr. Groehn and the jury was free to consider it when weighing Dr. Groehn's testimony.  Papaya chose not to present its own survey evidence and has not shown that the jury was without sufficient admissible evidence to find that its false advertising was material to consumers.

### iii. Causation

Finally, Papaya argues that no reasonable jury could have found that any harm suffered by Skillz flowed directly from the

false advertising as opposed to Papaya's use of bots.  The jury

was instructed:

> The last element that Skillz must prove is that it was
> actually injured by Papaya's materially false or
> misleading statements.  Skillz must show, by a
> preponderance of the evidence, that the false or
> misleading statements proximately caused an injury
> that Skillz has proven it sustained, such as by a
> diversion of sales.
>
> Proximate cause means that there must be a sufficient
> causal connection between the false or misleading
> statement or statements and any injury or damage
> sustained by Skillz.  The injury or damage must flow
> directly from the statement and be fairly traceable to
> it.  A statement is a proximate cause if it was a
> substantial factor in bringing about or actually
> causing injury.  On the other hand, a proximate cause
> need not be the nearest cause either in time or space
> and there may be more than one proximate cause of an
> injury or damage.  Many factors may operate at the
> same time, either independently or together, to cause
> an injury.

Skillz introduced ample evidence that it was directly

injured by Papaya's false advertising.  Bergman's testimony

regarding the damages and disgorgement models he created

provided the jury with tools to quantify that injury.

To the extent Papaya is arguing that the Bergman models

measured only injury from its undisclosed use of bots rather

than its false advertising, that argument has been discussed

above and rejected.  To the extent Papaya contends that there

were reasons other than Papaya's false advertising for Skillz's

loss of revenue, such as Skillz's decision to reduce its user-

acquisition expenses, that issue was litigated at trial and apparently taken into account by the jury when it reduced its award of damages to Skillz by about one-third of the amount Bergman had calculated.  This argument provides no basis to reject the jury's verdict.

### 4.    GBL Claim

Papaya recognizes that to the extent its motion has been denied with respect to the Lanham Act claim, then those same arguments should be denied with respect to the GBL claim. Papaya makes one additional argument, however, that applies to the GBL claim alone.  Papaya argues that any award to Skillz of damages under the GBL must be limited to financial harm that resulted from Papaya's deception of New York consumers.

The Court denied this same request from Papaya at the charging conference.  It is denied again.

To support its argument, Papaya relies on Goshen v. Mut. Life Ins. Co. of New York, 98 N.Y.2d 314 (2002).  For several reasons, Goshen is inapposite.  The plaintiffs in Goshen were consumers, not a competitor.  And the activity that injured the Florida consumers in Goshen occurred in Florida.  Id. at 326. Because the GBL only reaches acts "directed to consumers" and the deceptive acts "took place in Florida," the GBL claims of the Florida plaintiffs were dismissed.  Id.  Here, there is no

dispute that Papaya advertised to New York consumers and the plaintiff also operated in the New York market.  Skillz is entitled to be fully compensated for the injury it incurred through Papaya's wrongdoing even though that injury also impacted consumers who resided outside New York.

B.    New Trial

Papaya moves in the alternative for a new trial in the event its motion for JMOL is denied.  Under Rule 59(a), Fed. R. Civ. P., a court may grant a new trial only for reasons "for which a new trial has heretofore been granted in an action at law in federal court."  Rule 59(a)(1)(a), Fed. R. Civ. P.  "A grant of a new trial on the ground that the verdict was against the weight of the evidence is appropriate if the jury has reached a seriously erroneous result or the verdict is a miscarriage of justice."  Farrior v. Waterford Bd. of Educ., 277 F.3d 633, 634 (2d Cir. 2002) (per curiam) (citation omitted).

Papaya argues that it should be granted a new trial because Skillz's presentation of evidence moved the trial's center of gravity away from Papaya's false statements and any harm Skillz suffered from those statements to Papaya's unfair use of bots to gain a competitive advantage.  Papaya contends that Skillz's flawed theory of liability led it to present the jury with a defective damages model in which Skillz's expert Bergman failed

to evaluate a but-for world in which Papaya had not engaged in false advertising.

This argument reiterates arguments Papaya made in its motion for JMOL.  The motion for a new trial is denied for the reasons already given.  Papaya has not shown that the verdict was against the weight of the evidence or that a miscarriage of justice has occurred.

C.    Remittitur

Finally, Papaya moves for remittitur of the $420 million damages award.  Papaya suggests various alternative award amounts, including an award of one-third of that figure, or $140 million, and an award of $1.386 million, or 3.3% of the $420 million.

"Remittitur is the process by which a court compels a plaintiff to choose between reduction of an excessive verdict and a new trial."  Anderson Grp., 805 F.3d at 51 (citation omitted).

> Remittitur is appropriate in two situations: (1) where the court can identify an error that caused the jury to include in the verdict a quantifiable amount that should be stricken, and (2) more generally, where the award is "intrinsically excessive" in the sense of being greater than the amount a reasonable jury could have awarded, although the surplus cannot be ascribed to a particular, quantifiable error.

Id. (citation omitted).

Because the calculation of damages is to be done by the jury, the district court's role in reviewing a motion for remittitur "is limited to determining whether the award is so high as to shock the judicial conscience and constitute a denial of justice." Dancy v. McGinley, 843 F.3d 93, 113 (2d Cir. 2016) (citation omitted). The district court should "not vacate or reduce a jury award merely because [it] would have granted a lesser amount of damages." Id. (citation omitted). "In determining whether a particular award is excessive, courts have reviewed awards in other cases involving similar injuries, bearing in mind that any given judgment depends on a unique set of facts and circumstances." Scala v. Moore McCormack Lines, Inc., 985 F.2d 680, 684 (2d Cir. 1993) (citation omitted). The question is whether the verdict "lies within the reasonable range." Dancy, 843 F.3d at 113.

### 1.   Intrinsically Excessive Award

In support of remittitur, Papaya makes three arguments to support its claim that the damages award is intrinsically excessive. Each argument is addressed in turn.

Papaya first argues that the award is excessive in comparison to other false advertising awards. Papaya has located a trebled false advertising damages award in the Second Circuit of $527,000 and suggests that most false advertising

cases return damages awards in tens or hundreds of thousands of dollars, not millions of dollars.  It also identifies an out-of-circuit award of $271 million in damages, Monster Energy Company v. Vital Pharmaceuticals, Inc., No. 5:18cv-1882-JGB-SHK, ECF No. 890 (C.D. Cal Sept. 29, 2022), but contends that that case is not comparable.  Papaya argues that the jury award here of $420 million could only have occurred because the jury concluded that Papaya should not have entered the market or used bots, which Papaya contends is a conclusion that is "irrelevant" to its Lanham Act liability.

Papaya does not contend that there was any error in the jury charge regarding the standard the jury should apply in determining the amount of damages to award.  The jury was instructed that "Skillz must prove by a preponderance of the evidence that Papaya's unlawful conduct was the proximate cause of its damage" and that it may "not award damages to Skillz based on any other factors that caused harm to Skillz."

The jury's award does not shock the conscience when measured against that legal standard and the trial evidence. Skillz and Papaya were competing with each other in a new online industry where billions of dollars in revenue were available to the successful RMSB company.  Papaya's fraudulent conduct was extraordinary.  Papaya's false advertising concerned the very

nature of the only product that Papaya offered: its RMSB tournaments. By deceiving consumers through false advertising, the jury was entitled to find that Papaya usurped Skillz's consumer base and market share. Papaya's revenue skyrocketed while Skillz's plummeted. This occurred despite Papaya spending only a fraction on user acquisition compared to what Skillz had spent. The jury was entitled to find that Papaya's false advertising campaign both drove its successful entry into the market and inflicted hundreds of millions of dollars of damages on Skillz. While witnesses explained that many start-ups wait years to see a profit, it is nonetheless true that Skillz has yet to turn a profit and the jury was entitled to consider that as well in assessing the damages due to Papaya's false advertising. Papaya has cited no comparable case and therefore cannot rely on the Lanham Act awards in other cases to argue that the jury's award here was intrinsically excessive.

Papaya complains that Skillz presented no evidence of how many players saw the advertisements containing the false statements. But this is not an argument for remittitur of the jury's damages award. In any event, the statements at issue

38

appear throughout the Papaya advertisements introduced at trial, and Papaya failed to offer evidence to the contrary.[12]

Papaya next argues that the award of $420 million is excessive because it is four times Papaya's profits from 2020 to 2023, which were $122 million.  Even if it were appropriate to assess the reasonableness of Skillz's damages by the amount of Papaya's profit, the comparison that Papaya offers has several deficiencies.  It fails to account for Papaya's decision to reinvest revenue as it built its business and to consider the growth in Papaya's revenue.  During the years 2020 to 2023, Papaya reinvested almost $600 million of its revenue into its advertising.  Then, in 2024 and 2025, benefitting from the large user base that it had built through its false advertising and that reinvestment, Papaya's revenue increased further.  As explained elsewhere in this Opinion, the jury was entitled to find that confining an assessment of Papaya's financial success to only the very first years it entered the market would not fairly measure the impact of its false advertising campaign.

Finally, Papaya argues that the award is excessive because Bergman failed to disaggregate other causes of Papaya's success

---

[12] Skillz rightfully observes that Papaya's argument should be disregarded because it failed during discovery to provide the very data that it now complains Skillz should have introduced at trial.

and Skillz's decline, such as Papaya's superior graphics and bot use by other competitors.  But the jury reduced by one-third Bergman's calculated damages, suggesting that it carefully weighed each of Papaya's arguments and the evidence.  Papaya then pivots and argues that in reducing Bergman's calculation the jury must have used the more conservative enterprise multiplier of 2.7 which Papaya argued should be applied, instead of the multiplier of 4.1 that Bergman applied, and that demonstrates that the reduction was still inflated since it does not account for additional factors.  This argument falls flat. There is no reason to find that the jury ignored any of the evidence or Papaya's arguments.  At bottom, Papaya has not shown that it is entitled to remittitur on the basis that the jury erred in weighing evidence or that the award is intrinsically excessive.

2.   Attacks on Bergman's Damages Model

Papaya next offers a critique of Bergman's damages model. None of these challenges warrants remittitur.

First, Papaya asserts that the damages award must, as a matter of law, be proportional to the extent of consumer confusion and materiality.  In making this argument, Papaya relies on awards in trademark cases in which this Court considered the extent of consumer confusion shown in surveys in

40

awarding the plaintiff either its lost profits or the defendant's profits.  River Light V, L.P. v. Lin & J Int'l, Inc., No. 13CV3669 (DLC), 2015 WL 3916271, at *8 (S.D.N.Y. June 25, 2015); Volkswagen Aktiengesellschaft v. Uptown Motors, No. 91CV3447 (DLC), 1995 WL 605616, at *2 (S.D.N.Y. July 13, 1995). Papaya's reliance on these trademark cases fails.  In Volkswagen, the plaintiff did not have proof that it was damaged by the defendant's violation of its trademark rights and elected to seek disgorgement of the defendant's profits.  To calculate what percentage of the defendant's revenue could be attributed to the infringing conduct, the Court relied on a confusion survey offered by the plaintiff.  Id.  Here, Skillz has evidence of injury to its entire business and seeks damages as well as disgorgement.  In River Light, the plaintiff sought its own lost profits as a measure of its damages, using its own confusion survey as a measure of that loss.  2015 WL 3916271, at *7. Neither of these cases suggests that enterprise value damages are inappropriate, much less that such damages should be calculated by using consumer survey results.

Papaya next argues that Bergman improperly calculated the two companies' PMAU, a component of his calculation of the Ratio between their user acquisition spending.  Papaya complains that Bergman did not calculate Papaya's PMAU by averaging the two

figures -- Papaya's data for January 2021 and October 2022 -- that he used to project Papaya's year-end PMAU values. Papaya notes that, in contrast, Bergman did average the Skillz monthly data for each year. As Bergman explained, however, he extrapolated Papaya's PMAU from the only two data points for Papaya he had been given, while he had monthly data for Skillz that could be averaged.[13] He explained that estimating and then averaging Papaya's monthly PMAU numbers would have been imprecise and that he did not know whether that estimation would have resulted in higher or lower PMAU numbers for Papaya given the scarcity of the data.[14] This issue was actively litigated before the jury. Papaya's expert Orszag admitted that Bergman's extrapolation from Papaya's two data points was "an acceptable way" of projecting year-end PMAU numbers for both years, but explained why it was better, in his view, to project and then

---

[13] Papaya did not produce any other PMAU data during the discovery period.

[14] Bergman averaged the monthly PMAU data he had for Skillz to calculate its average PMAU values for the years 2019 and 2020. For Papaya, he extrapolated PMAU values using a linear PMAU growth rate from January 2021 to December 2022 using the two data points from January 2021 and October 2022. He then used the projected year-end PMAU (i.e., for December 2021 and December 2022) as the PMAU value for those respective years. For both companies, he averaged the two year-end PMAU figures he had calculated for that company to calculate his final PMAU for each party.

average monthly PMAU numbers from the two Papaya datapoints.  It bears noting that Orszag did not present his own methodology for calculating the damages incurred by Skillz.  The jury was entitled to weigh the experts' testimony and to reject Papaya's argument, which it apparently did.[15]  This argument does not suggest that a remittitur is appropriate.

Papaya next asserts that Bergman's damages model is inflated because he used Papaya's revenue in 2025, which was two years after Papaya stopped employing bots as players in tournaments.  According to Papaya, this confirms that Bergman was improperly measuring the effect of Papaya's bot use and not the effect of its false advertising.  As explained above, in calculating the actual damages that Skillz incurred due to Papaya's false advertising, Bergman calculated its loss in enterprise value by multiplying Papaya's "additional" revenue in 2025 by Skillz's market share of 39% in 2021, the year in which Papaya entered the RMSB market.  Bergman testified that Skillz's lost enterprise value as of 2025 was $637.5 million.

There was credible evidence at trial that Papaya benefitted from the network effects of its false advertising even after Papaya ceased using bots to fill and control tournaments.  In

---

[15] While the jury reduced the damages Skillz requested, it did not reduce the requested disgorgement amounts, each of which also depended on use of the Ratio.

43

other words, there was evidence that Papaya was generating revenue in 2025 by running tournaments for the player base that it had built while engaging in false advertising.  According to Bergman, his model captured that ongoing harm to Skillz.

Papaya asserts that even if there was some residual benefit in later years, that benefit would have ceased long before 2025 and that "advertising has no analogous carry-forward effect once the alleged mismatch between the advertising and the product no long exists."  This argument misapprehends the nature of the service Papaya sold through the false advertising.  The trial evidence showed that the goal of Papaya's false advertising campaign was to entice customers who would repeatedly play on its platform and thereby to build a liquid player base and create a network effect that would keep and attract customers. The goal of the advertising was not to sell a single product at one point in time in a unique transaction.  Accordingly, the jury was entitled to find that the impact of the false advertising scheme would reverberate after the advertising had ceased to be false.  Indeed, Orszag, Papaya's damages expert, testified that the number of Papaya's tournaments fell only 20% after it turned off the bots, suggesting that Papaya continued to benefit from the liquidity it had built through its false advertising.

Papaya contends Bergman erred in using Skillz's market share of the RMSB industry as of June 2021 -- 39% -- in his damages calculation.  Papaya argued at trial that the correct market against which to measure Skillz's market share was not the RMSB market but a multi-billion dollar market that included video entertainment, music entertainment, social networking and other forms of leisure, and therefore included the markets in which Sony, Amazon, Meta, Apple and Alphabet, among others operated.  Papaya calculated that Skillz's share of that relevant market was just 1.3%, which would have dramatically reduced Bergman's calculations and, according to Papaya, reduced the jury's award to 3.3% of the amount it awarded.  Papaya's expert Orszag, however, did not conduct a relevant market analysis to support this contention.  Moreover, this was another issue that was vigorously contested at trial.  For instance, Skillz pointed to evidence that Papaya's internal documents described its market as the RMSB market and measured itself against Skillz in calculating its market share of that market. Skillz's former Chief Strategy Officer, Chafkin, explained that the RMSB market was a zero-sum market in which one competitor's gain in users equated to losses in users by other RMSB companies.  The jury was entitled to reject the relevant market

45

argument on which Papaya relied at trial and presses again here. Its argument does not provide a basis for a remittitur.

Lastly, Papaya asserts that it is entitled to a remittitur because Bergman failed to account for the fact that Skillz shares 50% of its revenue with its developers.  At trial, Skillz's Chafkin explained that the developers' effective revenue share was roughly 7%.  Skillz's expert Bergman explained that he reviewed revenue sharing agreements and found that, due to their different formulas, they ultimately had effective developer-revenue-share rates of between 2 and 8%.  Bergman also explained the several ways in which his calculation of actual damages had been conservative.  For his part, Papaya's expert Orszag noted that the sharing of revenue with a developer is a cost to a business.  He did not offer, however, a competing quantitative analysis of the effective revenue-share rate or a competing damages model.  This issue was litigated before the jury and Papaya has not shown an error that entitles it to a new trial or remitter of the damages award.

In sum, Papaya's motions for JMOL or a new trial or a remittitur are denied.  The evidence at trial amply supported the jury's verdict on liability and its award of damages. Papaya has not shown that the verdict was against the weight of the evidence or unreasonable.

46

II.  Skillz's Motions

Papaya's attacks on the verdict having failed, the Opinion will now address Skillz's requested relief.  It seeks disgorgement of Papaya's unlawfully-obtained profits, an enhancement of that award, attorney's fees, prejudgment interest, and costs.  These requests are addressed in turn. Skillz's request for an injunction is addressed in a separate Opinion.

A.    Disgorgement and Request for Enhanced Monetary Relief

The issue of disgorgement was submitted to the jury for it to render an advisory verdict.  See Skillz Platform Inc. v. Papaya Gaming, Ltd., No. 24CV1646 (DLC), 2026 WL 812016 (S.D.N.Y. Mar. 23, 2026).  It is within the district court's discretion whether "to accept or reject, in whole or in part, the verdict of the advisory jury."  Ragin v. Harry Macklowe Real Est. Co., 6 F.3d 898, 907 (2d Cir. 1993) (citation omitted).

Skillz pursued two alternative theories of disgorgement at trial: Papaya's profits and Papaya's cost savings.  The jury returned an advisory verdict of $719 million on the former and $652 million on the latter.  Skillz requests that the Court double the disgorgement-of-profits amount of $719 million.  It alternatively requests that the Court treble the $420 million

47

damages award.[16]  For the following reasons, the Court adopts the jury's advisory verdict and awards disgorgement in the amount of $719 million.  Skillz's request to enhance that award to over $1.4 billion is denied.

          1.   Legal Standard

Section 35 of the Lanham Act authorizes, "subject to the principles of equity," recovery of "(1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action."  15 U.S.C. § 1117(a).  "Even when a plaintiff cannot quantify its losses with sufficient certainty to recover damages, it may still be entitled to . . . disgorgement of the defendant's ill-gotten profits under § 1117(a)."  Lexmark, 572 U.S. at 135–36.

There are three theories under which a district court may enter an award of a defendant's profits under § 35 of the Lanham Act: "(1) unjust enrichment, (2) compensation, and (3) deterrence."  Merck, 760 F.3d at 262 (citation omitted).  "The deterrence rationale is not compensatory in nature, but rather seeks to protect the public at large."  Id. at 261 (citation omitted).  The profits a defendant reaped from its unlawful conduct need not be calculated with mathematical certainty.

---

[16] Skillz does not move to enhance damages under the GBL, which only permits enhancements up to $1,000.  GBL § 349(h) (2024 version).

Louis Vuitton S.A. v. Spencer Handbags Corp., 765 F.2d 966, 973
(2d Cir. 1985).  See Restatement (Third) of Restitution and
Unjust Enrichment § 51 (2011) (As long as one of the three
rationales for awarding disgorgement is met, the plaintiff need
not prove that the "defendant's wrong is the exclusive or even
the predominant source of the defendant's profit.").

Whatever theory supports the award of a defendant's
profits, however,

> a district court must still balance equitable factors
> in assessing the propriety of a profits award.  These
> include, but are not limited to: (1) the degree of
> certainty that the defendant benefited from the
> unlawful conduct; (2) the availability and adequacy of
> other remedies; (3) the role of a particular defendant
> in effectuating the infringement; (4) any delay by
> plaintiff; and (5) plaintiff's clean (or unclean)
> hands.

4 Pillar Dynasty LLC v. New York & Co., Inc., 933 F.3d 202, 214
(2d Cir. 2019).  A district court must assess the relative
importance of these factors and determine whether, on the whole,
"the equities weigh in favor of" disgorgement.  George Basch Co.
v. Blue Coral, Inc., 968 F.2d 1532, 1540 (2d Cir. 1992).  While
"a defendant's mental state is relevant to assigning an
appropriate remedy," it is nonetheless true that a finding of
the defendant's willful intent is not a precondition for
awarding disgorgement.  Romag Fasteners, Inc v. Fossil, Inc.,
590 U.S. 212, 219 (2020) (abrogating willful intent

49

requirement).  Nor is actual consumer confusion a prerequisite to an award of a defendant's profits.  4 Pillar, 933 F.3d at 212.  A court should, however, "fashion a remedy that may sufficiently deter willful misconduct without giving plaintiffs a lottery-level windfall."  Id. at 214.

Finally, a plaintiff seeking compensation "for the same injury under different legal theories is only entitled to one recovery."  US Airways, Inc. v. Sabre Holdings Corp., 938 F.3d 43, 67 n.10 (2d Cir. 2019) (citation omitted) (antitrust).  Consequently, Skillz may not recover both its damages and Papaya's profits if that relief would overcompensate Skillz for its injury.  See also 5 McCarthy on Trademarks and Unfair Competition § 30:73 (5th ed.).

The Lanham Act also provides for enhancements of an award to a plaintiff.  15 U.S.C. § 1117(a).  "In assessing damages the court may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount."  Id.  An award disgorging a defendant's profits may also be enhanced.

> If the court shall find that the amount of the
> recovery based on profits is either inadequate or
> excessive the court may in its discretion enter
> judgment for such sum as the court shall find to be
> just, according to the circumstances of the case.
> Such sum in either of the above circumstances shall
> constitute compensation and not a penalty.

Id.  Under principles of equity, enhanced monetary relief is warranted when the enhancement reflects the "intangible benefits" that accrued to the defendant as a result of its false advertising, and in particular, the defendant's "usurpation of [the plaintiff's] market share."  Merck, 760 F.3d at 263 (citation omitted).

2.    The Disgorgement Award

Through its advisory verdict, the jury awarded Skillz $719 million in Papaya's profits.  That award was amply justified by the trial evidence and will be adopted as the amount to be awarded in this judgment, in addition to certain attorney's fees and costs.

The award of $719 million is principally justified by the need to prevent Papaya's unjust enrichment.  It will also compensate Skillz for the injury it incurred from Papaya's false advertising in violation of the Lanham Act and GBL.  The third factor that supports a disgorgement of a wrongdoer's profits, the need to deter the wrongdoer from future illegality, is less relevant.  While this award will help to deter other companies that may be inclined to enter a market with false advertising about the essential nature of its product, Skillz has not shown that disgorgement is necessary to deter Papaya from engaging again in false advertising regarding the composition of its

51

tournaments.[17]  It appears that Papaya largely ceased its false advertising in late 2023 by discontinuing the use of bots in its tournaments and there is no realistic possibility that Papaya will return to its false advertising campaign now that the unlawful advertising has been publicly revealed and addressed in this judgment.

Skillz has shown that equity requires that Papaya be deprived of the profits it achieved through its intentional multi-year violation of the laws against false advertising.  Its successful entry into the RMSB market with a relatively small investment and its swift growth to become a major participant in that market was achieved through a years-long scheme to deceive consumers, as well as others, about the core features of its product.  Instead of disclosing that it would use bots to achieve instantaneous player liquidity and to motivate losing players to enroll in more tournaments on its platform, it falsely advertised its games in terms that conveyed -- in multiple ways -- that human beings would compete with each other

---

[17] The Court is aware that Papaya continues to deny that it used false advertisements.  For instance, in arguing that Papaya's violation of the Lanham Act was not willful, Papaya's brief in opposition to Skillz's motion for disgorgement asserts that "Papaya did not use false advertisements to gain entry into the market; Papaya's advertisements were not 'the result of a deceptive and willful decision to induce customers.'"

in Papaya's cash tournaments and that their individual skill would fairly determine the outcome.

Depriving Papaya of the profits it obtained unfairly from this deceptive and unlawful advertising campaign is justified by each the relevant equitable factors.  Those factors are addressed next.

It cannot be fairly disputed that Papaya reaped enormous profits from its false advertising scheme.  Without its false advertising, it could not have entered the U.S. market or swiftly achieved its significant market share and the billions of dollars in revenue that came with that market share. Certainly, Papaya's relatively modest financial investment in its start-up business did not explain its explosive growth and Papaya did not suggest at trial that it could or that it did. Even large, deep-pocketed U.S. companies that had contemplated entering the market to compete with Skillz, which had already achieved a network effect, decided against doing so.

While an award of Skillz's loss in enterprise value, which the jury determined was appropriately calculated as $420 million, is available as a remedy, equity weighs in favor of depriving the wrongdoer of the benefits of its illegal scheme. Papaya is still a substantial player in the market and, because players tend to stay on a platform with which they are familiar,

the impact on Skillz of Papaya's wrongdoing will continue for the foreseeable future.

As for the role of Papaya in effectuating the scheme, that factor also weighs strongly in the award of Papaya's profits to Skillz.  The false advertising program was run and controlled by the executives who founded and managed Papaya.  These executives actively controlled Papaya's response to consumers who came to suspect, despite the representations in its advertising, that Papaya was running cash tournaments in which players "competed" against bots and not human beings.  Even when Skillz sued Papaya, they did not forthrightly admit their employment of bots but required Skillz to expend significant resources and energy to prove that that had been so and the degree to which it had been done.

There has been no unreasonable delay by Skillz in asserting its claims against Papaya that could weigh against this disgorgement of Papaya's profits.  While Skillz came to suspect and then believe in 2023 that Papaya's success was due to its false advertising and employment of bots, Skillz was entitled to sufficient time to develop the reasonable grounds necessary to plead its claim in federal court in early 2024.  Since that filing, Skillz has proceeded with diligence to prosecute this lawsuit, despite Papaya's strategy of making Skillz's assembly

54

of the proof of its claims difficult and expensive.  Skillz Platform Inc. v. Papaya Gaming, Ltd., No. 24CV1646 (DLC), 2026 WL 915251, at *1 (S.D.N.Y. Apr. 3, 2026) (Fifth Amendment Privilege Opinion); Papaya Gaming, Ltd. v. Fair Play for Mobile Games, No. 25CV5573 (DLC), 2026 WL 558698, at *14 (S.D.N.Y. Feb. 27, 2026) (imposing sanctions against Papaya and its counsel for filing dismissed counterclaims in Virginia).

Finally, there is no evidence that Skillz has unclean hands.  To the contrary, because Skillz did not use bots as "players" to create liquidity in its tournaments, its tournaments were largely confined to two-player tournaments. While Papaya tried to cobble together a theory that Skillz's conduct -- in managing the system by which players of similar skill were matched in tournaments -- constituted unclean hands, that theory did not survive scrutiny.  See Skillz Platform Inc. v. Papaya Gaming, Ltd., No. 24CV1646 (DLC), 2025 WL 438387, at *13 (S.D.N.Y. Feb. 7, 2025) (dismissing certain counterclaims); Skillz, 2025 WL 918411, at *7 (S.D.N.Y. Mar. 26, 2025) (denying motion for leave to file further amended counterclaims); Skillz, 2025 WL 3268799, at *7 (S.D.N.Y. Nov. 21, 2025) (granting summary judgment to Skillz on Papaya's counterclaims); Papaya Gaming, Ltd. v. Fair Play for Mobile Games, No. 25CV5573 (DLC), 2026 WL 558698, at *14 (S.D.N.Y. Feb. 27, 2026) (imposing

sanctions against Papaya and its counsel for filing dismissed counterclaims in Virginia).

Weighing each of these factors, and considering the evidence presented at trial, a disgorgement award of $719 million to reflect Papaya's illegally obtained profits and to compensate Skillz is amply justified.  Skillz's request for an enhancement of the disgorgement award of $719 million or alternatively an enhancement of the damages award of $420 million, however, is denied.

Skillz is correct that through Papaya's violation of the Lanham Act, Papaya usurped Skillz's market share and that the amount awarded in disgorgement could be properly enhanced under the law.  See Merck, 760 F.3d at 263.  As an exercise of the Court's discretion, however, no enhancement will be made.  The magnitude of the award that will be given here is sufficient to meet each of the equitable factors a court must weigh, including when those factors are weighed together.

If no disgorgement award were available, however, the Court would enhance the actual damages award by doubling it (but not by tripling it as Skillz requests).  The actual damages awarded by the jury in the amount of $420 million would be enhanced to $840 million.

As was true in <u>Merck</u>, the fact of actual damage to Skillz cannot be fairly disputed; it was severe but hard to quantify. The jury discounted by one-third the request made by Skillz for the award of $637.5 million, which Bergman calculated was the amount of Skillz's lost enterprise value as of the end of 2025. An enhancement of the jury award of $420 million would be appropriate for several reasons, including the following.  The damage inflicted by Papaya on Skillz included a loss in revenue and market share which will last into the foreseeable future. Papaya has created its own network effect and no longer requires its undisclosed use of bots and false advertising to remain the dominant RMSB business that it has become.  Moreover, the changes within Skillz in 2023 and thereafter, such as its reduction in user acquisition expenditures and its executive turnover, which Papaya was apparently successful in arguing should offset the Bergman calculation of lost enterprise value, could have just as properly been disregarded.  The evidence suggested that these changes were themselves tied to Papaya's false advertising.  Skillz had studied why it was losing ground to Papaya despite the very hefty expenditures it had made to build its user population.  It looked at Papaya's advertising and found no explanation there.  It compared aspects of its platform and marketing to Papaya's and again found no adequate

explanation.  The evidence at trial, however, revealed that Papaya's explosive growth was due to false advertising and the liquidity achieved through that advertising and its undisclosed use of bots.

Because the disgorgement award of $719 million is sufficient to meet the relevant equitable concerns, however, it is that amount that will constitute the judgment.  Papaya makes several arguments in opposition to the disgorgement of its profits in the amount of $719 million.  None succeeds in showing that Papaya should not be required to disgorge that amount, as representing its wrongfully-obtained profits.

Papaya begins by reasserting arguments that have been discussed above and rejected.  Papaya argues that Bergman's calculation of its profits is unreliable since he measured its profits from its use of bots and not from the advertisements that the jury found to be false.  Papaya argues that it would have made the profits that Skillz seeks to disgorge even if it had never made the false statements in its advertising.  Not so.  Skillz demonstrated conclusively at trial that these two issues are inextricably intertwined.  Skillz could not have successfully entered the market with its relatively modest investment, much less have made billions of dollars in revenue, without the use of bots, and it could not have used those bots

58

as "players" in its tournaments without its program of false advertising. Papaya's effort to disentangle these issues is rejected.

Similarly, Papaya again argues that Bergman constructed the wrong but-for world. It argues that he should have assumed that Papaya had used bots as it did but did not make the false statements in its advertisements. As explained supra, that argument is fundamentally flawed. Papaya did not explain to the jury or in this briefing what such advertisements might have looked like. In contrast, Skillz presented an abundance of evidence to show that any truthful description by Papaya of its use of bots in its cash tournaments would have doomed Papaya's entry into the market. There was unrefuted evidence at trial that Papaya was required to describe its product as skill-based and fair, and to distinguish it from gambling to get access to the U.S. market.

Papaya next attacks the model Bergman used to calculate the disgorgement of Papaya's "additional" profits gained from its false advertising. That model is as follows. To calculate the profits that Papaya earned from its false advertising, Bergman modeled a but-for world. He first calculated the amount that Papaya spent to acquire a paying monthly average user ("PMAU"),

59

which was $297.[18]  He then calculated Skillz's PMAU as 2.1 times that amount.  Bergman designated that 2.1 figure as the User Spend Ratio or Ratio.  Applying the 2.1 Ratio to Papaya's total revenue of roughly $2.1 billion from 2020 through 2025, Bergman calculated that Papaya's but-for revenue without the use of bots would have been $731 million, making a difference of $1.34 billion in revenue.  Deducting certain costs from the $1.34 billion, Bergman concluded that Papaya's profit from its false advertising was $719,003,023, which the jury apparently rounded to $719 million when it awarded disgorgement of Papaya's profits.

Papaya first argues that Skillz failed to show that the Ratio of 2.1 had anything to do with Papaya's bot use.  It contends that reliance on the Ratio ignores the multiple factors that could have made Papaya's expenditure on user acquisition more efficient than Skillz's, such as the better quality of Papaya's games, its better marketing, its excellent user interface, its well-regarded brand and effective social media presence, in contrast to Skillz's deficient performance on each of these metrics.  Papaya emphasizes that Skillz cut its historically hefty user acquisition spending in 2022, in 2023,

---

[18] Papaya's attack on Bergman's PMAU calculation is addressed <u>supra</u>.

and again in 2024, which coincided with a substantial reduction in Skillz's revenue over those years.  Each of these arguments was made to the jury and Skillz responded to each of them with its own evidence and arguments.  Skillz's evidence included testimony from its executive about the futile efforts it made to try to understand why it could not compete effectively against Papaya.  Teams at Skillz and its consultants tested the apparent differences between the Skillz and Papaya platforms and could not identify a difference that accounted for Skillz's declining market share.

In sum, Papaya failed to show at trial that the 2.1 Ratio was not a reliable metric to use when calculating the "additional" revenue that Papaya made through its false advertising.  The evidence was overwhelming that Papaya was able to reach, in its own words, "hyper-growth" within a year.  Papaya attributed its "exponential" revenue growth to its "very liquid ecosystem," a not-so-veiled reference to its extensive use of bots to create player liquidity.

Papaya next challenges Bergman's use of its revenue in 2024 and 2025 to calculate the profits that should be disgorged, instead of restricting the calculations to its revenue in the years 2020 through 2023.  It emphasizes that it ceased using bots to create liquidity in cash tournaments in November of

61

2023.  The revenue from those first three years was just under $1 billion, as opposed to over $2 billion over the course of the five-year period.  This argument carries little weight. Notably, Papaya did not argue at trial that it did not continue to benefit in 2024 and 2025 from the players it acquired through its multi-year false advertising and employment of bots before 2024.  Restricting disgorgement of Papaya's wrongful profits to just those years in which it employed bots would result in a massive understatement of both the benefit of the false advertising to Papaya and the injury to Skillz.

Papaya argues that Bergman should also have deducted even more than he did from Papaya's revenue to arrive at a profit figure.[19]  Papaya argues that Bergman failed to deduct its operating expenses, R&D expenses, sales and marketing expense, and general and administrative costs.  Even though the burden to identify deductible expenses rests on a defendant, Bergman made certain deductions in his disgorgement calculation and Papaya did not contend at trial that Bergman failed to deduct fewer expenses than he should have.  The Court will not undertake such an examination now.  While its brief in opposition to the award

---

[19] Bergman subtracted 54% of Papaya's revenue to account for its costs or $621 million from the $1.3 billion in additional revenue to arrive at an additional profit figure of $719 million.

of disgorgement lists a few documents that reflect expenses that it would now like to have deducted from Bergman's calculation, any fair assessment of that data and this request would require a bench trial.  Reliable fact-finding at that trial would be complicated by Papaya's failure to produce certain relevant financial data in discovery.  Such an undertaking though is unnecessary.  Skillz is not required to prove the disgorgement amount with precision, and the record amply supports the magnitude of the amount of disgorgement awarded by the jury.

As a final attack on Bergman's calculation, Papaya argues that any disgorgement amount should be reduced by 13% to remove non-U.S. revenue.  The Lanham Act is not extraterritorial. Abitron Austria GmbH v. Hetronic Int'l, Inc., 600 U.S. 412, 415 (2023).[20]  Skillz has the burden to show therefore that Papaya's U.S. revenue is used in the disgorgement calculation.  Papaya's audited financial statements, which were introduced at trial, did not disaggregate U.S. sales from foreign sales.

To prove that its revenue should be reduced by 13%, Papaya relies on a single graphic in a single document: a January 2023

---

[20] At Skillz's request during the charging conference, the Court removed from its jury charge language in the instruction that, to obtain an award of Papaya's profits, Skillz must show the amount of revenue from Papaya's sales "in the United States" that was proximately caused by the unlawful conduct.  The Court explained that that issue affected only the disgorgement calculation and had not been discussed before the jury.

PowerPoint presentation prepared by a third-party for Papaya, apparently to entice investors. (As of that time, Papaya was still engaged in false advertising in the United States.) The presentation disclaims that it is an "audit or due-diligence review"; it warns that the author does not give "any representation or warranty, express of implied, as to the accuracy or completeness of the information" in the document. The document states that there is an opportunity to invest in Papaya, which is "the only scaled profitable skill gaming business." The document repeatedly compares Papaya to Skillz, projecting that Skillz's market share would continue to decline and Papaya's would continue to grow. It represents that Papaya only operates in jurisdictions where its games are legal and not subject to license, "including in the US". At page ten, where the graphic at issue appears, the document explains that Papaya is well positioned to expand, including into new territories. The graphic represents that Papaya's gross non-U.S. revenue grew from the third-quarter of 2020 to the third-quarter of 2022 from 5% to 13%.

No adjustment to the $719 million disgorgement figure is necessary. It is undisputed that the U.S. was Papaya's target market when it began its RMSB business and that all but a fraction of Papaya's revenue has been derived over the years

64

from U.S. customers who paid to participate in its cash tournaments.  Papaya denied Skillz access during the discovery period to relevant information that Skillz sought, including the information that would permit Skillz to accept the representation in this graphic, to dispute it, or to place it in context.[21]  Papaya has not offered any other document to show whether its percentage of foreign revenue remained at 13%, increased, or declined over the period following the third-quarter of 2022.  Given this record, there is no need to adjust the disgorgement figure, which in any event need not be proven with precision.

Papaya makes several other arguments to suggest that a disgorgement award of $719 million is excessive.  First, it contends that the disgorgement award should be reduced by about 70% to reflect an absence of consumer confusion.  Papaya reaches this figure by cobbling together some of the responses given in Skillz's consumer confusion and likelihood surveys.[22]  Papaya has

---

[21] At the charging conference, Skillz noted that it had no information on how the 13% number was derived, including whether it reflected foreign nationals playing Americans in Papaya tournaments.

[22] Papaya multiplies the 45.8% of consumers who believed, upon viewing a compilation of statements from Papaya advertising, that Papaya's games would involve only human players, with the 66.8% of players who answered that they would likely stop playing if they learned that their opponents were bots.  From

not shown that the disgorgement of its illegally obtained profits should be reduced because of the Skillz survey numbers. Without the false advertising, Papaya would not have been able to enter the market or make any profit.  The principles which dictate that Papaya be deprived of its unjust enrichment and that Skillz be adequately compensated for its losses do not support a reduction in the award of $719 million.

Papaya contends that its net operating profit of $122 million[23] for the years 2020 through 2023 is the proper starting point for any disgorgement analysis.  As described above, Bergman's calculation of the amount of Papaya's profits that should be disgorged began with a calculation of Papaya's revenue, not its net operating profit, and included the revenue for the years 2020 through 2025, not just the first three years of its operations.  Despite Papaya's efforts at trial, the jury accepted Bergman's analysis and rejected Papaya's arguments for reducing the disgorgement award.  The jury's conclusion was well supported by the record.  As Skillz points out, it appears that Papaya chose to increase its market share as quickly as possible

---

this multiplication, it argues that only about 30% of players would have been affected by bots.

[23] Generally speaking, net operating profit is calculated by subtracting operating expenses and the cost of goods sold from revenue.

by reinvesting the bulk of its profits into its business.  That decision suggests that Bergman was correct to use Papaya's revenue (as opposed to its net operating profit) as the starting point for his disgorgement calculation.  And, as already discussed above, it was appropriate to include Papaya's revenue from 2024 and 2025 when measuring the unlawful profits that Papaya accrued due to its multi-year false advertising campaign during the years 2020 through 2023.  An award of $719 million therefore properly reflects the magnitude of the benefit that Papaya improperly received from its false advertising campaign.

Turning to issues of equity, Papaya contends that the award of damages in the amount of $420 million, or even a lesser amount, would be sufficient not only to compensate Skillz but also to prevent unjust enrichment.  To support this argument, Papaya asserts that Skillz's loss of users and revenue were not tied directly to the gains made by Papaya in users and revenue.[24]

---

[24] For example, Papaya points out that when it stopped using bots at the end of 2023, the number of its tournaments declined but Skillz did not see any increase in users of its platform.  Of course, a decline in the number of tournaments, when Papaya was no longer using "liquidity bots" to instantaneously fill tournaments, does not necessarily mean that Papaya experienced a decline in its user base or market share.  There was evidence at trial that users tend to stay with the platform that they know and no evidence that Papaya lost any users.  Papaya also points to Skillz's decline in revenue in 2023 and 2024.  The multiple potential reasons for that decline were the focus of significant testimony and argument at trial.  While those reasons could appropriately account for a reduction in the damages awarded by

67

That assertion does not withstand scrutiny.  There can be no doubt that through its false advertising, Papaya entered the RMSB market and in lightning speed took market share from Skillz.  Papaya's user base, revenue and market share grew by leaps and bounds during the years of its false advertising.  It will benefit for the foreseeable future from the massive user base it created during the years 2020 to 2023.  A disgorgement in the amount of $719 million is amply supported by the trial record to prevent Papaya's unjust enrichment.

B.    Attorney's Fees, Prejudgment Interest, and Costs

Finally, Skillz requests approximately $16.6 million in attorney's fees, $173.5 million in prejudgment interest, $1.94 million in costs, as well as post-judgment interest.[25]  Skillz's request is granted in part.

1.    Attorney's Fees

The Lanham Act provides that "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party."  15 U.S.C. § 1117(a).  "[A]n 'exceptional' case is

---

the jury, those reasons do not suggest that the amount of the disgorgement award determined by the jury should be adjusted. The disgorgement award properly accounted for Papaya's unjust enrichment.

[25] Papaya does not oppose Skillz's request for post-judgment interest.

simply one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated." Sleepy's LLC v. Select Comfort Wholesale Corp., 909 F.3d 519, 530 (2d Cir. 2018) (quoting Octane Fitness, LLC v. ICON Health & Fitness, Inc., 572 U.S. 545, 554 (2014)).

In deciding whether a case is "exceptional," courts should "evaluate the totality of the circumstances, [and] consider[] a wide variety of factors, including frivolousness, motivation, objective unreasonableness (both in the factual and legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence." Sleepy's, 909 F.3d at 530 (citation omitted). Exceptional circumstances may include "willful infringement" and bad faith, both with respect to the infringing conduct and the conduct of the litigation process. Merck, 760 F.3d at 265 (citation omitted). In Merck, the Court of Appeals affirmed an award of attorney's fees where the defendant's false advertising was willful and done in bad faith and the defendant's "litigation strategy was conducted in bad faith, with senior officials, including [the CEO], frustrating the litigation process at every turn, from withholding documents in discovery and obstructing

69

depositions to testifying falsely under oath." Id. at 265 (citation omitted).

Under the GBL, "[t]he court may award reasonable attorney's fees to a prevailing plaintiff." GBL § 349(h) (2024 version). Factors to consider when awarding reasonable attorney's fees include the "time and skill required in litigating the case, the complexity of issues, the customary fee for the work, and the results achieved." Riordan v. Nationwide Mut. Fire Ins. Co., 977 F.2d 47, 53 (2d Cir. 1992) (applying New York law).

When a court awards attorney's fees, the familiar lodestar method is used as the starting point for calculating a "presumptively reasonable fee." Millea v. Metro-N. R. Co., 658 F.3d 154, 166 (2d Cir. 2011) (citation omitted). Calculating the lodestar requires "determining a reasonable hourly rate by considering all pertinent factors . . . and then multiplying that rate by the number of hours reasonably expended." Lilly v. City of New York, 934 F.3d 222, 230 (2d Cir. 2019).

The calculation of attorney's fees "should not result in a second major litigation," because "[t]he essential goal in shifting fees . . . is to do rough justice, not to achieve auditing perfection." Fox v. Vice, 563 U.S. 826, 838 (2011) (citation omitted). Therefore, a court "may take into account [its] overall sense of a suit" in imposing a fee award, "and may

use estimates in calculating and allocating an attorney's time."
Id.

Skillz seeks an award of roughly $16.6 million in attorney's fees incurred in this litigation through the end of the trial. It requests an additional award of the fees incurred from this post-trial motion practice. The motion is granted, but only for the period through December 31, 2025, which will apparently reduce by roughly $6.5 million the requested amount of $16.6 million. Papaya does not dispute the lodestar calculation tendered by Skillz; it does dispute that any award of attorney's fees should be made.

This case is exceptional and fees are awarded under both the Lanham Act and the GBL. At its heart, this false advertising case revealed that Papaya entered the U.S. market through a massive deception. It falsely described its product to consumers, unfairly competed with Skillz, and lied to app stores, payment processors and others. There is ample evidence that Papaya acted willfully and in bad faith, a relevant but not controlling factor. As one example, taken from the document that Papaya's lawyers prepared to obtain access for Papaya to the services of payment processors,[26] Papaya understood that

---

[26] The record is silent on how Papaya described its platform to its attorneys.

online gambling for cash would violate both federal law and the laws of many States.  Therefore, the document is rife with false and misleading statements about the Papaya product.  In sum, Papaya's founders and executives willfully and intentionally created and controlled a scheme to profit from its deception of consumers and at the expense of a competitor like Skillz (who did not employ bots as players in its cash tournaments).  Given Papaya's wide-ranging and multi-year deception about its only product and its exploitation of that deception through its massive employment of bots, this case stands out from others. Skillz's proof of Papaya's liability is overwhelming whether assessed from either a legal or factual perspective. Consideration of Papaya's continued defense against a finding of liability as presented in its post-trial briefing does not alter that assessment.

This case is also exceptional because of the unreasonable manner in which Papaya litigated the case in 2024 and 2025. This litigation would have cost both the plaintiff and the defendant only a fraction of what it did in 2024 and 2025 if Papaya had complied forthrightly with its discovery obligations. Instead, Papaya slow-walked and obstructed the production of critical discovery material through the entire discovery period.

72

This strategy required persistence from Skillz,[27] imposed excessive litigation costs on both parties, and burdened the Court.  The ramifications of Papaya's strategy continues to ricochet through this litigation.  For example, during the presentation of the defense case, Skillz learned for the first time that Papaya had wrongfully redacted highly relevant passages from its documents by marking the material "nonresponsive," including pages that graphed such things as the number of Papaya's app store "installs" between 2020 and 2022, and its 2022 market share in comparison to Skillz.[28]

Skillz seeks this award of attorney's fees not only for Papaya's obstruction of discovery but also for Papaya's pleading of flawed counterclaims and some of Papaya's motion practice.  These aspects of Papaya's defense do not warrant a finding that

---

[27] Skillz's attorney Ms. Amy Nemetz was called upon repeatedly to demonstrate her impressive command of the record and discovery production in the many conferences with the Court in which Skillz sought documents and answers to interrogatories long after they were due.

[28] As described on the record on April 16, when Papaya gave notice that it would be offering DX 144 at trial, which was a highly redacted Papaya business record produced in discovery, Skillz asked for and received the unredacted version, which can be found as Court Exhibit 4.  DX 144 identified redacted material as "nonresponsive", even though it was highly responsive to Skillz's document demands.  The next day the Court was advised that Papaya would not seek to offer any of the redacted documents that appeared on its exhibit list for trial and would provide Skillz with unredacted copies of each of them.

this is an exceptional case for which an award of attorney's fees is warranted.  It is not unusual for defendants facing enormous damages awards to plead multiple counterclaims and engage in repetitive motion practice where its likelihood of success on those pleadings and motions is slim.  As Papaya phrases it, its defense was proportionate to its exposure.  But, while those pleadings and that motion practice do not merit an award of attorney's fees on their own, they also do not weigh against the award that will be granted here.

Accordingly, the Court will award the attorney's fees incurred by Skillz in 2024 and 2025.  This award is neither a punishment nor a penalty.  It is imposed under principles of equity for this exceptional case.  The Court declines, however, to award the attorney's fees Skillz incurred this year.  The award for the first two years of this litigation is sufficient to reflect the extraordinary nature of Papaya's violation of the law as well as its obstruction of the discovery process.  This year, Papaya changed counsel and the parties were largely involved in preparing for the April trial.  From any point of view, it was reasonable for Papaya to litigate the amount to be awarded in damages and that was largely the focus of the trial.

Skillz argues that some of the motions brought by Papaya in 2026, including the motion filed on the eve of trial to permit

its executives to withdraw their invocations of the Fifth Amendment privilege and to testify at trial, justify an award of fees incurred in 2026 as well.[29]  It is the Court's assessment that the award of attorney's fees for the first two calendar years of this litigation is sufficient to account for both the extraordinary nature and conduct of the litigation.

Papaya suggests that, should any fees be imposed, that the Court identify specific positions that it took during the pretrial period and calculate the fees associated with any "unreasonable" delay associated with those specific events.  It identifies roughly $800,000 associated with its reliance on the Hague Convention in 2024 to resist discovery and about $500,000 associated with its executives' invocation of the Fifth Amendment in 2025.  The Court will not undertake such a time-consuming task.  In any event, the exceptional nature of this litigation is associated with not just the defendants' obstruction of discovery, which caused undue delay, burden and expense, and deprived Skillz of relevant information.  The award

---

[29] For instance, Skillz also points to the fact that it had to respond to Papaya's efforts at trial to discredit Dr. Groehn's survey testimony for not relying on data when that data was not disclosed in discovery; Papaya's attempt to introduce evidence at trial related to Papaya's counterclaims, thus warranting a motion in limine; and, crucially, to Papaya's motion to supplement the expert opinion of Orszag after discovery had closed and summary judgment on the counterclaims had been granted.

of attorney's fees is also appropriate because of Papaya's willful, bad faith violation of the law through its false advertising scheme.

   2.    Prejudgment Interest

As for the prejudgment interest that may be awarded under the Lanham Act, the law "draws no distinctions between the showing required to support such an award and that required to justify an award of attorney's fees."  4 Pillar, 933 F.3d at 216.  Accordingly, such an award is "within the discretion of the trial court and is also normally reserved for 'exceptional' cases."  Id. at 215 (citation omitted).  The Court of Appeals has expressed its preference "for the district court to explicitly state its reasons for awarding prejudgment interest." Merck, 760 F.3d at 264 (citation omitted).

Skillz requests an award of prejudgment interest of over $173 million, assuming a $719 million disgorgement award.  That disgorgement award, as explained above, represents Papaya's unlawfully obtained profits as of December 2025.  The Court declines to award prejudgment interest.

Although this is an exceptional case from several perspectives, the award of attorney's fees is sufficient to address that exceptional nature.  Moreover, unlike a case with a straightforward calculation of damages that reflects an out-of-

pocket loss to a plaintiff at a specific point in time, or even a reasonable substitute for that loss, the award here is of the defendant's profits. The amount of disgorgement is calculated to deprive Papaya of its unjust enrichment. While disgorgement will also serve to compensate Skillz for the significant injury it suffered, in the Court's judgment it is not appropriate to award prejudgment interest on the disgorgement amount of $719 million and the Court declines to do so.

### 3. Costs

As stated above, "subject to the principles of equity," a Lanham Act plaintiff may recover "the costs of the action." 15 U.S.C. § 1117(a). The Court of Appeals for the Second Circuit has reviewed Lanham Act awards of the cost of litigation under the same standard for -- and in conjunction with -- the award of attorney's fees. See Merck, 760 F.3d at 265.

Skillz is awarded all costs incurred in 2025 that were associated with the invocation of the Fifth Amendment by the Papaya witnesses, including the costs of travel to London in connection with those depositions. While this is a fraction of the amount it seeks, it is sufficient in light of the award of attorney's fees to address the extraordinary nature of this litigation.

77

## Conclusion

Papaya's May 15, 2026 motions are denied.  Skillz's May 15, 2026 motions are granted in part.  Skillz is awarded a total of $719 million in disgorgement, its attorney's fees for 2024 and 2025, and the costs it incurred in 2025 from the invocation of the Fifth Amendment by the Papaya witnesses.

Dated:    New York, New York
          July 27, 2026

_____
DENISE COTE
United States District Judge